**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICALDEN INVESTMENTS S.A.                          :
                                                   :
                        Plaintiff,                 :
                                                   :
                      - against –                  :    Case No. 07 CV 2395 (VM)
                                                   :
OLGA ROSTROPOVICH, COOLEY GODWARD                  :
KRONISH LLP, RENEE SCHWARTZ, ATOOSA P.             :
MAMDANI, and MAHMOUD A. MAMDANI,                   :
                                                   :
                        Defendants.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )


### TRANSMITTAL AFFIDAVIT OF DAVID PARKER IN SUPPORT OF MOTION BY DEFENDANTS COOLEY GODWARD KRONISH LLP AND RENEE SCHWARTZ TO DISMISS THE COMPLAINT

**DAVID PARKER**, being duly sworn, deposes and says:

I am a shareholder and director of Kleinberg, Kaplan, Wolff & Cohen, P.C.,

attorneys for defendants Cooley Godward Kronish LLP and Renee Schwartz. I respectfully

submit this affidavit in support of the motion by those defendants, pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the complaint filed by plaintiff

Micalden Investments S.A.; and in order to transmit the following exhibits:

Exhibit A – Micalden's Complaint dated March 22, 2007.

Exhibit B – Judgment entered July 24, 2002 in the matrimonial action titled Olga
Rostropovich v. Olaf Guerrand-Hermes in the Supreme Court of the State of New
York (Index No. 350697/01) (the "Matrimonial Action") in favor of Olga
Rostropovich and against Olaf Guerrand-Hermes in the sum of $257,931.74.

Exhibit C – Affidavit for Judgment of Confession by Olaf Guerrand-Hermes sworn to on October 2, 2003.

Exhibit D – Decision and Order dated October 3, 2003 by the Honorable Emily Jane Goodman, J.S.C. in the Matrimonial Action whereby the Supreme Court issued its trial decision and awarded Mr. Rostropovich a second judgment for arrears.

Exhibit E – Judgment entered October 31, 2003 in the Matrimonial Action in favor of Olga Rostropovich and against Olaf Guerrand-Hermes in the sum of $453,010.

Exhibit F – UCC-1 Financing Statement filed on October 10, 2003.

Exhibit G – Judgment by Confession entered October 22, 2003 (the "Judgment by Confession"), in the consent judgment action titled Micalden Investments S.A. v. Olaf Guerrand-Hermes in the Supreme Court of the State of New York (Index No. 118422/03) (the "Consent Judgment Action").

Exhibit H – Order dated October 28, 2003 by the Honorable Emily Jane Goodman, J.S.C., whereby the Supreme Court issued its sequestration order in the Matrimonial Action.

Exhibit I – Order of Appointment entered December 5, 2003 by the Honorable Emily Jane Goodman, J.S.C. in the Matrimonial Action, whereby the Supreme Court appointed a receiver to sell the apartment that was the former marital residence of Ms. Rostropovich and Mr. Guerrand-Hermes (the "Apartment").

Exhibit J – Affidavit by Eva Blazek in Opposition sworn to on January 20, 2004, submitted in the Consent Judgment Action.

Exhibit K – Demand Revolving Promissory Note by Olaf Guerrand-Hermes, dated "as of" February 20, 2003.

Exhibit L – Decision and Order dated March 17, 2004 by the Honorable Emily Jane Goodman, J.S.C. in the Consent Judgment Action, whereby the Supreme Court vacated the Judgment by Confession.

Exhibit M – Order Approving Contract of Sale dated April 8, 2004 by the Honorable Emily Jane Goodman, J.S.C. in the Matrimonial Action, whereby the Supreme Court approved the contract of sale with respect to the Apartment dated April 8, 2004.

Exhibit N – Decision and Order dated November 18, 2004 by the Honorable Emily Jane Goodman, J.S.C. in the Matrimonial Action, whereby the Supreme Court ordered that certain proceeds from the sale of the Apartment be distributed.

Exhibit O – Decision and Order by the Appellate Division, First Department, dated June 29, 2006, in the Consent Judgment Action.

Exhibit P – UCC-3 Termination Statement filed on or about May 12, 2004.

David Parker (DP-1075)

Sworn to me before this
31st day of May 2007

Notary Public

CYNTHIA WISE
Notary Public, State of New York
No. 01WI6098423
Qualified in New York County
Commission Expires September 08, 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------

MICALDEN INVESTMENTS S.A.,

**07   CV   2395**

Plaintiff

07 Civ.

-against-

**COMPLAINT**

OLGA ROSTROPOVICH, COOLEY
GODWARD KRONISH LLP, RENEE
SCHWARTZ, ATOOSA P.
MAMDANI and MAHMOUD A. MAMDANI,



Defendants.
------------------------------------------------x

Plaintiff Micalden Investments S. A. ("Micalden") by its undersigned

counsel, for its complaint, states as follows:

## JURISDICTION, VENUE AND PARTIES

1. This is an action to declare the validity of a UCC lien on the shares of a

cooperative apartment sold in 2004 for $3.925 million and to direct the sale of

those shares, or in the alternative for damages against one defendant for

removing the lien by fraudulent means. This Court has jurisdiction of this action

pursuant to 28 U.S.C. §1332(a)(2) because the amount in controversy exceeds

the sum of $75,000, exclusive of interests and costs, and is between a foreign

corporation and citizens of a State.

2. Venue is proper in this District pursuant to 28 U.S.C. §1391 because all

defendants reside in this District, the property to which the action relates is

located in this District and significant acts giving rise to the claims took place in

this District.

3.  Plaintiff Micalden is a corporation organized and existing under the laws of Panama with a principal place of business in Panama City, Panama and is wholly owned by Eva-Marie Blazek ("Blazek").

4.  Upon information and belief, defendant Olga Rostropovich ("Olga") is a citizen of New York residing at 161 West 61st Street in the Southern District of New York.

5.  Upon information and belief, Cooley Godward Kronish LLP ("Cooley"), a law firm, is a limited liability partnership organized and existing under the laws of California with a principal place of business in Palo Alto, California and an office located at 1114 Avenue of the Americas in the Southern District of New York. In the fall of 2006 Cooley became successor by merger to Kronish Lieb Weiner & Hellman LLP ("Kronish"), a New York law firm which represented and continues to represent Olga.

6.  Upon information and belief, Renee Schwartz ("Schwartz") is an attorney residing and practicing in the State of New York, a current partner of Cooley and former partner of Kronish and the attorney who at all material times represented Olga with respect to Olga's matrimonial litigation and the other litigations which are the subject matter of this action.

7.  Upon information and belief, defendants Atoosa P. Mamdani and Mahmoud A. Mamdani (collectively the "Mamdanis") are citizens of New York residing at 1 West 67th Street in the Southern District of New York.

## BACKGROUND

### The Creation Of The Relevant Liens

8.  In 1991, Olga married Olaf Guerrand-Hermes ("Olaf"). In or about 1990, Olaf's father, Patrick Guerrand-Hermes ("Patrick") paid for the purchase and renovation of a cooperative apartment at the Hotel des Artistes, 1 West 67th Street (units 600, 601, 603 and 6M and collectively the "Apartment") in which Olaf and Olga resided. Ownership of the Apartment, consisting of a total of 756 shares (the Shares") of the cooperative corporation, Hotel des Artistes, Inc. (the "Cooperative Corporation") and a proprietary lease or leases (collectively the "Lease"), was recorded in Olaf's name, but the purchase price and renovation costs, totaling more than $3 million, were paid by Patrick.

9.  In 2001 Olga commenced a divorce action against Olaf in Supreme Court, New York County (*Rostropovich v. Guerrand-Hermes*, New York County Index No. 350697/01 (the "Divorce Action")). The Divorce Action was tried in 2003. A post-trial decision (the "Divorce Decision") was issued on October 8, 2003. Judgment in the Divorce Action was entered January 26, 2004 (the "Divorce Judgment") but a money judgment for support arrears owed by Olaf to Olga in the amount of approximately $450,000 (the "Arrears Judgment") was entered earlier, on or about October 31, 2003. Following cross-appeals, the Divorce Judgment was modified in one respect in Olaf's favor and otherwise affirmed (*Rostropovich v. Guerrand-Hermes*, 18 A.D.3d 211, 794 N.Y.S.2d 42 (1st Dept. 2004)).

10. In 2003, at a time when Olaf and Olga had been estranged and living apart for some years, Olaf was engaged to Blazek, whom he married in 2004 after his divorce from Olga became final. Between February and May of 2003, Olaf borrowed approximately $1.4 million from Micalden (the "Micalden Loans") to pay various expenses, mostly related to the Apartment. The agreement was that the Micalden Loans would be secured by the Shares.

11. In the summer and fall of 2003, as the parties awaited the Divorce Decision, Blazek took formal steps to secure the Micalden Loans in accordance with the agreement of the parties. On October 2, 2003, Olaf executed an affidavit of confession of judgment in favor of Micalden and authorized the filing of a judgment by confession and a UCC1 financing statement (the "UCC1") recording Micalden's security interest in the Shares and the Lease (the "Micalden Lien"). The UCC1 was filed on or about October 10, 2003 with the Office of the City Register of the City of New York (the "City Register") and the judgment by confession (the "Consent Judgment") was entered with the Clerk of the Supreme Court on or about October 22, 2003 under New York County Index No. 118422/03 (the "Consent Action"). The UCC1 identified the collateral as

> "...all of the debtor's interest in the Proprietary Leases dated July 10, 1990, for apartments 603, 601, 6M and 600 located at 1 West 67th Street, New York, NY 10023, and the proceeds of any sale of the Shares, transfer of the apartments or subsequent assignment of the Leases.

## The Appointment Of The Receiver And The Consent Judgment Litigation

12. On or about December 5, 2003, the court in the Divorce Action (Supreme Court, New York County, Emily Jane Goodman, J.S.C. (the

"Matrimonial Court")) entered an order appointing Harvey Fishbein, Esq. as receiver (the "Receiver") of the Apartment[1] with, among other powers, the authority to sell the Apartment (the "Receivership Order"). The Receivership Order also granted Olga's motion for "sequestration", meaning that all net proceeds of the sale of the Apartment, including the portion attributable to Olaf's equity interest, would be "sequestered" to secure Olaf's future alimony and child-support obligations to Olga.

13. After qualifying, the Receiver obtained an order from the Matrimonial Court authorizing the retainer of Carol Lilienfeld, Esq. as his counsel and began efforts to sell the Apartment.

14. During the period when the Receiver was trying to sell the Apartment, Olga, in an effort to maximize the net proceeds payable to her and/or available to be sequestered under the terms of the Receivership Order, began trying to remove those liens on the Apartment which had priority ahead of the Arrears Judgment and the Receivership Order, including among others the Consent Judgment.

15. On December 19, 2003, Olga, as a non-party affected by the judgment with statutory standing under applicable New York law, moved by order to show cause in the Consent Action to vacate the Consent Judgment on the ground that the entry of the Consent Judgment was designed to prevent Olga

---

[1] Of the four units which originally comprised the Apartment, Unit 600 was excluded from the receivership and subsequent sale by the Receiver of the Apartment to the Mamdani defendants because that unit was occupied not by the couple but by Olaf's brother Mathias Guerrand-Hermes ("Mathias") to whom it was transferred of record for no consideration simultaneously with the sale of the remainder of the Apartment to the Mamdanis. Subsequent references to the Apartment therefore refer only to Units 601, 603 and 6M and references to the Shares refer to the 724 shares appurtenant to those three units.

from collecting obligations due her and was therefore fraudulent as to her.

Micalden contended in opposition that Micalden was a legitimate creditor of Olaf

by virtue of the Micalden Loans, and that therefore the Consent Judgment, even

if its effect was to prefer one legitimate creditor (Micalden) to another (Olga), was

perfectly valid.

16. By decision and order dated March 17, 2004, the Matrimonial Court

agreed with Olga and, without any evidentiary hearing, ordered the Consent

Judgment vacated on the ground that even assuming the validity of the Micalden

Loans, the court was satisfied that the real purpose of the Consent Judgment

was to prevent Olga from collecting what she was and would be owed and it was

therefore fraudulent as to her (the "Vacatur Order").

17. Micalden appealed the Vacatur Order to the Appellate Division, First

Department (the "Appeal"). By decision dated June 29, 2006 (the "Appellate

Decision") the Appellate Division reversed the Vacatur Order and remanded the

case for a hearing on the ground that the Consent Judgment could only be

vacated if Olga proved, by clear and convincing evidence, that the Consent

Judgment was specifically intended to defraud her, and that Olga had failed to

prove that below (*Micalden Investments S.A. v. Guerrand-Hermes*,

30 A.D.3d 341, 819 N.Y.S.2d 228 (1st Dept. 2006)). Since the entry of the

Appellate Decision, Olga has taken no steps to obtain such a hearing.

18. At no time between December 2003 and June 2004 did Olga apply to

any court for vacatur of the UCC1. The Vacatur Order, which contained a

direction to the Clerk of the Court to vacate the Consent Judgment, did not mention the UCC1 and contained no direction of any kind to the City Register.

**The Filing Of The Unauthorized UCC3 And The Sale Of The Apartment**

19. On or about March 30, 2004, the Receiver entered into a contract (the "Contract") to sell the Apartment to the Mamdanis for $3.925 million.

20. On or about May 12, 2004, Olga, through her counsel Schwartz and Kronish, caused a UCC3 Termination Statement (the "UCC3") to be filed with the City Register purporting to terminate the Micalden Lien. The UCC3 identified the "Presenter" as Olga Rostropovich and the party to whom the acknowledgment of filing was to be sent as Renee Schwartz at Kronish. Under the heading "Name of Secured Party of Record Authorizing This Amendment" was written "Micalden Investments SA".

21. The statement in the UCC3 that its filing had been authorized by Micalden was false. In truth, Micalden had never authorized the filing of the UCC3. At no time prior to the filing of the UCC3 did Olga or her counsel contact Micalden or its counsel with respect to the UCC3 or give notice to Micalden or its counsel of Olga's intent to file the UCC3 or of any legal challenge to the UCC1 or any attempt by Olga to have the UCC1 vacated.

22. Pursuant to the relevant provisions of Uniform Commercial Code ("UCC") §9-509, only Micalden was authorized to file a UCC3 terminating the Micalden Lien.

23. Micalden and its counsel were unaware of the UCC3 at the time it was filed and learned of it only when Olga moved to dismiss the Appeal as moot

and then argued mootness in her appellate brief, both times in reliance on the false UCC3. Olga's mootness argument was impliedly rejected by the Appellate Division in that the Appeal was decided on the merits by the Appellate Decision, which does not mention the mootness argument.

24. The sale of the Apartment to the Mamdanis (the "Sale") closed on or about June 10, 2004 (the "Closing").

25. Upon information and belief, at the time of the Closing, the only liens on the Shares prior in time and right to the Micalden Lien were the first mortgage (the "Mortgage") and an earlier arrears judgment in Olga's favor (the "Interim Arrears Judgment") (collectively the "Prior Liens"). Upon information and belief, the amount of the Prior Liens did not exceed $2.4 million.

26. If the Micalden Lien had been paid in the order it was entitled to in the distribution of the proceeds of the Sale (the "Proceeds"), there would have been enough money to pay the Micalden Loans in their entirety, with applicable interest.

27. Upon information and belief, the portion of the Proceeds that should have been paid to Micalden was in fact paid to or for the benefit of Olga, either pursuant to liens junior to the Micalden Lien, in payout of her equity interest or pursuant to the sequestration provision of the Receivership Order.

### COUNT I
### Declaratory Judgment

28. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 27 of this complaint.

29. A justiciable controversy exists between plaintiff and defendants regarding the surviving validity of the UCC1 and the Micalden Lien after the filing of the UCC3 on May 12, 2004, in that plaintiff contends that the UCC1 and the Micalden Lien survived that filing and remain valid today, which defendants dispute.

30. Pursuant to UCC §9-510, a filed record is effective only if filed by a party authorized to file such a record pursuant to UCC §9-509.

31. UCC §9-509(d) provides in turn as follows:

> (d) Person entitled to file certain amendments. A person may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement only if:
>
> (1) the secured party of record authorizes the filing; or
>
> (2) the amendment is a termination statement for a financing statement as to which the secured party of record has failed to file or send a termination statement as required by Section 9-513(a) or (c), the debtor authorizes the filing, and the termination statement indicates that the debtor authorized it to be filed.

32. The UCC3 here relied upon subsection (1) above in that it purported to have been authorized by the secured party, not by the debtor, but in fact it was never authorized by Micalden.

33. By reason of the foregoing, the UCC3 was ineffective as a matter of law to terminate or discharge the UCC1 and/or the Micalden Lien and Micalden is therefore entitled to a judgment declaring that the UCC1 and the Micalden Lien are valid and subsisting liens on the Apartment, the Shares and the Lease.

## COUNT II
## Foreclosure and Sale

34.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 33 of this complaint.

35.  Pursuant to UCC §§9-604 and 9-601(a)(1) plaintiff is entitled to foreclose the Micalden Lien and the Consent Judgment and to have the Shares, the Lease and any appurtenant interests sold at auction to satisfy the debt created by the Micalden Loans and evidenced by the Consent Judgment.

36.  By reason of the foregoing, plaintiff is entitled to a judgment of foreclosure providing for the appointment of a referee to compute the principal and interest due under the Micalden Loans as embodied in the Consent Judgment (the "Current Debt") and directing the referee to sell the Shares, Lease and any appurtenant interest to satisfy said debt, and to remit to Micalden the net proceeds of such sale up to the full amount of the Current Debt as of the date of sale.

## COUNT III
## Unjust Enrichment

37.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 36 of this complaint.

38.  By causing the filing of the unauthorized UCC3 and by then receiving money from the Proceeds of the Sale that should rightfully have gone to Micalden, Olga has been unjustly enriched.

39. By reason of the foregoing, Micalden is entitled to a money judgment against Olga in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing.

## COUNT IV
### Impairment of Collateral

40. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 39 of this complaint.

41. The filing of the unauthorized UCC3 by Olga, Schwartz and Kronish impaired Micalden's collateral by making it appear that the Micalden Lien had been discharged and caused the Proceeds of the Sale to be distributed in derogation of Micalden's lawful priority.

42. By reason of the foregoing, Olga, Schwartz and Cooley are jointly and severally liable to Micalden in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing.

43. Because the filing of the unauthorized UCC3 was a fraudulent act, plaintiff is also entitled to punitive damages in the amount of $12.5 million.

## COUNT V
### Fraud

44. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 43 of this complaint

45. By filing the false UCC3, Olga, Schwartz and Kronish falsely represented to the City Register and to the public that they represented, or had authority to act on behalf of, Micalden in filing the UCC3 (the "False

Representation")   Olga, Schwarz and Kronish knew the False Representation to be false when made.

46.   Olga, Schwartz and Kronish made the False Representation for the purpose of inducing the clerk of the City Register to accept their filing of the unauthorized UCC3, as well for the purpose of fraudulently deceiving prospective purchasers of the Apartment into believing that the Apartment could be purchased free of the lien of the UCC1.

47.   The clerk of the City Register relied on the False Representation in accepting the fraudulent UCC3 for filing and the Mamdanis, their counsel, their title company, the Receiver and the Receiver's counsel all relied on the apparent authenticity of the UCC3 and were deceived into believing that the Apartment was unencumbered by the UCC1 at the time of the Closing.

48.   Olga, Schwartz and Kronish intentionally concealed their filing of the fraudulent UCC3 from Micalden, which continued to believe that its interest was protected by the UCC1.  Micalden relied on the continuing viability of the UCC1 by refraining from taking legal action to protect its interest which it would have taken had it known of the fraudulent UCC3 filing.

49.   By virtue of the fraud perpetrated by Olga, Schwartz and Kronish, the Closing took place without any payment being made to satisfy the Micalden Loans.

50.   But for the fraud of Olga, Schwartz and Kronish, the Closing would not have occurred without payment of the Micalden Loans.

51. By virtue of the foregoing, Olga, Schwartz and Kronish are jointly and severally liable to Micalden in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing.

52. Because the filing of the unauthorized UCC3 was a flagrantly dishonest act aimed not only at Micalden but also at the public, plaintiff is further entitled to punitive damages in the amount of $12.5 million.

WHEREFORE plaintiff demands that this Court enter judgment in its favor as follows:

A) On Count I, declaring that the UCC1 and the Micalden Lien are valid and subsisting liens on the Apartment, the Shares and the Lease;

B) On Count II, directing the appointment of a referee to compute the principal and interest due under the Micalden Loans as embodied in the Consent Judgment (the "Current Debt") and directing the referee to sell the Shares, Lease and any appurtenant interest to satisfy said debt, and to remit to Micalden the net proceeds of such sale up to the full amount of the Current Debt as of the date of sale;

C) On Count III, granting plaintiff a money judgment against Olga in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing;

D) On Count IV, granting plaintiff a money judgment against Olga, Schwartz and Cooley jointly and severally in an amount to be determined at trial,

consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing and punitive damages in the amount of $12.5 million;

E) On Count V, granting plaintiff a money judgment against Olga, Schwartz and Cooley jointly and severally in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing and punitive damages in the amount of $12.5 million; and

F) Granting plaintiff such other relief as the Court may deem just and proper.

Dated: New York, New York
     March 22, 2007

EDWARD RUBIN (ER-8843)
477 Madison Avenue
New York, New York 10022
(212) 888-7300

MICHAEL SCHNEIDER (MS-4555)
477 Madison Avenue
New York, New York 10022
(212) 888-2100

*Attorneys for Plaintiff*

Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

OLGA ROSTROPOVITCH,

            Plaintiff,             Index No. 350697-01

      -against-             JUDGMENT

OLAF GUERRAND-HERMES,

            Defendant.

---

UPON THE Order of the Honorable Joan B. Lobis, Justice, which signed on May

30, 2002, and entered by the New York County Clerk's office on June 7, 2002, which granted a

money judgment to plaintiff Olga Rostropovitch for all sums unpaid that were ordered to be paid

by the Court's March 5, 2002 Order,

AND UPON THE Stipulation between the parties concerning the amount of the

judgment under the Court's May 30, 2002 Order, which was "so ordered" by the Court on July 9, *7/24/02*

2002, it is

*OLGA ROSTRO POVITCH v OLAF GUERRAND-HECHEZ*

ADJUDGED that plaintiff shall recover from the defendant the principal sum of
                        *PLUS*    *8,666·24*
$ 249,265.50, together with interest on said principal in the amount of ~~$ 8,543.31 (calculated~~
~~pursuant to CPLR 5001-5004, see Schedule A attached hereto) as measured from March 5, 2002~~ *DATE OF ENTRY · FOR A TOTAL JUDGMENT OF   257,931·74*
to ~~July 22, 2002,~~ and let plaintiff have execution thereto.

*Addresses on*
*ext page ·*
Judgment entered this
day of    , 2002 by the Clerk
of the New York County Courthouse

                              Clerk

FILED

JUL 2 4 2002

COUNTY CLERKS OFFICE
NEW YORK

SCHEDULE A

INTEREST CALCULATON PUSURANT TO CPLR 5001-5004

INTEREST RATE:            9 % SIMPLE

PRINCIPAL AMOUNT          $249,265.50

PERIOD OF INTEREST        MARCH 5, 2002 – JULY 22, 2002

INTEREST AMOUNT           $8,543.31

PRINCIPAL + INTEREST      $257,808.81

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OLGA ROSTROPOVITCH,                          :
                                             :
                    Plaintiff,               :    Index No. 350697-01
                                             :
          -against-                          :    STIPULATION
                                             :
OLAF GUERRAND-HERMES,                        :
                                             :
                    Defendant.               :

          WHEREAS, on May 30, 2002, the Court issued an Order that stated that "plaintiff is entitled to a money judgment for all sums unpaid that were ordered to be paid pendente lite"; and

          WHEREAS, plaintiff has prepared a Notice of Settlement of Judgment and a proposed form of Judgment, which states that plaintiff is entitled to recover a money judgment from the defendant in the amount of $249,265.50, together with interest on that principal amount, at the rate of 9% per annum from March 5, 2002 to the date of entry of the judgment; and

          WHEREAS, defendant does not object to the amount set forth in plaintiff's Notice of Settlement of Judgment and proposed form of Judgment, and the calculation of this amount;

IT IS HEREBY STIPULATED AND AGREED TO that plaintiff is entitled to a money judgment from the defendant in the amount of $249,265.50, together with interest on that principal amount, at the rate of 9% from March 5, 2002 to the date of entry of the judgment; and

IT IS FURTHER STIPULATED AND AGREED TO that for purposes of this Stipulation, facsimile signatures shall be deemed to be an original.

Date: June 28 2002

William S. Beslow, Esq.
Attorney for Defendant,
Olaf Guerrand-Hermes

So Ordered:

Date: July 9 , 2002

Renee Schwartz, Esq.
Attorney for Plaintiff,
Olga Rostropovitch

ENTER

J.S.C.
JOAN B. LOBIS

2

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ LOBIS _____                    PART 20
                        Justice

ILGA ROSTROPOVITCH                    INDEX NO. _____

                                      MOTION DATE 5/30/02

            - v -                     MOTION SEQ. NO. 002

LAF GUERRAND- HERMES                  MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | 1  2-12 |
| Answering Affidavits — Exhibits _____ | 13-15 |
| Replying Affidavits _____ |  |

Cross-Motion:  ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion  is resolved as
follows. The plaintiff is entitled
to a money judgment for all
sums unpaid that were ordered to be paid
pendente lite. The exclusive
possession claim is resolved as per
stipulation of the parties. All outstanding
economic discovery demands shall be
complied with within 10 days of the
date of service of a copy of this order
with notice of entry or Defendant will be
subject to CPLR 3124 & 3126

Dated: ___8/20/02___                          JOAN B. LOBIS
                                                      J.S.C.

Check one:  ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION

Index No. 350697-00001

Supreme Court of the State of New York
County of New York

Olga Roustopovitch

Plaintiff,

-against-

Olaf Guerrand-Hermes

Defendant.

Judgment

KRONISH LIEB WEINER & HELLMAN LLP

Attorneys For: Plaintiff

1114 Avenue of the Americas
New York, New York, 10036-7798

212-479-6000

FILED AND
DOCKETED

JUL 2 4 2002    P M

AT
N.Y. CO. CLK'S OFFICE

Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MICALDEN INVESTMENTS SA,

Plaintiff,

-against-

**AFFIDAVIT FOR
JUDGMENT BY CONFESSION**

OLAF GUERRAND-HERMES,

Defendant.

| STATE OF NEW YORK | ) | Kingdom of Morocco | ) |
| | ) | District of Casablanca | ) |
| | ) ss.: | City of Casablanca | ) ss |
| COUNTY OF NEW YORK | ) | Consulate General of The | ) |
| | | United States of America | ) |

Olaf Guerrand-Hermes, being duly sworn, deposes and says:

1.     I am the defendant in the above entitled action.

2.     I reside at 1 West 67th Street, City of New York, County of New York, State of New York.

3.     I, the defendant in the above entitled action, confess judgment in this court in favor of the plaintiff, Micalden Investments SA, for One Million Three Hundred and Ninety Thousand Six Hundred and Seventy-Four Dollars and Thirty Cents ($1,390,674.30), plus interest and hereby authorize the plaintiff or its heirs, executors, administrators, or assigns to enter judgment for that sum against me.

4.     This confession of judgment is for a debt justly due to the plaintiff arising out of a personal loan that was made to the defendant by Micalden Investments SA, to pay the mortgage and maintenance fees for the defendant's apartment located at 1 West 67th Street, New York, New York. Proceeds from said personal loan was also used for his support and maintenance and the support and maintenance of defendant's two children Slava and Oleg. This personal loan was made in several separate transactions which are listed below:



(a)  $125,036.62 made on February 24, 2003, for mortgage payments and maintenance fees due on the defendant's apartment.

(b)  $20,036.62 made on February 24, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(c)  $16,326.62 made on February 24, 2003, for living expenses.

(d)  $5,508.99 made on March 3, 2003, for legal fees.

(e)  $1,000,036.68 made on March 17, 2003, for loan repayment/equity purchase given by Patrick Guerrand-Hermes to defendant.

(f)  $21,756.27 made on March 27, 2003, for Lycee Francais School tuition and living expenses.

(g)  $5,538.26 made on April 8, 2003, for living expense.

(h)  $20,037.91 made on May 14, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(i)  $7,537.84 made on May 15, 2003, for legal fees.

(j)  $5,037.84 made on May 15, 2003, for living expenses.

(k)  $6,072.42 made on May 19, 2003, for living expenses.

(l)  $12,170.86 made on May 28, 2003, for assessment charges for defendant's apartment.

(m)  $6,101.53 made on June 12, 2003, for airline tickets for the defendant and his children to and from Morocco and living expenses.

(n)  $4,138.30 made on June 12, 2003, for life insurance policy.

(o)  $33,538.52 made on June 16, 2003, as mortgage payment for defendant's apartment.

(p)  $5,884.33 made on July 10, 2003, for living expenses.

(q)  $10,036.62 made on July 31, 2003, for legal fees.

(r)  $4,036.12 made on September 16, 2003, for living expenses.

(s)  $31,795.00 made on September 19, 2003, as mortgage payment for defendant's apartment.

(t)  $50,037.00 made on September 22, 2003, for common charges, assessments, and ancillary charges for defendant's apartment.

5.    This confession of judgment is not for the purpose of securing the plaintiff against a contingent liability.

Dated:

Olaf Guenard-Hermes, Defendant

Sworn to before me this _Second_
day of _October_ _2003_

Daniel J. ERNST
Vice Consul of the United
States of America

Exhibit D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: I. A. S. PART 17
--------------------------------- --------------------------X

OLGA ROSTROPOVICH,

                   Plaintiff

        - against -

                                     Index No.: 350697/01

OLAF GUERRAND HERMES

                   Defendant.

--------------------------------------------------------- ------X

## EMILY JANE GOODMAN, JSC.:

Both parties to this divorce action are members of internationally prominent
families: Olga Rostropovich (hereafter Rostropovich or Wife or Plaintiff) is the daughter
of the renowned Russian conductor Maestro Rostropovich; he, Olaf Guerrand Hermes
(hereafter Hermes or Husband or Defendant), is a member of the French Hermes family,
polo players and purveyors of luxury goods. The couple has long been accustomed to
incessant traveling on several continents, to maintaining multiple households, and to
spectacular acquisition. The Wife resides in New York with the couple's two young
children and the Husband continues to live an extraordinarily lavish lifestyle in France
unencumbered by employment.

To borrow an observation from F. Scott Fitzgerald "the rich are different." For
one thing, at least as regards the Defendant herein, he does not work or comply with court
ordered support of his children. This case came to me for trial following a pendente lite
order of support made by Hon. Joan Lobis, dated March 2, 2002, in which the Husband,
was to pay $8,333.00 monthly for support of his two children with his Wife Olga
Rostropovitch (as distinguished from his newborn baby with his girlfriend).[1]  He was
also ordered to pay the maintenance and carrying charges for both the marital residence at
the Des Artistes apartment and the Connecticut home, to continue policies of medical and
dental insurance for the family, to pay all unreimbursed medical and dental expenses, and
to pay private school tuition. To date, he is in arrears for a total of $707,836.74. That
amount includes a money judgment for $257,931.74, which was granted by Justice Lobis
on May 30, 2002, based upon Defendant's refusal to make payments previously ordered,
and the amount of $449,904 found due herein. Justice Lobis gave leave to this Court to

---

[1] No maintenance was awarded to Rostropovich pendente lite.

review the amount she awarded pendente lite.[2] I herewith concur with my bench sister and, accordingly, at the outset ORDER said payment of $449,904 within ten days from entry hereof.

## Defendant's Lack Of Credibility

Over a period of weeks, necessitated largely by international travel by Defendant and his father, who was a witness, the Court had the opportunity to assess the credibility of the parties and witnesses. The Court finds Hermes and his father to be incredible in material ways, and as the trier of facts applies the doctrine of Falsus in Uno. The Court has also observed Defendant's belligerence, hostility and arrogance. Perhaps the most blatant example of Hermes's (and his father's) lack of credibility is the position they have taken with respect to the Des Artistes apartment. One of the contentions of Hermes, who is a trained lawyer, is that the apartment really belongs to his father as the "constructive owner," despite representations to banks, insurance companies, the IRS, real estate agents and other third parties that he, and not his father, owns the apartment. Defendant's father, an extraordinarily sophisticated man, fluent in English, testified that he owned the apartment, but also testified that his son was an owner: "in a way formally, yes. Formally, it seems like to be, from what I have here today, but formally it seems like it." The Court's observation of the father was a combination of loyalty to, and exasperation with, his son, whom he seemed to consider an immature child. Essentially, Hermes wants the Court to adopt an argument which would result in the perpetuation of a fraud on the banks, insurance companies, the IRS, real estate agents and other third parties, to whom Hermes represented that he was the owner. However, the Court will not enforce secret understandings that are contrary to the documents submitted to financial and other institutions and presented as evidence in this trial.

Defendant's lack of credibility was further demonstrated in the way he (and his father) testified about the issue of gifts. Defendant's form 3520 federal income tax return for 2001 lists only $67,000 worth of gifts, even though he had received $929,000 from his father (Tr. 507, Exh 40).[3] He admitted that this was incorrect (Tr. 510). Hermes's

---

[2] At trial Defendant moved for a downward modification of Justice Lobis's pendente lite award, by motion dated September 2, 2002. By decision dated October 23, 2002, Justice Lobis reserved decision and subsequently referred the issue to me. The application is denied because the pendente lite award was not excessive, for the reasons discussed herein.

[3] References to exhibits herein are references to Plaintiff's exhibits submitted in connection with her post trial briefs.

2

father claimed that some gifts, which were reported as gifts in Defendant's Internal Revenue Service returns (Exhs 30, 40), were not really gifts at all. For example, when confronted with evidence that he gave $560,000 to his son in 1997, the father claimed that it was a "reward" for his son's work in connection with the commercial organization of Blue Growth Capital, L.P. (Tr. 1392). Similarly, transfers of more than $1 million for 1998, which Hermes also reported as gifts, were also "business recognition for his work" (Tr. 1393). Hermes paid no income taxes on any of these alleged "rewards" (Exh 29).

Yet a further example of Defendant's lack of credibility is his attempt to portray his economic situation as dire. Although he cheerfully acknowledges having no employment as of the commencement of this divorce (and a negative net worth of $3,907,736.32 [Exh. 39]), he manages to travel to and vacation in, among other places, Paris (in fact he now resides there), London, Dallas, Morocco, Costa Rica, Mexico, Switzerland, Hawaii, Asia and the Maldives (Tr. 589-603). Accordingly, except as otherwise indicated, the Court will draw all inferences against Hermes (and his father) when their credibility is at issue.

The Parties' Lavish Lifestyle

The pre-divorce standard of living is a fundamental criteria for determining the amount of child support and maintenance (see Anonymous v Anonymous, 286 AD2d 585 [1st Dept 2001] [child support on income greater than $80,000 based on actual needs with reference to pre-divorce standard of living]; Alvares-Correa v Alvares-Correa, 285 AD2d 123 [1st Dept 2001] [lifetime maintenance awarded based on reasonable needs and pre-divorce standard of living]). The standard for support is to permit a former spouse and the children to resume a lifestyle approximating the standard of living enjoyed prior to the divorce (see Hartog v Hartog, 85 NY2d 36, 50-51 [1995]). Here, the parties lived a lavish lifestyle. The family lived in an eight room apartment at Hotel Des Artistes, which was formerly three separate apartments, redesigned to fit their European tastes (Exh Court I, pp. 14, 42). During the marriage, the parties also acquired a home in Paris, which they sold in 2000 (Tr. 239-242, 791-798; Exh 8). They acquired and completely renovated a country home in Connecticut, and added a guest house and a large swimming pool, costing at least $400,000 (Exhs 10; 35 (B), (C),(D), 64; Tr. 799-801). The parties had a housekeeper, a nanny, and additional help when entertaining (Tr. 59). Throughout the marriage, they traveled extensively-- Christmas in Morocco, February vacation skiing in Megeve, April in either Mexico or Costa Rica, the whole month of July in a rented house in Biarritz, hunting season in England, Germany or Austria, travels to Russia, and countless weekend trips (Tr. 60). The children also attend private school at the Lycee Francais as well as the Lucy Moses School of Music, at a total cost of more than $40,000 per year (Exh 9; Tr. 1690-91). Hermes, however, has attempted to downplay the family lifestyle, contending that it was not extravagant (Tr.

3

904). Perhaps by his standards it was not.

<u>Imputing employment income</u>

Throughout the marriage, Hermes held a series of high-paying jobs in the legal, investment management, venture capital, and telecommunications sectors. However, once Rostropovich commenced this action, Hermes embarked on a series of vacations that continue. It is well-settled law that, under these circumstances, where a spouse intentionally reduces his employment income to avoid child support and maintenance payments, the court may impute income to that spouse. Hermes was a French lawyer and was admitted to practice in New York as well. However, he has intentionally allowed his New York attorney registration to lapse, making him ineligible to practice law. After completing New York University law school's master's program, he worked as an attorney with the prestigious law firm of Sullivan & Cromwell for two years, including in the securities area (Tr. 737; Exh 3). In 1994, Hermes left the practice of law to join Nomura Securities, where he did mergers and acquisitions work and developed new business opportunities, earning approximately $250,000 with base salary and bonus (Tr. 740-41). His combined income from the Athena Group and Nomura in 1996 was approximately $350,000 (Tr. 744, Exh 4). Hermes's reported income for 1997 included approximately $80,000 from Athena Group, where he originated financing opportunities and raised capital (Tr. 745), and other business income of $117,000, for a total of $197,000 (Exh 29). He left the Athena Group in 1997 to start Blue Growth Capital L.P., a hedge fund, with his brother (Tr. 747-49). In 1998, in addition to his involvement with Blue Growth, defendant became involved with opportunities in telecommunications and the Internet, including various companies named Phone Free, E-Ventures, and Novo Networks (Tr. 750-755). His 1998 tax return indicates income of $100,000 from Blue Growth and an additional $140,000 from other sources, for a total of $240,000 (Exh 29). In 1999, Defendant's total gross earnings from all sources, including distributions from Blue Growth, were approximately $850,000 (Exh 29). In late 2000, defendant was terminated from Novo Networks, and was given six months of severance pay (Exh K). Hermes reported his income as $140,000 on his 2000 tax returns. In the summer of 2001, he joined a venture capital firm, BFD Capital, where he ran the New York office and raised capital for a telecommunications fund and for a telecommunications company known as Next Wave (Tr. 769-771). His base salary at BFD was $100,000 per year with the potential for a substantial bonus of up to $150,000 (Tr. 771). Based on his earnings at BFD and other sources, Defendant listed his 2001 income on his statement of net worth as $291,000 (Exh 39). He gave three different explanations for why he left BFD on November 15, 2001, less than two weeks after Rostropovich began this action. At his deposition, he stated that he and BFD mutually agreed to end his employment relationship (Tr. 482). On cross examination he stated that BFD had terminated him (Tr. 481-482). Finally, when he was examined by his own lawyer, he claimed that his

4

employment ended on its own because BFD did not extend terms of its letter agreement with him, dated July 19, 2001 (Tr. 770, 773).

The Court finds that based upon the evidence, including intentionally allowing his New York attorney registration to lapse, and evaluation of Hermes's credibility, he purposefully chose to become unemployed and remain unemployed simultaneously with his Wife's filing for divorce. As discussed above, during the pendency of the divorce, instead of seeking gainful employment, Hermes has vacationed around the world and created additional offspring while not supporting the children of the marriage. His minimal and alleged attempts to find work, given his qualifications, credentials, contacts and experience, demonstrate a lack of good faith (Tr. 483-488, Tr. 782, Tr. 1524-1525, Tr. 1573). Courts may impute income to a party who has deliberately reduced his income while a divorce action is pending (see Domestic Relations Law § 240 [1-b] [b] [5] [v] [which includes within its definition of income "an amount imputed as income based upon the parent's former resources or income, if the court determines that a parent has reduced resources or income in order to reduce or avoid the parent's obligation for child support"]; Unger v Unger, 256 AD2d 220 [1st Dept 1998] [imputation of income when defendant had not made serious effort to become gainfully re-employed]; Davis v Davis, 197 AD2d 622 [2d Dept 1993] [imputing income to defendant when there was no evidence of good faith job search]; David W. v Julia W., 158 AD2d 1, 8 [1st Dept 1990] [plaintiff could not abandon medical practice for academic practice and procure downward modification of support by his own voluntary actions regarding his employment situation]). Therefore, courts may award support based on a party's earning potential rather than the party's present income (see Brodsky v Brodsky, 214 AD2d 599, 600 [2d Dept 1995] [proper award of child support may be based on earnings potential, as opposed to actual income]).

The Court may also impute income when a party understates his income or gives incredible testimony (see Cohen v Cohen, 294 AD2d 184 [1st Dept 2002] [court imputed income in light of the parties' marital lifestyle, as well as spouses' inconsistent and evasive testimony concerning income and expenses]; Zhigina v Adzhiashvili, 292 AD2d 625 [2d Dept 2002] [court imputed income because spouse failed to adequately disclose income]). Here, Defendant's stated net worth of negative $3.9 million is not credible in light of his lifestyle, both during the marriage and today. Accordingly, the Court imputes to Defendant $344,666 of income, an average of Defendant's reported earnings for six years prior to the commencement of this action (earnings of approximately $350,000 in 1996, $197,000 in 1997, $240,00 in 1998, $850,000 in 1999, $140,000 in 2000, and $291,000 in 2001).

Imputing Recurring Gifts

Defendant's earnings were not enough to support his family's lavish lifestyle. His

5

father made the most significant contributions to the parties' ongoing expenses. His father gave consistently large gifts, totaling $1,015,000 in 1998, $796,973 in 1999, $1,134,106 in 2000, and $929,000 in 2001, an average of more than $975,000 per year. (Tr. 507, Exhs 30, 40). These gifts were used as needed for family expenses (Tr. 1378). As previously noted, Defendant's and his father's testimony about the gifts was not credible. Similar to father and son's contention that the father owned the Des Artistes apartment despite all evidence to the contrary, the father's gifts (which Hermes reported as gifts on tax filings) were incredibly re-characterized at trial as rewards for business work.[4]

Hermes unsuccessfully claims that his father can no longer afford to give him gifts (Tr. 510-511) primarily due to a lawsuit against JP Morgan (Tr. 1099-1100, 1103-04, 1323-25). However, that litigation has been pending since May 1999 and did not affect the nearly one million dollars of gifts given thereafter up to the commencement of this divorce (Exh 65; Tr. 1112-1113). The father's alleged inability to make future gifts due to the stock market decline is also not credible. He testified that he only owned Hermes stock, and admitted the highs and lows remained roughly the same throughout 1999-2001 (Tr. 1163-1166). Further, as the Court found the father generally incredible, and given the testimony concerning his lifestyle and wealth, the Court finds it proper to impute $975,000 worth of gifts from the father (the average of amount of gifts from 1998-2001) for the purpose of calculating child support (see Domestic Relations Law § 240 [1-b] [b] [5] [iv] [d]; Lapkin v Lapkin, 208 AD2d 474 [1st Dept 1994] [monies from spouse's parents imputed for purposes of establishing child support]) and maintenance (see Wildenstein v Wildenstein, 251 AD2d 189 [1st Dept 1998] [gifts from spouse's father imputed for purposes of establishing temporary maintenance]; Warshaw v Warshaw, 169 AD2d 408 [1st Dept 1991] [gifts from spouse's father imputed for purposes of establishing maintenance]). The Court finds that Defendant's father's past history of gift giving was sufficiently regular such that it could be expect to continue, especially given that the couple's standard of living was never within the Husband's salary, and given that the Husband has not worked since 2001, yet continues to travel the world.[5]

---

[4] Starting with November 15, 2001 (which is when Defendant's employment terminated and this action commenced) the gifts were characterized as undocumented "loans" (Tr. 511).

[5] The Court declines to impute gifts given by Rostropovich's father to his daughter during the marriage. Rostropovich's father gave her $450,000 in connection with the acquisition and renovation of a Paris apartment, and $200,000 in connection with the purchase of the Connecticut home. However, these gifts (made for the purpose of purchasing individual real estate) were not sufficiently regular and do not establish a

Maintenance

Rostropovitch seeks maintenance of $25,000 per month, tax-free to her, for ten years (Plaintiff's Post-Trial Brief at 11-39, 44-47). Hermes contends the amount should be $50,000 per year for a period of five years (Defendant's Post-Trial Reply Brief at 92-97). In her net worth statement, Rostropovich delineates ongoing monthly expenses for herself and her children of $52,193 (Exh 9). Rostropovich supports these expenses through the testimony of Enid Hoffman, a certified public accountant and accredited business evaluator (Tr. 271) who testified on the subject of the parties' expenses in 1999-2001 (Tr. 274-275). Hermes correctly notes that the value of Hoffman's testimony is reduced because she failed to allocate expenses between Plaintiff, Defendant and the children, because there were some inconsistencies with Hoffman's findings and Rostropovich's testimony (Defendant's Post-Trial Reply Brief at 89-91), and because there were some expenses listed as recurring when they were not likely to be so (e.g., Rostropovich's root canal). Instead, Defendant suggests that the Court award his Wife $4,166.66 per month (id. at 92), but offers no basis for this figure. Notably, Hermes himself listed that his (and his children's) monthly expenses in his net worth statement were $50,025 (Exh. 39). Using Hoffman's testimony as a guide, along with the other testimony and evidence in the record, the Court determines that Rostropovich should receive monthly maintenance of $25,000 per month, tax-free to her, non-deductible to Hermes (pursuant to 26 USCA § 71 [b] [1] [B]) for a period of seven years retroactive to the date of the request. In reaching this determination, the Court has considered the following factors: (1) Hermes's income does not accurately reflect his income potential, nor his access to continuing family income, the marital property distributed pursuant to equitable distribution is minimal considering the parties' lifestyle and Hermes has the greater amount of separate property; (2) the marriage lasted 12 years and the parties are in good health; (3) Hermes's present and future earning capacity (which is not accurately reflected by his alleged inability to be employed) is vastly greater than Rostropovich's, who was not self-supporting during the marriage, and earned less than $20,000 per annum before the marriage by giving cello lessons (Tr. 31); (4) Rostropovich, who has not played the cello in more than 10 years (Tr. 33, 200), and who is the custodial parent of two young children, has the ability to be self-supporting, albeit at an altogether reduced standard of living; (5) Rostropovich has lost some earning capacity because

---

pattern of gift giving such that those gifts should be imputed. For the same reason, the Court did not impute the gifts that Defendant's father made to his son for the purchase of the Des Artistes apartment, and the Studio apartment. The Court also declines to impute money which Rostropovich states that her father lent to her after the commencement of this action so that she and the children could live, totaling under $500,000, which was necessitated solely as a result of Defendant's failure to pay court ordered support.

7

Hermes objected to her working during the marriage (Tr. 32-33); (6) due to the cost of childcare and the likelihood that Rostropovich's future income would be small, the presence of the children her home is an important factor; (7) Hermes has not disputed Rostropovich's contention that, since he will live in France, he would have no need of an income tax deduction, while Rostropovich would; (8) Rostropovich has made substantial contributions as spouse, parent and homemaker, and these contributions have allowed her husband to study at New York University School of Law, prepare for the bar exam and concentrate on his investments and businesses (Tr. 51, 60, 159-160, 376-378, 1681); (9) there has been evidence presented regarding wasteful dissipation of marital property; (10) there has been no evidence presented regarding transfers made in contemplation of this matrimonial action without fair consideration; and (11) it is just and proper to consider that Hermes was an unreliable and incredible trial witness (see Zimberg v Zimberg, 215 AD2d 313 [1st Dept 1995]).

The Court further finds that Defendant's proceeds pursuant to equitable distribution shall be held by Rostropovich's attorneys in escrow as security for spousal and child support and arrears because of Defendant's history of non-payment of his pendente lite obligations (see Domestic Relations Law § 243; Kornblau v Kornblau, 60 AD2d 531 [1st Dept 1977]). Upon full payment of these amounts, the Defendant may move this Court for an order authorizing release of the security from escrow.

### Child Support

To determine the appropriate amount of child support, the Court must first determine the respective incomes of the parties (see Domestic Relations Law § 240 [1-b] [c] [1]). As set forth above, the Court imputes $344,666 of earned income to Hermes, as well as $975,000 worth of gift income to him, for a total annual income of $1,319,666. It is also appropriate to reduce his income by the amount of maintenance paid to Rostropovich (Domestic Relations Law § 240 [1-b] [b] [5] [vii] [C]; Goldman v Goldman, 248 AD2d 590 [2d Dept 1998]), which as discussed in more detail below is $300,000 per annum. Rostropovich is not employed and has no income. Therefore, Defendant's income for purposes of calculating child support, after deducting maintenance, is $1,019,666.[6]

The applicable statutory child support percentage should be applied to the

---

[6] Deductions for FICA and New York City taxes are inapplicable because Hermes has had no such deductions since 2001. Even if the Court were required to consider deducting FICA and New York City taxes when it imputes income, no such evidence was presented to the Court and in any event, such deductions would be de minimus.

8

combined income up to $80,000. Under the Child Support Standards Act, the applicable child support percentage is 25% (see Domestic Relations Law § 240 [1-b] [b] [3] [ii]). Thus, for Defendant's income up to $80,000, he is required to pay $20,000 of child support.

For the income above $80,000 "the court shall determine the amount of child support for the amount of the combined parental income in excess of such dollar amount through consideration of the factors set forth in paragraph (f) of this subdivision and/or the child support percentage" (Domestic Relations Law § 240 [1-b] [c] [3]; see also Cassano v Cassano, 85 NY2d 649 [1995]). The Court considers that a combination of the statutory percentage and paragraph (f) factors (i.e., financial resources of parents, health and special needs of children, the pre-divorce standard of living, tax consequences, non-monetary parental contributions, parents' educational needs, disparity in parental incomes, needs of non-party children, extraordinary visitation expenses, and any other relevant factors) will produce a figure for basic child support that is both just and appropriate.

The children's actual needs with reference to the prior standard of living is the touchstone for establishing child support for incomes over $80,000 (Anonymous v Anonymous, 286 AD2d 585, 586 [1st Dept 2001]). Prior to the break-up of the household, the Hermes children enjoyed a lifestyle that included private school plus such educational enrichment and necessaries as speech therapy, tutors and music lessons, a luxurious Manhattan residence, a country home in Connecticut, and travel and vacations abroad. Rostropovich's expenditures on behalf of the children reveal that the children's actual reasonable needs for food, shelter, clothing and miscellany (such as extra-curricular activities and vacations amount to $10,000 monthly or $120,000 per annum. The statutory percentage of the parties' combined income in excess of $80,000 is 25% of $1,019,666 (less $80,000) or $234,916. In consideration of the expenditures for the actual needs of the children, the Court, however, finds that this amount exceeds the reasonable needs of the children at this time with respect to that "standard of living the child[ren] would have enjoyed had the marriage or household not been dissolved" (Domestic Relations Law § 240 [1-b] [f] [3], [10]; Harmon v Harmon, 173 AD2d 98, 110-11J [1st Dept 1992]).

The Court has considered the financial resources of the parties, the children's actual reasonable needs, the pre-divorce standard of living, the basic good health of the children (apart from dyslexia), the parties non-monetary contributions to the children's care, tax consequences, the limited impact of travel expenses for visitation upon Defendant's resources given his peripatetic lifestyle, and the financial assistance for the support of his recently born child provided by the grandfather and the mother of that child, and the absence of any parental educational needs. In light of these factors, the Court determines

9

that Defendant's obligation for basic child support in the amount of 25% of the first
$480,000 of his income or $120,000 annually ($10,000 monthly) will provide for the
children's physical and emotional well-being, as well as a standard of living consistent
with their pre-divorce lifestyle (see Kosovsky v Zahl, 272 AD2d 59 [1st Dept 2000] [court
applied statutory percentage to the first $300,000 of the combined income of $550,000]).[7]

The Court further determines, and Defendant concurs, that he will be entirely
responsible for providing health insurance and for payment of the children's health care
which is not covered by insurance, as well as the costs of their education, including private
school tuition, books, supplies, tutors, and speech therapy, except that Rostropovich shall
pay for the cost of any music lessons. Defendant has consented to paying for the
children's educational expenses at the Lycee Francais, which currently costs $44,100 per
annum for the two children. Additional educational expenses for tutors and speech
therapy currently total less than $37,750 per annum. Child care expenses are not at issue.
The Court further determines that Hermes, the monied spouse, shall pay the children's
college tuition and expenses until each reaches the age of 21 based on the fact that the
children would benefit from a college education, and because Hermes is an educated
professional. Defendant's child support obligation shall be reduced by one half of the
amount he pays for the children's room and board while at college (see Saslow v Saslow,
305 AD2d 487 [2d Dept 2003]; Sheridan v Sperber, 269 AD2d 439 [2d Dept 2000]).
While the children are attending college, Plaintiff shall be obligated to maintain a home
for them.

Arrears
Rostropovich brought an Order to Show Cause, dated July 15, 2003, which is
consolidated herein for disposition. In addition to the money judgment granted by Judge
Lobis for $257,931.74, Rostropovich seeks $212,977, representing arrears pendente lite,
and $236,927, representing arrears under a June 20, 2002 so-ordered stipulation. Plaintiff
submits a summary of her expenses which have accrued and remain unpaid under the
pendente lite order, with copies of checks. With respect to the so-ordered stipulation
(pursuant to which Hermes agreed to pay for a new apartment for Rostropovich up to
$16,000 per month, for one year, plus brokerage and moving expenses), Rostropovich
seeks $192,000 for rent, $16,127 for moving expenses, and $28,800 for a broker's fee.
Although Defendant correctly argues that Plaintiff laid an inadequate foundation at trial
for the arrears requested, as not all arrears were documented at trial (which cannot be
cured in post trial briefs), that defect was remedied by submission of the Order to Show
Cause. Defendant opposes the Order to Show Cause, contending that it cannot be decided
until his pending motion for a downward modification of Justice Lobis' pendente lite

---

[7] Since the child support is calculated only on a portion of Defendant's income, the
cessation of maintenance will not require a re-calculation of child support.

10

award is decided, because utilities were not covered by the pendente lite order, and because he was entitled to renege on the so-ordered stipulation for reasons unclear to the Court. As the Court has decided that the downward modification should be denied, that argument is moot. Hermes has chosen not to dispute the arrears documented in the Order to Show Cause, except for utility charges, which the Court finds were covered by the pendente lite order as "carrying charges." Defendant presents no reason why he should not be bound by a stipulation he signed while represented by counsel. Accordingly, the Court finds that $449,904 is owed in arrears. However, to the extent that Plaintiff seeks interest on that amount from May 8, 2002, the Court rejects that request because the arrears accrued monthly, not on one specific date. Accordingly, the Court finds that interest shall be computed upon $449,904 from the date of this decision, as a single reasonable intermediate date (see CPLR 5001 [b]).

<u>Wasteful Dissipation of Assets</u>

For the period 1997 through December 31, 1999, Defendant and his brother were 99% and 1% equity owners, respectively, in Blue Growth Capital LLC, a limited liability company, which was the General Manager of Blue Growth Capital Partners LLP, a hedge fund (Exh 49, Tr. 535, 557). On December 31, 1999, Defendant, his brother and his brother's wife entered into an agreement allowing Defendant to withdraw from the company. This had the effect of giving the entire interest (other than 1% to his sister-in-law) to Defendant's brother. Defendant received no value for this transfer because the terms of the withdrawal only entitled Defendant to receive the amount equal to his capital account in the company, which was zero as of the withdrawal date (Tr. at 1559). Defendant correctly states that the value of a general partner's interest in a hedge fund is a function of the amount of money under management (Tr. at 765). Defendant also correctly points out that Plaintiff has introduced no proof of the value of Defendant's interest as of the date of his withdrawal. The letter from Terence E. Fox, Chief Executive Operating Officer of the company, valuating Defendant's interest in excess of $850,000 as of October 27, 1998, has no relevance to Defendant's interest nearly one year later. Therefore, the Court cannot find that Defendant committed waste with respect to this transfer.

However, the Court does find that Defendant committed waste with respect to Defendant's payment of maintenance for the Studio apartment. Defendant admitted continuing to pay approximately $300 monthly for that apartment (Tr. at 1460, 1551), even though he testified that he transferred the apartment to his brother in 1998 (although no documents exist to support the transfer) (Tr. at 555-556). The Court does not agree with Plaintiff's contention that Defendant transferred the apartment to his brother, which diminished marital property by at least $150,000 (Plaintiff's Post-Trial Brief at 92). As discussed below, the Court finds that the Studio apartment is Defendant's separate

11

property, not marital property. However, the Court finds that since 1998, Defendant's
payment of $300.00 monthly for maintenance on behalf of his brother was a wasteful
dissipation of marital assets.

Des Artistes Apartment

The apartment in Des Artistes, which was the marital home, was purchased in
1990, before the marriage, for $1,825,000 in Defendant's name, with his father's money.
(Exhs 1, 2; Tr. 548, Tr. 1175, 1225-31, 1492). Hermes claims that either the apartment
really belongs to his father as the "constructive owner" or it is completely his separate
property (Tr. 2000-01; Defendant's Post-Trial Rely Brief at 4). Despite the voluminous
documentary evidence that Hermes is the owner of the Des Artistes apartment, he claims
that he held the title "for tax reasons only," but that his father was really the owner
(Defendant's Post-Trial Reply Brief at 4-7).

As discussed above, the Court finds Defendant's contention that the apartment
really belongs to his father, completely incredible. The stock of the Cooperative
apartment is in Defendant's name (Exhs 1 and 2); when arranging for letters of
recommendation to the co-op board, his father held out his son as the "buyer" (Exhs. AJ
and AK); Defendant always took the tax deductions relating to the apartment on his and
his wife's joint income tax returns (Exhs 4, 29); when Defendant alone, or with his Wife,
borrowed money from a bank, he listed the apartment as his (Exhs 38, 43, 55; Tr. 1433);
and reported the rental income and the rental deduction on the parties' joint income tax
returns (Tr. 55; Exh 4, Scheds. A, E; Exh 20, Scheds. A for 1997-1999). Further, when
the apartment was mortgaged in 1994 with Emigrant Bank, Defendant said he kept the
proceeds, transferred them to an investment manager, and then used some as collateral
for a loan at Bank Audi (Tr. 549-50, 612-13). When Defendant refinanced the apartment
with JP Morgan Chase in 1998, he did not discuss it with his father, did not return the
cash available from refinancing to his father, but rather kept the cash to pay the interest
on the loan (Tr. 551, 1252, 1472). To the Court's surprise, Defendant's father admitted
in open Court to knowing that his son made representations as to his son's ownership to
banks, insurance companies, the IRS, real estate agents and other third parties, even
though both of them testified that the father owned the apartment (Tr. 1432-1433).

The Court determines that the Des Artistes apartment is not the father's apartment
and is not marital property. Rather, the apartment was a gift from the father to the son,
and is therefore, separate property (except for the appreciation which occurred during the
marriage). As noted above, the property was purchased for $1,825,000. The father also
paid for the construction costs, although the evidence is inconsistent as to what exactly
was paid. Rostropovich testified that $500,000 was spent on construction and $500,000
on decorating, although she did not pay the bills (Tr. 46, 48, 50). In 1994, Defendant
represented on his Bank Audi loan application that the total cost of the apartment was

$2.5 million (as the apartment was purchased for $1,825,000, along with furnishings, which the parties do not dispute were $200,000, the construction cost would be $500,000). At one point, Defendant's father testified that the apartment cost $2.5 million (Tr. 1199), but later testified that the renovations alone totaled $3 million (Tr. 1252). To substantiate renovation costs of $2 million, Defendant attempted to rely on a 1992 cost accounting he claimed to have prepared for his father (Exh R for identification), which was not admitted into evidence, because it was not produced in discovery (Tr. 958-959, 1253-1254; Defendant's Post-Trial Brief at 9). Defendant's father stated numerous times that he was unable to refresh his memory by reviewing the document, which he did not prepare (Tr. 1184, 1265-1259; Defendant's Post-Trial Reply Brief at 8). Therefore, the father could not credibly substantiate $2 million dollars worth of renovations that he funded but did not oversee.

Hermes has the burden of proving the amount of construction costs as separate property (see Haynes v Toma, 300 AD2d 357 [2d Dept 2002]; Silver v Akerson, 223 AD2d 499 [1st Dept 1996]). Given that the testimony was inconsistent, and he failed to meet his burden of proving the higher amount of construction costs, the Court determines that the construction costs were $500,000, based on representations made in the Bank Audi loan application. Accordingly, Defendant's credit for separate property is $2,325,000 (the initial purchase price of $1,825,000 million and the construction costs of $500,000).

As an alternative to her argument that the Des Artistes apartment is marital property, Rostropovich argues that she is entitled to the value of the appreciation of that apartment during the marriage (Plaintiff's Post-Brief at 53). Plaintiff argues that the exact dollar value of her contributions towards the renovations of both the Des Artistes apartment (and the Studio apartment) would be impossible to obtain, and is unnecessary to determine (Plaintiff's Post-Trial Brief at 58). She argues that once the Court determines that the appreciation is not solely due to market forces, but appreciates in part due to the non-titled spouse's contributions, she is entitled to a portion of the entire appreciation (id. at 59). Hermes contends that his wife is not entitled to any award given that the increase in the value of the separate property during the marriage was solely due to market forces (Defendant's Post-Trial Brief at 12-13; Defendant's Post Trial-Brief at 17-24).

An increase in the value of separate property occurring during the marriage, which is due in part to direct contributions of the other spouse or the indirect contributions of that spouse as homemaker and parent, is marital property (Price v Price, 69 NY2d 8 [1986]; Domestic Relations Law § 236 [B] [1] [d] [3]). However, an increase due solely to market forces is not marital property (Price, supra, at 18). Contrary to Rostropovich's

13

position, the Court must identify the portion of the appreciated value that resulted from the spouse's active efforts and from the spouse's indirect efforts as homemaker and caretaker (see Hartog v Hartog, 85 NY2d 36 [1995]; Acosta v Acosta, 301 AD2d 467 [1st Dept 2003]). However, the non-titled spouse need not establish, by precise dollar amount, the increase in the separate property attributable to her efforts because that runs counter to the purposes of the statutory concept of marriage as a partnership (see Zelnick v Zelnick, 169 AD2d 317, 330 [1st Dept 1991]).

The property was valued at the time of trial by a Court appointed neutral appraiser, Larry Sicular, at $4 million (Exh. Court I, at 42).[8] He testified that the market in general for an apartment in the seven to eight room category was about $1.3 million in 1990 and between $2.5-$2.6 million in October 2002, and an apartment in the nine plus room category was about $2.6 million in 1990 and about $5.1 million in October 2002 (Tr. 1447-1448; Court Exh I). Sicular provided these figures because the Des Artistes apartment fell between the two categories (Tr. 1447-1448). He also testified that he could not judge the impact of the renovations on the value because he did not know the condition of the Des Artistes apartment prior to the renovations (Tr. 1449). Hermes argues that based on Sicular's testimony and the appraised $4 million dollar value, the Court should conclude that the Des Artistes apartment appreciated 100% from 1990 to 2002 due to market forces alone and therefore, there is no appreciation as the result of the apartment renovations. As noted above, Rostropovich claims that she does not bear the burden to factor out market increases.

The Court finds that $475,000 is marital property, unrelated to market forces, which is attributable to appreciation as the result of Rostropovich's direct efforts in assisting with renovations and her efforts as spouse and homemaker. Rostropovich directly contributed to the apartment's appreciated value by designing many aspects of the home improvements, consulting with contractors, and providing lodging for workers in her separate apartment (Tr. 46-51). Her contributions as homemaker and as the parent who primarily cared for the children, enabled her husband to oversee the improvements. Crediting Sicular's testimony that an eight-room apartment was worth 1.3 million dollars in 1990 and 2.5 million dollars in 2002, the Court finds that the Des Artistes increased $1.2 million dollars due to market forces. Accordingly, crediting Sicular's testimony that the apartment is worth $4 million dollars, and deducting $2,325,000 for the cost of the apartment and the improvements and $1.2 million due to market forces, the Court concludes that $475,000 is marital property, of which Rostropovich is entitled to 75

_____

[8] Although the appraiser admitted to mistakenly including the maintenance of the Studio apartment in valuing the Des Artistes apartment (determining that the maintenance was $6,846.84, instead of $6,557.03) (Tr. 1459-61), the Court finds that the error is de minimus as it relates to the $4 million dollar valuation of the Des Artistes apartment.

percent ($356,250) as described below.

The Studio Apartment

The Studio apartment is contiguous to the Des Artistes apartment and was purchased during the marriage (in September 1991) by Defendant's father for approximately $150,000 in the name of his son (Tr. 43, 555). The Studio apartment was renovated for an unspecified amount, also paid for by Defendant's father (Tr. 957), who testified that he was really the owner and that his son merely held title because it "was easier for the building regulations to include [the Studio] with the [Des Artistes apartment]" (Tr. 1179; Defendant's Post-Trial Brief at 11-12). For the same reasons that the Court rejected this argument with respect to the Des Artistes apartment, the Court rejects this argument with respect to the Studio apartment. The specious nature of this contention is further belied by the fact that Defendant's father admitted that, as of 1996, he did not even stay in the Studio apartment, which was allegedly his "own separate world," until he was "evicted" from it (with his wife) following the birth of the parties' child (Defendant's Post-Trial Brief at 11-12; Tr. 1250-1251). The father had no trouble asserting his ownership at other times (i.e., his boast about proving that he owned the "Gathering Pansies" painting that had been hanging in the Des Artistes apartment by packing it in a suitcase and announcing to "everyone" that he was taking it) and, the Court concludes that based on its observations, this man would have no difficulty asserting his authority or ownership at any time. Defendant testified that he transferred the Studio apartment to his brother for no consideration; however, all documents evidencing ownership remain in his name and he still pays the maintenance of $300 per month (Tr. 556; Tr. 1460, 1551). The Studio apartment is collateral for Hermes's 1.75 million dollar mortgage (Tr. 550; Tr. 1003; Exhs 1, 2). As with the Des Artistes apartment, the Court finds that the Studio apartment was a gift from Defendant's father to Defendant and is therefore, separate property. Although Rostropovich contends that she is entitled to a percentage of appreciation as a result of her efforts in designing the apartment, the Studio apartment was never appraised (Tr. 1461). Accordingly, Rostropovich has failed to prove the amount attributable to her direct or indirect efforts, and she is not entitled to any portion of the alleged appreciation of the Studio apartment.

The 19th Century Collection

Rostropovich maintains that the nineteenth century art collection (XIX collection) is presumptively marital property and that Hermes has the burden to prove that the XIX collection is separate property (Plaintiff's Post-Trial Brief at 64). She argues that "[t]hese paintings were a gift to both parties to display and enjoy in what defendant's father knew was the parties' marital home. Since the parties took possession of these paintings during the marriage, they are presumptively martial [sic] property" (id.). Defendant counters that,

Rostropovich has the burden to prove that the XIX collection was gifted to the parties and further contends that his father did not gift the collection, but still owns it (Defendant's Post-Trial Brief at 52).

The classification of property as marital or separate is confined to property that has been "acquired" by the parties. Domestic Relations Law § 236 defines "marital property" in relevant part, as "all property acquired by either or both spouses during the marriage and before the execution of a separation agreement" (Domestic Relations Law § 236 [B] [1] [c]) (emphasis added). Marital property excludes separate property which, in pertinent part, encompasses "property acquired by bequest, devise, or descent or gift from a party other than the spouse" either before or after the marriage (Domestic Relations Law § 236 [B] [1] [d] [1] [emphasis added]). Where there is no disagreement that the property was "acquired," the Court can proceed to address questions about the classification of the property as marital or separate. In the case of property acquired as a gift, it would be classified as marital or separate property, and distributed accordingly, depending on the identity of the recipient or recipients (see McSparron v McSparron, 87 NY2d 275, 282 n* [1995], Ackley v Ackley, 100 AD2d 153 [4th Dept 1984] [gift from third party to both spouses is marital property]; Pelletier v Pelletier, 242 AD2d 325 [2d Dept 1997] [gift from third party to only one spouse is separate property]). However, since the acquisition of the XIX collection is disputed, the Court must first consider whether the XIX collection constitutes a valid gift "acquired" by the parties.[9]

According to Gruen and its progeny, and contrary to Rostropovich's apparent position that possession alone determines gift status, an inter vivos gift is valid only upon satisfaction of the three elements of intent, delivery, and acceptance (Gruen v Gruen, 68 NY2d 48 [1986] [finding that, despite retention of a life interest in the chattel, the latter was a gift since the three elements of intent, delivery and acceptance were satisfied by clear and convincing evidence]). Since Hermes and his father deny that the XIX collection was a gift, Rostropovich has the burden of showing, by clear and convincing evidence, that these elements are indeed satisfied (id. at 53), viz., that the intent of the donor was to make an irrevocable transfer of present ownership (id.), that "the delivery required must be such as to vest the donee with control and dominion over the property" (Matter of Szabo, 10 NY2d 94, 98 [1961]; see also Gruen, 68 NY2d at 57-58); and that there was acceptance by the donee (Gruen, 68 NY2d at 53; see also Chien v Chien, 276 AD2d 426 [1st Dept

[9] The cases cited by Plaintiff are not inconsistent with this position since they address the issue of identifying to whom a gift was made, rather than whether the property was gifted in the first instance (see Haynes v Toma, 300 AD2d 357 [2d Dept 2002] [plaintiff failed to show that the advance from his father to purchase the marital residence was solely a gift to him]; Parkinson v Parkinson, 295 AD2d 909 [4th Dept 2002] [despite title of property being in both parties' names, testimony of both parties supported plaintiff's claim that she was the intended recipient of the gift]).

16

2000]).

The alleged donor of the XIX collection, Defendant's father, averred that he was the purchaser of the XIX collection, with all related purchase orders and invoices in his name (Defendant's Post-Trial Brief at 48). He testified that he did not intend to gift the collection to anyone (Tr. 1195, 1269-70, 1276-84, 1291-92, 1297-98, 1339), with the exception of one painting ("Joan of Arc") to a niece (Tr. 1281) and the painting of a "clubbish" man to the parties (Tr. 1195). In support of his claim, Defendant's father pointed out that his interest in nineteenth century art and the beginning of his collection preceded the parties' relationship, with the purchase of eighteen paintings on May 23, 1990 (Tr. 989, 1249, 1282; Defendant's Post-Trial Brief at 47); and that he continued to exercise ownership over the XIX collection by relocating one painting to his residence in France and permitting Sotheby's to display another of the paintings (Tr. 1280, 1390, 1292, 1295, 1470, Exh AS). He explained that his decision to decorate the Des Artistes apartment with nineteenth century art also pre-dated the parties' relationship (Tr. 963). The father made handwritten notations on art catalogues indicating which room in the Des Artistes apartment the painting would be hung (Tr. 1276, 1277, 1278-80); and notes his family's tradition of parents lending artworks to their children for distribution after the parents' deaths (Tr. 15, 1200, 1233, 1334; Defendant's Post-Trial Brief at 50-51). The father further testified that his understanding of the parties' pre-nuptial agreement and the consensus between him and Rostropovich's father regarding the separation of the parties' respective inheritances reassured him that Rostropovich could not lay claim to the XIX collection (Tr. 1368-77).[10]

Rostropovich's evidence that the XIX collection was a gift to the parties consists of the delivery of the XIX collection to, and its subsequent display in, the marital residence, the Des Artistes apartment (Plaintiff's Post-Trial Brief at 64, 66) and inconsistencies in testimony. While Rostropovich acknowledges that the "vast majority" of the XIX collection was purchased by her father-in-law before the marriage (Plaintiff's Post-Trial Brief at 64, Exhs S-Y) and was initially stored at the auction house, not at the apartment (Plaintiff's Post-Trial Reply Brief at 30 n 14; Tr. 1191), she urges skepticism regarding the father's testimony since a few of the paintings were bought by the parties with the father's funds (Exh AD; Plaintiff's Post-Trial Brief at 64); and that, not only did Defendant's father know that the Des Artistes apartment constituted the parties' marital residence (Plaintiff's Post-Trial Brief at 64), but most of the art was displayed in the common areas

---

[10] The pre-nuptial agreement was not admitted at trial because it was held unenforceable by Justice Lobis' decision dated June 28, 2002, and her decision was affirmed by the Appellate Division, First Department. However, inasmuch as Defendant's father's belief that there was an agreement influenced his donative intent and consequent conduct, his testimony was admitted as relevant to the issue of his intent.

and not just in the room where the father stayed for fewer than 20 nights in ten years (Plaintiff's Post-Trial Brief at 68-69; Tr. 1193-94, 1385-86). Plaintiff also noted that the father's practice of bestowing large cash gifts on the parties (Tr. 1378) was inconsistent with his alleged concern about merging inheritances (Plaintiff's Post-Trial Reply Brief at 31). According to Rostropovich, the father's removal of a painting to France was less an exercise of ownership than testimony to his awareness that the parties regarded the XIX collection as theirs (Plaintiff's Post-Trial Brief at 68; Tr. 1280, 1390). Finally, Rostropovich notes that her Husband treated the art as belonging to him when he referred to $2 million and $1.4 million worth of art and furnishings, respectively, in his applications for credit at two different banks (Tr. 619, Exhs 6, 48; Plaintiff's Post-Trial Brief at 67); when he claimed an insurable interest in the art in his homeowner's policy (Tr. 630-32, Exh 59; Plaintiff's Post-Trial Brief at 67); and when he authorized a dealer to sell a painting without his father's knowledge (Tr. 722, 1407-09, 1527; Plaintiff's Post-Trial Brief at 67).

Due to the probable high value of the XIX collection, the Court will presume acceptance by the alleged donees, as a matter of law (Gruen, 68 NY2d at 57). Clear and convincing evidence of donative intent may be shown by way of documents and donor testimony or by donor testimony with credible motive (see Gruen, 68 NY2d at 53 [donor's letters and testimony regarding donor's past statement established intent to give a painting to son]; Ackley, 100 AD2d 153 [gift to both parties shown by deed to parties as tenants by the entirety and donor-father's testimony that the residence was to benefit the married couple]; Wilcox v Wilcox, 233 AD2d 565 [3d Dept 1996] [father's testimony that his conveyance of farm as a gift to defendant, motivated by the "desire to shield the farm from any claims from the nursing home," provided ample evidence that the conveyance was a gift]). Donative intent may be found despite inconsistent evidence when the opposing party effectively admits to the intent (see Seidman v Seidman, 226 AD2d 1011 [3d Dept 1996] [real estate was a gift to both parties because, although the title was in defendant's name, defendant's testimony was that the deceased donor gave "us" the property]; Strang v Strang, 222 AD2d 975 [3d Dept 1995] [gift from wife's deceased father to help pay for the marital residence was a gift to the married couple as shown by the wife's testimony that father gave "us" the gift so "we" could buy the house and by the fact that the gift was used to satisfy a marital debt]).

Rostropovich has failed to meet her burden to show by clear and convincing evidence that the XIX collection was a gift at all, much less a gift to both parties. The father's purchase of the collection is uncontested. Although the Court does not find the father's testimony credible with respect to other issues, the Court accepts his testimony regarding his lack of donative intent with respect to the XIX collection. The Court credits the father's testimony about his belief that the parties had a pre-nuptial agreement. The Court

18

finds persuasive that the delivery of eighteen of the paintings to the Des Artistes apartment was contemplated before a relationship between the parties developed, as evidenced by the catalogue notations and, as noted by Rostropovich, by the storage of the collection pending completion of the apartment renovation. Further, the Court notes that the father continued to exercise the right of dominion and control over two items in the XIX collection when he removed one painting to another residence and when he gave permission to Sotheby's to display a painting.

The Court also reaches its determination based on the fact that Rostropovich has presented no contrary testimony alleging that the father ever expressed the intention to gift the XIX collection. She argues only the absence of an intent to exclude her from a gift ("[m]oreover, defendant did not testify that his father ever told him that the art was a gift to him alone" (Plaintiff's Post-Trial Brief at 67), but fails to proves that there was a gift in the first instance. Moreover, no documentary evidence for the gifting of the XIX collection has been presented by Rostropovich. She effectively admits to the lack of documentation when by observing that "[t]he invoices and purchase documents were in defendant's father's name and there was no evidence that he ever attempted to transfer title or otherwise memorialize any transfer to defendant" (Plaintiff's Post-Trial Brief at 67; Exhs S-Y). Rostropovich's arguments about her Husband's attempt to sell a painting from the collection, without his father's knowledge, provides scant evidence of the father's intentions (Tr. at 1527). Moreover, her Husband's reference to over a million dollars worth of art and furnishings he owned in two bank applications did not expressly mention the XIX collection. As Rostropovich fails to meet the clear and convincing standard required to establish a valid inter vivos gift, the Court finds that the XIX collection is the property of Defendant's father and is not part of the marital estate.[11]

## The Russian Collection

The parties agree that the Russian collection is marital property, purchased during the marriage. The parties' quarrel concerns the distribution of the collection. Hermes agues that Rostropovich's claim to her share of the distribution was foreclosed by her failure, as the non-titled spouse, to provide a timely valuation. Rostropovich maintains that the collection was properly valued either by a purported Sotheby's oral estimate from an unidentified individual or by an insurance appraisal for the collection's replacement value. Rostropovich requests that the distribution of the Russian collection be in kind whereas Hermes urges the sale of the entire collection in order to maximize the proceeds.

---

[11] However, the XIX painting by Jamin, which both parties agreed was a gift from an uncle and the painting of the "clubbish" man is marital property shall be sold within 90 days of entry of a judgment, with the proceeds divided 75 percent to Rostropovich and 25 percent to Hermes.

19

Although the Court does not accept either the estimate or the insurance appraisal as adequate valuations of the Russian collection's value,[12] it does not agree that an equitable distribution to both parties is thereby precluded. The cases relied upon by Defendant are inapposite since they involve assets that either have little value or whose distribution through sale is not a viable option (i.e. Antoian v Antoian, 215 AD2d 421 [2d Dept 1995] [family business]; Daisernia v Daisernia, 188 AD2d 944 [3d Dept 1992] [used car of insignificant value]; Gredel v Gredel, 128 AD2d 834 [2d Dept 1987] [pension]; Michalek v Michalek, 114 Ad2d 655 [3d Dept 1985] [pension]; Chew v Chew, 157 Misc 2d 322 [Sup Ct NY County 1992] [Master's degree]). The Russian collection, in contrast, is admittedly both valuable and marketable. Nevertheless, without a valuation for each object in the collection, the Court is unable to effect an in-kind distribution of the collection as requested by Rostropovich.

If the parties do not agree on a valuation or division of the collection within 90 days, the Russian collection is to be sold and the proceeds divided between the parties with 75% to Rostropovich and 25% to Hermes (see Dougherty v Dougherty, 256 AD2d 714 [3d Dept 1998] [ordering parties to mutually agree to a division in kind of artwork and, absent agreement, to sell the art and distribute the proceeds]).

## Antiques and Furnishings

Rostropovich claims that the various antiques and furnishings acquired by Defendant's father and located in the Des Artistes apartment were gifts to the parties and constitute marital property (Domestic Relations Law § 236 [B] [1] [c]). Hermes argues that these items are either his father's property or are his own separate property acquired as gifts to him alone (Domestic Relations Law § 236 [B] [1] [d] [1]). The Court finds the following items (in addition to the XIX collection) are the property of Defendant's father:

Arthur B. Davis etching, works by Pausett, ink and watercolor (# 7, EB), pencil on paper (#8, Walters), French Louis XVI gilt wood barometer, pictures by Tauzin, "Standing Portrait of a Lady" by Shannon, works by Kaemmerer, "Putti," painting by Blondel, XIX century French cast iron garden figures, bronze candelabra, English calamander and satinwood-banded sofa table, picture by Andre, picture by Brown, two cast bronze groups, William IV mahogany pier table, gilt caryatid pilasters, XIX century Louis torcheres, Italian gilt wood frame pier glasses, Herbert painting, Stilke painting, Aman-Jean painting, Velasquez painting, work by Shee,

---

[12] The insurance appraisal falls short as a valuation because replacement value is not equivalent to market value and, absent additional documentation or information, the Court is unable to determine whether the Sotheby's estimate was an actual offer or a marketing device.

Fiasoli carving, French XIX oil on canvas (portrait of family member), "Portrait of a Napoleonic Grenadier," Detaille watercolor, 4 Italian rococo carved wood wall mirrors, four sconces, two Venetian XVIII century oils on canvas, Loubon oil on canvas, chest of drawers (#126), # 127, two Jensen pictures, "Equitation," "A May Procession" by Mueller, painting by Garlot, "Allegorical Figure of the Republic," marble bathtub, marble after Antonio, two XVIII century Chantilly pictures, 1850 porcelain dishes, candelabra, silver hunter presentation watch, Crystal du Sanre crystal, Louis XIV beechwood canapé, Biedermeier chest of drawers, Charles X lit en bateau, "L.'Elegante" by Beraud, "Pandora's Box" by Garit, Odalisques by Hebert, "Un Moment de Reflexion" by Piguet, "Views of Paris from Meudon" by Tanzin, "Fin de Soireee" by Ribera, still life by Pieler, Louise XIV ormolu mantle clock, "Little Mishap" by Sonderland, "Gathering Pansies" by Alma Tadema, "Study of Two Heads" and "Stage Décor" by Erus, important silver, Venetian school "Masquers Playing a Cello...," silver-plated wine coasters, two Austrian fruitwood and gilt side chairs, silver on copper oval box, Louis XVI ormolu three-light bras de lumiere, Russian silver articles, Mene cast bronze, four XIX century bronzes of horses.

The Court makes this determination based on the father's acquisition of the items through purchase (as evidenced by invoices and purchase orders for a number of the items), the father's declared lack of donative intent (which the Court considers credible due to his belief in the existence of a pre-nuptial agreement between the parties), the fact that a significant portion of his testimony is supported by the documentary evidence, and the failure of either party to sustain their burden to prove that the items were gifts (see Gruen supra).

Uncontroverted testimony indicates that the cello belongs to Rostropovich's father. Uncontested testimony also indicates that the English Sheraton mahogany drum table and continental Baroque oak frame armchairs belong to Defendant's Uncle Xavier. These items shall be returned to the respective parties.

Undisputed testimony further indicates that the following items constitute Rostropovich's separate property, acquired either before the marriage, as a gift to her from a third party, or purchased through separate funds: the ebonized grand piano, Kashan wool carpet, "Portrait of Olga," oil on canvas (#154), and the Louis style commode. While the status of the Connecticut real estate is disputed, according to Rostropovich's uncontroverted testimony, the furnishings of the Connecticut house (excluding the contents of the Des Artistes Apartment that have been relocated there), were purchased by her with separate funds obtained from the sale of her family's New York apartment and therefore, the Court finds these furnishings constitute her separate property. Similarly, the

following items constitute Defendant's separate property because they were third-party gifts to him alone or were acquired before the marriage: wall brackets, porcelain jars, a Zwobada bronze, Yoshikazu wood blocks, a portrait of his mother, English silver cups, a set of dishes from his grandmother, Portuguese silver, trophies, and family photographs.

The remaining belongings (including the Jamin painting, Dutriac pen and ink, and "Un Chant d'Amour"), consisting of items that the parties either failed to establish as separate or were acquired during the marriage via purchase by a spouse, as spousal gifts, or as gifts to both parties, constitute marital property. Rostropovich has proposed a division in kind of the parties' personal marital property, viz. that Hermes retain the items currently housed in the Des Artistes apartment while she retains the remainder. Absent agreement between the parties and a proper valuation of the property, the Court finds that considerations of equity dictate that the marital property be sold and the proceeds equitably distributed in the proportions already determined, 75% to Rostropovich and 25% to Hermes (see Dougherty v Dougherty, 256 AD2d 714 [3d Dept 1998] [determining that absent parties' mutual agreement concerning the division of artwork, the artwork was to be sold and distributed equitably]). However, the painting of a Russian lady (a spousal gift from Defendant) and two mugs (wedding gift from Rostropovich's father) are marital property to be distributed 100% to Rostropovich in accord with Hermes's consent.

### The Connecticut home

Both parties agree that their home in Connecticut, which is held in Rostropovich's name, is martial property.[13] However, Rostropovich claims that her father gave her $200,000 towards the purchase price and seeks a separate property credit in that amount (Tr. 69). As Rostropovich signed an affidavit acknowledging that her father gave the couple a gift of $200,000 toward the downpayment of the Connecticut home, Rostropovich is not entitled to a separate property credit of $200,000.

Hermes also seeks a separate property credit of $200,000 alleging that he borrowed $200,000 from his uncle Hubert Guerrand-Hermes, in connection with the purchase of the Connecticut home (Tr. 806-808). However, Defendant's statement of net worth indicates that the nature of this loan is personal (Exh 34, p 12). Further, although he has a signed note for this amount (Exh O), which coincided with the purchase of the Connecticut home, the nexus to the home has not been established. Given that the Court has found Defendant to be an incredible witness, the Court finds that he has not meet his burden to establish that he is entitled to a separate property credit of $200,000. The Connecticut home should be sold forthwith and after satisfaction of the mortgage (the Washington Mutual Loan) and all

---

[13] The home was appraised at $3.3 million by a Court appointed neutral appraiser (Exh BQ, 64).

closing costs, the proceeds shall be divided 75% to Rostropovich and 25% to Hermes.

## Equitable Distribution of Marital Assets

In equitably dividing the marital assets, the Court finds that Plaintiff is entitled to a 75 percent distribution, while Defendant is entitled to 25 percent. Equitable distribution need not be equal (see Arvantides v Arvantides, 64 NY2d 1033, 1034 [1985] [husband received 75 percent of value of dental practice while wife received 25 percent]). Pursuant to Domestic Relations Law § 236, the Court has considered the following factors in determining how to equitably distribute marital assets: (1) the income of the Husband at the time of the marriage was vastly superior to his Wife's and the income of the Husband at the commencement of this action does not accurately reflect his true income potential, nor access to family wealth and the Husband has the greater amount of separate property at the time of the marriage and at the commencement of the action; (2) the marriage lasted 12 years and the parties are in good health; (3) there is no need for the custodial parent to occupy or own the marital residence because Rostropovich has moved into a new apartment, but there is a need for her to use its household effects in her new residence; (4) each party will likely receive some amount of inheritance and pension rights are not an issue because neither party has one; (5) Rostropovich will receive maintenance as ordered herein; (6) Rostropovich has made substantial contributions as spouse, parent and homemaker, and these contributions have allowed her Husband to study at New York University, prepare for the bar exam and concentrate on his investments and businesses (Tr. 51, 60, 159-160, 376-378, 1681); (7) the liquidity of the marital property is not an issue; (8) Plaintiff's future financial circumstances are unclear since she did not work during the marriage and earned less than $20,000 per annum before the marriage teaching music (Tr. 31); Defendant's future financial circumstances remain a mystery in light of the fact that he claims to have a negative net worth and has no employment, yet continues to live an extravagant lifestyle, and he has the greater business acumen and greater part of separate property; (9) the difficulty in evaluating any interest in a business is not an issue; (10) Defendant has not disputed Plaintiff's contention that since he will live in France, he would have no need of an income tax deduction or dependant exemptions, while Rostropovich would; (11) there was evidence presented regarding wasteful dissipation of assets; (12) there has been no evidence presented regarding transfers made in contemplation of this matrimonial action without fair consideration; and (13) it is just and proper to consider that Hermes was an unreliable and incredible witness (see Zimberg v Zimberg, 215 AD2d 313 [1st Dept 1995]).

## Miscellaneous stock

Plaintiff has not proven the value of the Gurin judgment, Defendant's options to acquire shares of Novo Networks, Inc. and the value of Defendant's 25 % interest in options to acquire 408,631 shares of stock in Gemini Voice Solutions at a price of $1.72

per share, expiring June 2004. Defendant contends that these items have no value. Accordingly, contrary to Plaintiff's contention, the Court cannot divide something for which it has no proof a value. With respect to Defendant's 4,000 shares of stock in Nova Networks, Inc. given that Defendant stated Plaintiff could have those shares (Tr. 1820), he should transfer ownership of those shares within 90 days.

<u>Insurance</u>

Both parties agree that the cash surrender value of Defendant's life insurance policy is $17,467.26 and constitutes marital property (Defendant's Post-Trial Brief at 29; Plaintiff's Post-Trial Reply Brief at 38). Accordingly, Rostropovich is entitled to 75% and Hermes is entitled to 25%. Hermes is also directed to immediately provide (if he has not already) life insurance in the event of his death, for the benefit of the children in the minimum amount of $2 million dollars, and health insurance for the benefit of Plaintiff (for the period that maintenance has been awarded) and the children until they are emancipated (Domestic Relations Law § 236 [B] [8] [a]).

<u>Hermes' Law License</u>

Rostropovich claims an interest in Hermes's law license as marital property subject to equitable distribution. Before his marriage to Rostropovich, Hermes earned two French master's degrees in law (Maitrise de Droit). Subsequent to the marriage, Hermes earned an L.L.M. degree from New York University School of Law, which was a pre-requisite to obtaining his New York law license (Tr. 303). A professional license, like a law license, or an academic degree, like a master's degree, is a valuable asset that can constitute marital property subject to equitable distribution to the extent that the license or degree was acquired during the marriage (see <u>O'Brien v O'Brien</u>, 66 NY2d 576, 584 [1985] [law license]; <u>McGowan v McGowan</u>, 142 AD2d 355 [2d Dept 1988] [master's degree]). Rostropovich's interest, as the non-titled spouse, in Defendant's law license (or degree) is based upon her indirect contributions to the achievement of the license (or degree) (see Domestic Relations Law § 236 [B] [5] [d] [6]). However, the portion of the license (or degree) representing the training and education that was undertaken before the marriage remains separate property (see <u>Grunfeld v Grunfeld</u>, 94 NY2d 696, 701 [2000] ["Because the parties did not marry until defendant was halfway through law school, only one half of the bare license was a marital asset"]).

Rostropovich claims that the marital portion of Defendant's law license amounts to $344,000 (of which she is entitled to $172,000) based on testimony of her expert, Enid Hoffman. Hoffman reached her valuation by determining the enhanced earning capacity that a law license provides to a college graduate, and applied a one-third coverture factor (Plaintiff's Post-Trial Brief at 81-83). Alternatively, Rostropovich contends that at least a one-quarter coverture factor should be applied (<u>id.</u>). Hermes counters that, while the

24

proper coverture factor should only be one-fifth, his law license was not properly valued by Hoffman (Defendant's Post-Trial Brief at 27-28), and has no value because he pursued a more lucrative career in business and because his license lapsed due to his failure to pay the appropriate fees and fulfill mandatory continuing education requirements (Defendant's Post-Trial Reply Brief at 57-58).

In order to effect an equitable distribution of a license or a degree, the Court must value the enhanced earning capacity that the degree or license provides to holder (see O'Brien v O'Brien, 66 NY2d at 586). The enhanced earning capacity is determined by comparing the spouse's earning capacity at the beginning of the marriage to the earning capacity as a licensed person at the commencement of the matrimonial action (see Grunfeld, 94 NY2d at 702). The non-titled spouse has the burden to prove a valuation of the license so that a court can equitably distribute it (see Iwahara v Iwahara, 226 AD2d 346, 347 [2d Dept 1996] ["the nontitled spouse, had the burden of proving the asset's value so as to afford the court a sufficient basis upon which to make a distributive award"] [citations omitted]). An inaccurate assessment of the earning capacity at the beginning of the marriage results in a flawed valuation of the license or degree that will either be rejected in favor of the alternative valuation provided by the other party or, if there is no alternative, will prevent distribution altogether (see Morales v Morales, 230 AD2d 895 [2d Dept 1996] [valuation of the wife's nursing license could not stand because it was based on the earnings of a high school graduate working as a nurse's aide instead of one working as a clerk]; Holihan v Holihan, 159 AD2d 685 [2d Dept 1990] [no award of a portion of husband's guidance counselor license was issued to wife since the wife's expert's calculation omitted the husband's earning capacity without the license thereby preventing the wife from establishing the value of the husband's license]; Rosenberg v Rosenberg, 155 AD2d 428, 430 [2d Dept 1989] [court did not reach issue of whether wife's Master's in Social Work was marital property because "[t]he expert was unaware of the wife's previous earnings as a social worker, and failed to provide the underlying figures upon which his testimony of enhanced earnings was based]; Iwahara, 226 AD2d 346 [court accepted the husband's valuation of his medical license because wife's valuation was flawed inasmuch as it was based on an initial earning capacity of a college graduate in math rather than that of a medical doctor]).

Rostropovich's expert valued the law license by equating his initial marital earning capacity with that of a white, 35-39 year old male college graduate working in New York City and comparing it to Defendant's earning capacity as a practicing New York City attorney (Tr. 311-313). The expert admitted to not knowing the specifics of Defendant's French education prior to the marriage (Tr. 318-320). Rostropovich attempts to gloss over this flaw, contending that the expert's baseline of a college graduate's earning capacity was appropriate (and even conservative) given that Hermes did not have a college degree

(although he had a law degree from France) (Plaintiff's Post-Trial Brief at 81-82).
However, Rostropovich does not contend that a mere college graduate (much less a high
school graduate) could be admitted to New York University's L.L.M. program and sit for
the bar. In fact, Rostropovich acknowledges that Defendant's master's degree from
France can be considered the equivalent of a graduate degree in law (id. at 83).
Accordingly, Rostropovich's valuation of the law license failed to properly value the
masters' degrees in law that Hermes earned in France such that the Court could determine
the enhanced earning capacity that New York University L.L.M. provided. As the Court
lacks a sufficient basis upon which to equitably distribute Defendant's law license, it does
not reach the issue of the proper coverture factor.

<u>The Countrywide Loan</u>
In 1994, Hermes took out a $1.7 million dollar loan, which is now held by
Countrywide Home Loans (Tr. 550-551). The parties agree that the balance of the loan
was $1.75 million at the commencement of this action and is secured by a mortgage on the
Des Artistes apartment. Defendant contends that this loan is a marital debt because it was
used for the purposes of generating income through investments for the family and was
also used to pay for family expenses (Defendant's Post-Trial Brief at 30-34; Defendant's
Post-Trial Reply Brief at 30). Plaintiff objects to Defendant's classification of the loan as
marital property, despite the fact that her attorney argued in her opening statement that the
proceeds were used for marital purposes (Tr. 14) and the fact that her statements of
proposed disposition (before the last revision) listed the loan as a marital debt. Plaintiff's
argument is that to require her to pay a portion of the loan would somehow amount to
double counting (Plaintiff's Post-Trial Brief at 54). However, the only relevant issue is
whether the loan was used for Defendant's exclusive benefit or for marital purposes; the
nature of the property which secures the loan is irrelevant (see Jonas v Jonas, 241 AD2d
839 [3d Dept 1997]; Pauk v Pauk, 232 AD2d 386 [2d Dept 1996]). In that regard,
Rostropovich claims that Hermes has not met his burden to prove that the loan was used
for marital purposes (Plaintiff's Post-Trial Reply Brief at 24-28). Specifically, she alleges
that he has admitted that the bulk of the loan proceeds were used in failed investments, and
that the principal of the loan was to go back to his father, while the family would use any
profit (Tr. 1582). Defendant's father admitted receiving an undisclosed amount from this
loan (Tr. 1395). Rostropovich also argues that because $100,000 of the loan was used to
pay rent on the Des Artistes apartment (which is Hermes's separate property), the loan is
not a marital debt (Plaintiff's Post-Trial Reply Brief at 27).

Although Hermes argues that Rostropovich should be precluded from changing her
original position that the loan was marital, the Court is obligated to make its decision
based on the state of the law. Defendant has failed to prove that the loan (of which a
portion was admittedly used to make payments to his father) was used solely for marital

purposes (see Phillips v Phillips, 249 AD2d 527 [2d Dept 1998] [wife was not responsible for debt of husband who failed to substantiate his claim with documentary evidence]). He has also failed to meet his burden to specify what portion of the loan was used for marital purposes, and what portion was used for separate purposes, except to the extent that the parties have not disputed that $100,000 of the loan was used to pay rent on the Des Artistes apartment. Although the Des Artistes apartment is Defendant's separate property, it was nonetheless used by the family as the marital residence. Accordingly, the Court finds that $100,000 of the $1.7 million dollar loan is marital debt, and the balance is Defendant's separate liability. The parties shall each be responsible for one half of the portion of the loan which is marital debt.

The Washington Mutual Loan

The parties agree that this mortgage loan was obtained in 1998 and was used to purchase the Connecticut house. The balance of this loan is $1.4 million and the parties shall each be responsible for one half of the portion of the loan. To the extent that Rostropovich has paid money to terminate a foreclosure proceeding, that amount should be deducted from the portion of the loan for which she is responsible.

Bank Audi Line of Credit

Defendant devotes one paragraph in a reply brief of 122 pages (and nothing in his initial brief) to an argument that a Bank Audi (USA) line of credit for $200,000 is marital debt (Defendant's Post-Trial Reply Brief at 102). That line of credit, dated June 6, 2001, is in the name of Hermes and pursuant to paragraph 1.1, was "to be used for investment purposes" (Exh. 56). Hermes's assertion that the money was used for family expenses (although the credit agreement indicates the contrary) is conclusory and unsubstantiated. As Defendant has failed to prove that the loan was used for marital purposes (see Phillips, supra), the Court finds that the line of credit is not marital debt and is Hermes's separate liability.

Bruce Colley Loan

Hermes testified that he borrowed $50,000 from his friend Bruce Colley for purposes of investing in a New York restaurant, Man Ray (Tr. 1586). However, Hermes did not receive $50,000 from his friend, but rather his friend allegedly invested the money on his behalf (Tr. 857, Tr. 1586-1587). Hermes did not know what he received in return for the alleged loan, nor did he make any interest or principal payments on it (Tr. 858, 1589, 1862). There is insufficient evidence in the record for the Court to find that this transaction was a loan (and therefore marital debt). There is also insufficient evidence in the record to distribute any interest in Man Ray as marital property, as requested by Rostropovich because there is no proof what, if any, investment was ever made by Bruce Colley.

27

Credit Card Debt

Hermes contends that $41,960 owed to American Express (Exh. 39) and $33,456.80 owed to Citibank Visa (Exh. 39) is marital debt (Defendant's Post-Trial Reply Brief at 103). He claims that the expenses are marital debt even though an unknown portion admittedly related to business expenses (e.g., dinners for potential investors and business associates) (Tr. 898). Accordingly, as Defendant has failed to prove that this debt was used for marital purposes (see Phillips, supra), the Court finds that it is Defendant's separate liability.

Miscellaneous Separate Property

Rostropovich does not dispute that the following is Hermes's separate property: (i) 1 share of stock in Hermes Sellier, (ii) a 1/10 interest in forest land in France, which is subject to a life estate by his grandmother, and (iii) 220 shares of Hermes International stock, which are subject to a life estate by his grandmother.

Hermes does not dispute that he signed a promissory note in favor of Rostropovich, dated July 18, 1996 for $100,000 (Ex 7) and therefore, the note is Rostropvich's separate property and Hermes's separate liability.

Custody

Defendant, who has decided to leave New York and reside in France, has agreed that Rostropovich will be the primary custodial parent of the two children, Oleg, 10 and Slava, 8 and that the children will reside with her (Defendant's Post-Trial Reply Brief at 113). He argues however, that despite their strained relationship, the parties should have joint custody and each parent should have separate "spheres of influence" and that his sphere encompass education, so that the children, who are American, continue to have a French education (id.). Although Rostropovich is willing to consult with Defendant on major issues, she contends that she should have final decision-making responsibilities and rights (Tr. 1686-1687; Plaintiff's Post Trial Brief at 100-102).

The Court awards custody to Rostropovich who shall consult with Hermes on all major decision making issues, such as education, consider his preferences and concerns and attempt to include him in significant events in the children's lives (see, Matter of Fedash, Jr. v Neilsen, 211 AD2d 1003 [3d Dept 1995] [consultation was appropriate]).[14] However, absent agreement, it is in the best interests of the children that decisions be

---

[14] Dr. Weintrob recommended Rostropovich as the custodial parent, noting in part Hermes's apparent insensitivity to his children in certain situations and his self-centered approach to issues involving the children (Exh. Court II, p. 44-47).

made, and because agreement may be impossible, Rostropovich, the custodial parent, shall have final decision making authority (see Trapp v Trapp, 136 AD2d 178 [1st Dept 1988] [antagonistic relationship precluded joint decision-making on contested issues, including choice of schools, as being inimical to the best interests of the children]; Matter of Yetter v Jones, 272 AD2d 654 [3d Dept 2000] [joint decision-making not appropriate unless "parents are capable of and engage in cooperative civil communication concerning the children" and is not appropriate where "the parents are combative, accusatory and simply unable to jointly address the best interests of the children as a direct result of their hostility toward each other"]). The parties have not been able to discuss educational matters since the divorce proceeding commenced (Tr. 1693). Moreover, over the many weeks of trial, this Court closely observed the parties who did not on any occasion communicate with, or acknowledge each other, in any manner other than with hostility. There is nothing in the record before the Court to suggest that these two individuals are even minimally capable of joint decision-making. The Court has considered the recommendation of the Court-appointed neutral forensic psychiatrist, Dr. Alex Weintrob, who recommended that if there were going to be a single custodial parent, the decision-making should reside with that custodial parent (Tr. 1743-44, Exh. Court II, p. 47-48). Therefore, to award joint decision making, or even spheres of decision making in this case, would place the children's lives in constant turmoil and would not be in their best interests.

## Visitation

The Court finds that the following visitation schedule is in the best interests of the children: Defendant, who has left the United States, shall have one weekend each month with the children, and four of the three-day holiday weekends, all in New York City. Missed weekends shall not be accumulated for additional visitation but shall be waived. Defendant shall have six of the twelve weeks of the summer vacation with the children; an equal division of Christmas vacation and alternating years for winter, Easter and Thanksgiving vacations. There shall be no unaccompanied travel by the children until Slava is twelve. All traveling companions must be known to the children and to Rostropovich, and Defendant shall provide a contact telephone number and itinerary at least one week in advance of any travel outside the United States or within this country. Rostropovich shall keep the children's U.S. passports.

## Attorney's Fees

Rostropovich requests that the Court award her counsel fees in an amount to be determined at a hearing (Plaintiff's Post-Trial Brief at 109). In her March 5, 2002 decision, Justice Lobis declined to award Rostropovich counsel fees pendente lite, without prejudice to renewal at trial. Justice Lobis premised her denial in part upon Rostropovich's expectation of receiving a substantial distributive award, which has not occurred. Pursuant to Domestic Relations Law § 237, the Court finds that it is proper to

29

direct Hermes to pay Rostropovich's attorney's fees and expenses as the bulk of Plaintiff's
assets is monthly maintenance and Defendant is the monied spouse, who unlike Plaintiff,
has a lucrative career (see Gober v Gober, 282 AD2d 392 [1st Dept 2001] [where wife's
assets were confined to maintenance and husband's wealth was in the millions and
accumulating, award of counsel fees was appropriate]; Atweh v Hashem, 284 AD2d 216
[1st Dept 2001] [although the parties had comparable assets, the husband, a doctor, was
ordered to pay wife's attorney's fees because he had significantly greater earning
capacity]; Dunnan v Dunnan, 261 AD2d 195 [1st Dept 1999] [award of attorney's fees
proper where wife, who was unable to work, was not be required to deplete her assets to
pay legal fees]). The fact that Plaintiff's father has already paid a portion of her counsel
fees does not preclude the award of fees (see Charpie v Charpie, 271 AD2d 169 [1st Dept
2000]). Plaintiff's request to re-visit Justice Lobis's order allocating Dr. Weintrob's fee
between the parties and Plaintiff's request for an order requiring Defendant to reimburse
her for her expert witness's fee is denied.

Accordingly, it is hereby

ORDERED that pursuant to Domestic Relations Law § 236, the maintenance and
child support awarded herein is retroactive to the date of application taking into account
any amounts already paid and shall be payable at the rate of $10,000 per month in addition
to the sums awarded herein until all arrears have been satisfied; and it is further

ORDERED that Plaintiff shall submit a proposed Findings of Fact and Conclusions
of Law and Judgment on notice, in conformity with this Post Trial Decision, within 45
days hereof; and it is further

ORDERED that Plaintiff submit, on notice, a Judgment for arrears in the amount of
$449,904, plus interest from the date of this decision; and it is further

ORDERED that Hermes shall pay his portion of Dr. Alex Weintrob's fee as directed
by Justice Lobis's order, dated January 17, 2002, within 15 days from the date hereof, and
it is further

ORDERED that the issue of attorney's fees are referred to a Special Referee to hear
and report; and it is further

ORDERED that Plaintiff shall serve a copy of this Post Trial Decision, with Notice
of Entry, on Defendant within 30 days and on the Clerk of the Judicial Support Office
(Room 311) within 90 days to arrange for a date for the reference to a Special Referee.

**This constitutes the Decision and Order of the Court.**
Dated: October 3, 2003

ENTER:

J.S.C.

EMILY JANE GOODMAN

30

Exhibit E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

OLGA ROSTROPOVICH,

                Plaintiff,

       -against-

OLAF GUERRAND-HERMES,

               Defendant.

---

Index No. 350697-01

JUDGMENT

**LIT ROLL COPY**

        WHEREAS plaintiff moved by order to show cause dated July 15, 2003 for a money judgment in the amount of $449,904 plus interest and filed an Affidavit in support thereof dated July 11, 2003; and

        WHEREAS defendant submitted an Affirmation from William Beslow dated July 25, 2003 in opposition to plaintiff's motion; and

        WHEREAS plaintiff submitted reply papers in further support of her motion, consisting of the Affirmation of Renee Schwartz, dated July 29, 2003, and the Affidavit of Olga Rostropovich, dated July 29, 2003; and

        UPON THE Order of the Honorable Emily Jane Goodman, Justice, signed on October 3, 2003 and entered by the New York County Clerk's Office on October 8, 2003 (a copy of which is attached hereto) which granted a money judgment to plaintiff Olga Rostropovich in the amount of $449,904 plus interest from October 3, 2003; it is hereby

        ADJUDGED that plaintiff, Olga Rostropovich, who resides at 64 East 77th Street, New York, New York, 10021, shall recover from the defendant Olaf Guerrand-Hermes, who maintains a residence at 1 West 67th Street, Apartment 601, New York, New York 10023, the

74

principal sum of $ 449,904, plus interest on said principal in the amount of $3106·00 from

October 3, 2003 to date of entry for a total judgment of 453,010.00 and let plaintiff

have execution thereto.

DATED: October 27, 2003

Clerk

JSG

EMILY JANE GOODMAN

Judgment entered this 31st
day of October, 2003 by the Clerk
of the New York County Courthouse

Clerk

FILED

OCT 31 2003

No 131979

STATE OF NEW YORK,
COUNTY OF NEW YORK, SS.:
I, NORMAN GOODMAN,
COUNTY CLERK AND CLERK
OF THE SUPREME COURT,
NEW YORK COUNTY,
DO HEREBY CERTIFY, that

OCT 31 2003

THAT I HAVE COMPARED THIS
COPY WITH THE ORIGINAL
FILED IN MY OFFICE ON
10-31-03
AND THAT THE SAME IS A
CORRECT TRANSCRIPT
THEREFROM AND OF THE
WHOLE OF SUCH ORIGINAL,
IN WITNESS WHEREOF,
I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY
OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE
SUPREME COURT, NEW YORK COUNTY
FACSIMILE SIGNATURE USED
PURSUANT TO SEC. 903,
COUNTY LAW.

FEE PAID

Exhibit F

## FINANCING STATEMENT: (FILED IN THE NEW YORK COUNTY REGISTER'S OFFICE)

| | | |
|---|---|---|
| 1. Debtor(s) and Address(es) | 2. Secured Party(ies) Name(s) and Address(es) | 3. For Filing Officer Date, Time, No. Filing Office |
| Guerrand-Hermes, Olaf<br>1 West 67th Street<br>Apt. #600,#601,#603,#6M<br>New York, NY 10023 | Morgan Guaranty Trust Company<br>of New York<br>500 Stanton Christiana Road<br>Newark, DE 19713 | 98MAY 15 PM12:34<br><br>98PN24625 |

6. This Financing Statement covers the following types (or items) of property:

Cooperative Proprietary Lease and stock filing on Apt. #600,#601,#603,#6M at 1 West 67th Street, New York, NY, i.e. 720 shares of Hotel des Artistes, Inc. and lease of Apt to debtor together with all fixtures used in connection there with by debtor.

7. Assignee(s) of Secured Party and Address(es)

ASS. VER.
BY ADDRESS

☐ Products of the Collateral are also covered

8. Describe Real Estate Here
1 West 67th Street,
Apt. #600,601,603,6M
New York, NY 10023

☐ This statement is to be indexed in the Real Estate Records.
until terminated

9. Name of a Record Owner
Hotel des Artistes, Inc.

No. & Street    Town or City    County    Section    Block 1120  Lot 23

10. This statement is filed without the debtor's signature to perfect a security interest in collateral (check appropriate box)
☐ under a security agreement signed by debtor authorizing secured party to file this statement, or
☐ which is proceeds of the original collateral described above in which a security interest was perfected, or
☐ acquired after a change of name, identity or corporate structure of the debtor, or ☐ as to which the filing has lapsed, or already subject to a security interest in another jurisdiction.
☐ when the collateral was brought into the state, or ☐ when the debtor's location was changed to this state

Olaf Guerrand-Hermes                    Morgan Guaranty Trust Company of New York

By _____          By Thomas P. _____ Vice President
(Signature(s) of Debtor(s))
(1) FILING OFFICER COPY  MAIL(H.A)
STANDARD FORM - FORM UCC-1 — Approved by Secretary of State of New York

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2003100801283001002E18EA

## RECORDING AND ENDORSEMENT COVER PAGE

| | |
|---|---|
| Document ID: 2003100801283001 | PAGE 1 OF 4 |
| Document Type: INITIAL UCC1 | |
| Document Page Count: 2 | Preparation Date: 10-08-2003 |
| | COOPERATIVE |

| PRESENTER: | RETURN TO: |
|---|---|
| MERLE & BROWN P.C. | MERLE & BROWN P.C. |
| 330 MADISON AVENUE, SUITE 2900 | 330 MADISON AVENUE, SUITE 2900 |
| NEW YORK, NY 10017 | NEW YORK, NY 10017 |
| 212-471-2990 | 212-471-2990 |
| j.bradley@mbpclaw.com | j.bradley@mbpclaw.com |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | | 603 | 1 WEST 67TH STREET |

Property Type: SINGLE RESIDENTIAL COOP UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 601 | 1 WEST 67TH STREET |

Property Type: SINGLE RESIDENTIAL COOP UNIT
☒ Additional Properties on Continuation Page

### CROSS REFERENCE DATA

CRFN _____ or Document ID _____ or    Year ____ Reel ____ Page ____ or File Number _____

| DEBTOR: | PARTIES |
|---|---|
| OLAF GUERRAND-HERMES | SECURED PARTY: |
| 1 WEST 67TH STREET | MICALDEN INVESTMENTS SA |
| NEW YORK, NY 10023 | C/O MORGEN & MORGEN, SWISS TOWER, 16 FL, 53 |
| | ROAD E STREET, URB |
| | MARBELA-WORLDTRADECTR |

### FEES AND TAXES

| Mortgage | | | | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Recording Fee: $ | 40.00 |
| Taxable Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | |
| Exemption: | | | NYC Real Property Transfer Tax Filing Fee: | |
| TAXES: | | | | $ | 0.00 |
| County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |

RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK
Recorded/Filed        10-17-2003 10:37
City Register File No.(CRFN):
2003000426135

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2003100801283001002C1A6A

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 4 |
|---|---|
| Document ID: 2003100801283001 | |
| Document Type: INITIAL UCC1 | Preparation Date: 10-08-2003 |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 6M | 1 WEST 67TH STREET |
| | Property Type: | SINGLE RESIDENTIAL COOP UNIT | | | |
| Borough | Block | Lot | | Unit | Address |
| MANHATTAN | 1120 | 23 | Partial Lot | 600 | 1 WEST 67TH STREET |
| | Property Type: | SINGLE RESIDENTIAL COOP UNIT | | | |

**FINANCING STATEMENT: (FILED IN THE NEW YORK COUNTY REGISTER'S OFFICE)**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> Merle & Brown, P.C.
> 330 Madison Avenue
> New York, New York 10017

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| Guerrand-Hermes | Olaf | | | |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1 West 67th Street | New York | | NY | 10023 | U.S.A. |
| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
| 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 | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Micalden Investments SA | | | | ☐ NONE |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS c/o Morgan & Morgan, Swiss Tower,. | CITY | | STATE | POSTAL CODE | COUNTRY |
| 16th FL., 53 Road E Street, URB Marbela-World Trade Ctr | Panama City | | | | Panama |

4. This FINANCING STATEMENT covers the following collateral:

All of the debtor's right, title, and interest in 756 Shares of Hotel des Artistes, Inc. represented by
share certificates numbered 345, 346, 347 and 354 and assigns to the Secured Party all of the
debtor's interest in the Proprietary Leases, dated July 10, 1990, for apartments 603, 601, 6M, and 600
located at 1 West 67th Street, New York, NY 10023, and the proceeds of any sale of the Shares,
transfer of the apartments, or subsequent assignment of the leases.

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.



2003101400495001001EBC92

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 4 |
|---|---|
| Document ID: 2003101400495001 | Preparation Date: 10-14-2003 |
| Document Type: INITIAL COOP UCC1 | COOPERATIVE |
| Document Page Count: 2 | |

| PRESENTER: | RETURN TO: |
|---|---|
| MERLE & BROWN P.C. | MERLE & BROWN P.C. |
| 330 MADISON AVENUE | 330 MADISON AVENUE |
| SUITE 2900 | SUITE 2900 |
| NEW YORK, NY 10017 | NEW YORK, NY 10017 |
| 212-471-2990 | 212-471-2990 |
| j.bradley@mbpclaw.com | j.bradley@mbpclaw.com |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 603 | 1 WEST 67TH STREET |
| | | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 601 | 1 WEST 67TH STREET |
| | | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |

☒ Additional Properties on Continuation Page

**CROSS REFERENCE DATA**

CRFN ____ __ or Document ID ____ or     Year ___ Reel ___ Page ___     or File Number ___ __

**PARTIES**

| DEBTOR: | SECURED PARTY: |
|---|---|
| OLAF GUERRAND-HERMES | XAVIER GUERRAND-HERMES |
| 1 WEST 67TH STREET | 216 BD SAINT GERMAIN |
| NEW YORK, NY 10023 | PARIS |
| | FRANCE |

**FEES AND TAXES**

| Mortgage | | | | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Recording Fee: $ | | 40.00 |
| Taxable Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | | 0.00 |
| Exemption: | | | NYC Real Property Transfer Tax Filing Fee: | | |
| TAXES: | | | $ | | 0.00 |
| County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | $ | | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK**
Recorded/Filed          10-22-2003 09:44
City Register File No.(CRFN):
2003000431595

*John Farmere*
*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2003101400495001001CBE12

**RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION)**       **PAGE 2 OF 4**

| Document ID: 2003101400495001 | |
|---|---|
| Document Type: INITIAL COOP UCC1 | Preparation Date: 10-14-2003 |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 6M | 1 WEST 67TH STREET |
| | Property Type: | SINGLE RESIDENTIAL | COOP UNIT | | |

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 600 | 1 WEST 67TH STREET |
| | Property Type: | SINGLE RESIDENTIAL | COOP UNIT | | |

## FINANCING STATEMENT: (FILED IN THE NEW YORK COUNTY REGISTER'S OFFICE)

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Merle & Brown, P.C.
330 Madison Avenue
New York, New York 10017

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| Guerrand-Hermes | Olaf | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1 West 67th Street | New York | NY | 10023 | U.S.A. |
| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
| 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 | ORGANIZATION DEBTOR | | | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names  ☐ NONE

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
| | ORGANIZATION DEBTOR | | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)  ☐ NONE

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| Guerrand-Hermes | Xavier | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 216 bd Saint Germain | Paris | | | France |

4. This FINANCING STATEMENT covers the following collateral:

All of the debtor's right, title, and interest in 756 Shares of Hotel des Artistes, Inc. represented by share certificates numbered 345, 346, 347 and 354 and assigns to the Secured Party all of the debtor's interest in the Proprietary Leases, dated July 10, 1990, for apartments 603, 601, 6M, and 600 located at 1 West 67th Street, New York, NY 10023, and the proceeds of any sale of the Shares, transfer of the apartments, or subsequent assignment of the leases.

5. ALTERNATE DESIGNATION [if applicable]   ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR   ☐ SELLER/BUYER   ☐ AG. LIEN   ☐ NON-UCC FILING
6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable]   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]   ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2
8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2003101400621001002E4541

**RECORDING AND ENDORSEMENT COVER PAGE**                    PAGE 1 OF 4

Document Date: 10-14-2003

Document ID: 2003101400621001                              Preparation Date: 10-14-2003
Document Type: INITIAL COOP UCC1                                      COOPERATIVE
Document Page Count: 2

**PRESENTER:**                              **RETURN TO:**
MERLE & BROWN, P.C.                         MERLE & BROWN, P.C.
330 MADISON AVENUE                          330 MADISON AVENUE
SUITE 2900                                  SUITE 2900
NEW YORK, NY 10017                          NEW YORK, NY 10017
212-471-2990                                212-471-2990
j.bradley@mbpclaw.com                       j.bradley@mbpclaw.com

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 603 | 1 WEST 67TH STREET |

Property Type: SINGLE RESIDENTIAL COOP UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 601 | 1 WEST 67TH STREET |

Property Type: SINGLE RESIDENTIAL COOP UNIT

☒ Additional Properties on Continuation Page

**CROSS REFERENCE DATA**

CRFN _____ or Document ID _____ or Year ____ Reel ____ Page ____ or File Number ____

**PARTIES**

**DEBTOR:**                                 **SECURED PARTY:**
OLAF GUERRAND-HERMES                        PATRICK GUERRAND-HERMES
1 WEST 67TH STREET                          29 RUE DE SENLIS, DINEUIL ST. FIRMIN 60500
NEW YORK, NY 10023                          CHANTILLY
                                            FRANCE

**FEES AND TAXES**

| | | | | | |
|---|---|---|---|---|---|
| Mortgage | | | | Recording Fee: $ | 40.00 |
| Mortgage Amount: | $ | 0.00 | | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | 0.00 | | | $ 0.00 |
| TAXES: | | | | NYS Real Estate Transfer Tax: | |
| County (Basic): | $ | 0.00 | | | $ 0.00 |
| City (Additional): | $ | 0.00 | | | |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed    10-22-2003 09:48
City Register File No.(CRFN):
                  2003000431623

*City Register Official Signature*

Exhibit G

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MICALDEN INVESTMENTS SA,

                    Plaintiff,

**0 3 1 1 8 4 2 2**

**JUDGMENT BY CONFESSION**

           -against-

OLAF GUERRAND-HERMES,

                    Defendant.

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

Upon reading and filing the annexed affidavit of confession of judgment, sworn to on the 2nd day of

October, 2003, by the defendant, Olaf Guerrand-Hermes, and on motion of Merle & Brown, P.C.,

attorney for plaintiff, it is

~~ORDERED, ADJUDGED AND DECREED~~, that the plaintiff, Micalden Investments SA, having

an office c/o Morgen & Morgen, Swiss Tower, 16th Floor, 53 Road E. Street, URB Marbela - World

Trade Centre, Panama City, Panama, the sum of One Million Three Hundred and Ninety Thousand

Six Hundred and Seventy-Four Dollars and Thirty Cents ($          4.35) and that the plaintiff have

execution therefor.

*recover of defendent Olaf Guerrand-Hermes*

*(1,390,664.35)*

**FILED**

**OCT 2 2 2003**

**COUNTY CLERKS OFFICE**
**NEW YORK**

Judgment signed this _____ day of _____, 2003.

_____
Clerk

*Olaf Guerrand-Hermes*
*1 West 67th Street*
*NY, New York*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MICALDEN INVESTMENTS SA,

                Plaintiff,

        -against-

OLAF GUERRAND-HERMES,

                Defendant.

**AFFIDAVIT FOR
JUDGMENT BY CONFESSION**

| | | Kingdom of Morocco | ) |
|---|---|---|---|
| STATE OF NEW YORK | ) | District of Casablanca | ) |
| | ) ss.: | City of Casablanca | )SS |
| COUNTY OF NEW YORK | ) | Consulate Général of The | ) |
| | | United States of America | ) |

Olaf Guerrand-Hermes, being duly sworn, deposes and says:

I am the defendant in the above entitled action.

I reside at 1 West 67th Street, City of New York, County of New York, State of New York.

I, the defendant in the above entitled action, confess judgment in this court in favor of the plaintiff Micalden Investments SA, for One Million Three Hundred and Ninety Thousand Six Hundred and Seventy-Four Dollars and Thirty Cents ($1,390,674.30), plus interest and hereby authorize the plaintiff or its heirs, executors, administrators, or assigns to enter judgment for that sum against me.

This confession of judgment is for a debt justly due to the plaintiff arising out of a personal loan that was made to the defendant by Micalden Investments SA, to pay the mortgage and maintenance fees for the defendant's apartment located at 1 West 67th Street, New York, New York. Proceeds from said personal loan was also used for his support and maintenance and the support and maintenance of defendant's two children Slava and Oleg. This personal loan was made in several separate transactions which are listed below:

(a)   $125,036.62 made on February 24, 2003, for mortgage payments and maintenance fees due on the defendant's apartment.

(b)   $20,036.62 made on February 24, 2003, as repayment for loan given by Mathias Guerrand-Hermes to defendant.

(c)   $16,326.62 made on February 24, 2003, for living expenses.

(d)   $5,508.99 made on March 3, 2003, for legal fees.

(e)   $1,000,036.68 made on March 17, 2003, for loan repayment/equity purchase given by Patrick Guerrand-Hermes to defendant.

(f)   $21,756.27 made on March 27, 2003, for Lycee Francais School tuition and living expenses.

(g)   $5,538.26 made on April 8, 2003, for living expense.

(h)   $20,037.91 made on May 14, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(i)   $7,537.84 made on May 15, 2003, for legal fees.

(j)   $5,037.84 made on May 15, 2003, for living expenses.

(k)   $6,072.42 made on May 19, 2003, for living expenses.

(l)   $12,170.86 made on May 28, 2003, for assessment charges for defendant's apartment.

(m)   $6,101.53 made on June 12, 2003, for airline tickets for the defendant and his children to and from Morocco and living expenses.

(n)   $4,138.30 made on June 12, 2003, for life insurance policy.

(o)   $33,538.52 made on June 16, 2003, as mortgage payment for defendant's apartment.

(p)   $5,884.33 made on July 10, 2003, for living expenses.

(q)   $10,036.62 made on July 31, 2003, for legal fees.

(r)   $4,036.12 made on September 16, 2003, for living expenses.

(s)   $31,795.00 made on September 19, 2003, as mortgage payment for defendant's apartment.

(t)   $50,037.00 made on September 22, 2003, for common charges, assessments, and ancillary charges for defendant's apartment.

...liability. ...is not for the purpose of securing the plaintiff against

Dated:

Olaf Guenand Hermes, Defendant

Sworn to before me this _____
day of _____ 200_

Daniel J. ERNST
Vice Consul of the United
States of America

# Exhibit H

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:    Hon.  **EMILY JANE GOODMAN**          PART ___17___
                      *Justice*

---

OLGA ROSTROPOVICH,                              INDEX NO. ____350697/01____

                                                MOTION DATE _____

                    - v -                       MOTION SEQ. NO. ___010___

OLAF GUERRAND-HERMES                            MOTION CAL. NO. _____

---

The following papers, numbered 1 to_____ were read on this motion to/for _____

                                                        PAPERS NUMBERED

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...    _____

Answering Affidavits — Exhibits _____

Replying Affidavits _____

**Cross-Motion:**   ☐ Yes   ☑ No

*MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE  DATED:*

*J.S.C.*

   Upon the foregoing papers, it is ordered that Plaintiff's order to show cause for the
sequestering of the Defendant's apartment at Hotel Des Artistes and for the
appointment of a receiver, or, for contempt, is granted without opposition, as follows:
ORDERED that pursuant to DRL § 243 and based upon Defendant's wilful failure to
comply with Court orders, the Court appoints Harvey Fischbein, Esq. as receiver to
sell the apartment at Hotel Des Artistes and apply the net proceeds to Plaintiff's
arrears and to future spousal and child support.

   Submit order of appointment, on notice.

Dated: October 28, 2003

                                        *J.S.C.*
                                **EMILY JANE GOODMAN**

Check one:   ☑ **FINAL DISPOSITION**    ☐ **NON-FINAL DISPOSITION**

LIT ROLL COPY

Exhibit I



LIT
ROLL
COP

AT I.A.S. PART ___ 17 ___ OF TH
SUPREME COURT OF THE STATE OF NEW
YORK, HELD IN AND FOR THE COUNTY OF
NEW YORK, AT THE COUNTY COURT
HOUSE THEREOF ON _____
2003

SUPREME COURT OF THE STATE OF ____
COUNTY OF NEW YORK

OLGA ROSTROPOVICH,

            Plaintiff,

    -against-

OLAF GUERRAND-HERMES,

            Defendant.

Index No. 350697-01

NYS SUPREME COURT
RECEIVED
DEC - 3 2003
I.A.S. MOTION
SUPPORT OFFICE

FILED
DEC - 5 2003
COUNTY CLERK'S OFFICE
NEW YORK

WHEREAS, pursuant to an Order dated March 5, 2002, Defendant was required to pay $8,333 in monthly child support *pendente lite*, and all of the maintenance and carrying charges for the then-marital residence at Hotel Des Artistes and the parties' home in Connecticut, unreimbursed medical, dental and psychiatric expenses for Plaintiff and the parties' two children, and the children's tuition and school-related expenses; and

WHEREAS, pursuant to June 20, 2002 so-ordered Stipulation, Defendant was required to pay Plaintiff's rent up to $16,000 for one year, as well as the brokerage and moving expenses when she and the children moved out of the Des Artistes apartment, and

WHEREAS plaintiff moved by order to show cause dated September 10, 2003, for an Order pursuant to DRL § 243, sequestering Defendant's apartment at the Hotel Des Artistes and appointing an independent receiver thereof, or in the alternative holding Defendant in contempt for failure to pay outstanding support in arrears; and

WHEREAS the September 10, 2003 Order to Show cause was properly served on Defendant's counsel, William S. Beslow on September 12, 2003; and

WHEREAS the September 10, 2003 Order to Show cause ordered that answering papers, if any, were to be served on Plaintiff's counsel, and to Chambers, Room 551, so as to be received on or before September 2(), 2003 and

WHEREAS Defendant did not file any timely opposition papers; and

WHEREAS, in a Decision dated October 28, 2003, a copy of which is attached hereto, the Court granted Plaintiff's September 10, 2003 order to show cause without opposition and appointed Harvey Fishbein, Esq. as receiver to sell the Des Artistes apartment and apply the net proceeds to Plaintiff's arrears and to future spousal and child support obligations; and

WHEREAS the Court's trial decision dated October 3, 2003 ordered Defendant to pay maintenance in the amount of $25,000 per month for a period of seven years retroactive to Plaintiff's November 8, 2001 request for *pendente lite* maintenance and that arrears owed by reason of the Court's decision shall be paid at a total rate of $10,000 per month (for maintenance and child support arrears) in addition to the sum awarded above, until all arrears have been satisfied; and

WHEREAS the Court's trial decision ordered Defendant to pay child support in the amount of $10,000 per month retroactive to Plaintiff's November 8, 2001 request for *pendente lite* child support and that arrears owed by reason of the Court's decision shall be paid at a total rate of $10,000 per month (for maintenance and child support) in addition to the sum awarded above. The Court also ordered, as further child support, that Defendant shall be entirely responsible for providing health insurance and for payment for all of the children's health care (medical, dental and psychiatric) which is not covered by insurance, as well as the costs of their education, including private school tuition, books, supplies, tutors, and speech therapy, except that Plaintiff shall pay for the cost of any music lessons; and

2

WHEREAS the Court's trial decision dated October 3, 2003 found that Defendant owed Plaintiff support in arrears in the amount of $707,836.74 as of that date. The $707,836.74 total included a $257,931.74 money judgment that was entered on July 24, 2002, as well as $449,904 of arrears, plus interest, which was the subject of Plaintiff's July 15, 2003 Order to Show Cause for all arrears up to the date of that order to show cause; and

*↑ from October 3, 2003*

WHEREAS a money judgment for arrears in the amount of $453,010, representing the $449,904 principal amount plus interest, was entered against Defendant on October 31, 2003; it is hereby

ORDERED that pursuant to CPLR 5228, Harvey Fishbein, Esq. is hereby appointed as Receiver for Defendant's apartments #601, 603 and 6M at Hotel Des Artistes, 1 West 67th Street, New York, New York (the "Premises"); and it is further

ORDERED that Defendant or anyone else hereafter in possession of the Premises immediately surrender possession to the Receiver and provide the Receiver with a key, notify managing agent of Des Artistes that the Receiver has the powers set forth herein, and to provide any other assistance as requested by the Receiver to enable him to carry out his duties set forth herein; and it is further

ORDERED that Defendant provide the Receiver with a copy of any brokerage agreements which are currently in effect, as well as any appraisals for the Premises; and it is *further 30 days from a demand* father

ORDERED that Defendant cooperate in order to obtain or provide whatever consent or other documents that are necessary from or to the Board of the Hotel Des Artistes, including but not limited to a power of attorney, to assist the Receiver's ability to carry out the duties set forth herein; and it is further

3

ORDERED that the Receiver is authorized to discuss his efforts to fulfill his duties as Receiver with the parties and/or their counsel, either individually or jointly; and it is further

ORDERED that Defendant is restrained from making any disposition of the Premises or encumbering it in any manner or form other than as directed herein; and it is further

ORDERED that the Receiver is authorized to ↑make a motion to retain a broker(s), counsel or any other agent as the Receiver deems necessary to assist his efforts to sell the Premises, by auction or otherwise, as soon as is reasonably practicable; and it is further

ORDERED that the Receiver may incur costs and charges at the expense of the Premises and make disbursements as necessary for obtaining possession thereof, preserving the property, and in connection with the sale of the Premises; and it is further

ORDERED that the Defendant is required to keep the Premises insured against loss and to pay the maintenance, mortgage, taxes and assessments on the Premises until the Premises are sold; and it is further

ORDERED that the Receiver be directed to deposit all monies at the time he receives them in an account established in connection with his duties as Receiver, that only the Receiver shall be able to make withdrawals from the account, and that the Receiver shall send a copy of monthly statements from the bank account to the parties' attorneys; and it is further

ORDERED that after paying the expenses of management and care of the Premises and the expenses relating to its sale (including any broker's fee), and satisfying the mortgage on the apartment, the Receiver shall apply the balance of the moneys to any of the arrears owed by Defendant to Plaintiff. If there are any funds remaining thereafter, they shall be used to pay Plaintiff's present and future child support and maintenance as set forth in the

4

Court's trial decision, payable on the first of every month, provided however, that the Receiver

first coordinate with Plaintiff's attorneys who may be holding funds in escrow from equitable

distribution to be used for the same purposes; and it is further

ORDERED that the Receiver and any party to this proceeding may apply at any

time on notice to all parties for further or other instructions and for such further power as may be

necessary to enable the receiver to properly carry out the terms of this order and fulfill his duties

as Receiver; and it is further

ORDERED that the Receiver shall be entitled to earn a reasonable commission in

connection with his responsibilities as Receiver.  The Receiver shall make an application to this

Court for the receipt of a reasonable compensation, which shall not exceed, and may be less than,

the amount permissible under CPLR 5228.  This application shall detail the Receiver's services

and efforts and any expenses incurred.  The parties shall be given an opportunity to respond to

the Receiver's request for a commission; and it is further

ORDERED that the Receiver shall execute an oath pursuant to CPLR 5228 and

6402 before commencing his duties as Receiver; and it is further

ORDERED that the Receiver shall file with the Clerk of the Court an undertaking

in the amount of $ _100,000_ conditioned on the faithful discharge of his duties of his duties

as Receiver.  *ORDERED that the Receiver shall file with the fiduciary clerk a notice of appointment and certification of compliance on the appropriate UCS 830 forms within 30 days of receipt of those forms and prior to commencing any duties*

Dated: New York ~~September~~ ___, 200_

FILED

DEC - 5 2003    Enter

COUNTY CLERK'S OFFICE
NEW YORK

J.S.C.

EMILY JANE GOODMAN

5



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OLGA ROSTROPOVICH,

                 Plaintiff,

      -against-

OLAF GUERRAND-HERMES,

                Defendant.

Index No. 350697-01

NOTICE OF SETTLEMENT OF
ORDER

      PLEASE TAKE NOTICE that the attached proposed Order has been presented to

The Hon. Emily Jane Goodman, J.S.C. and shall be returnable before the Court on November 19,

2003 at 9:30 a.m. or as otherwise directed by the Court.  Pursuant to Rule 202.48, any proposed

counter-order must be served by personal service on Plaintiff's counsel by November 17, 2003.

Dated: November 12, 2003

                KRONISH LIEB WEINER & HELLMAN LLP

                By: _____
                    Renee Schwartz
                    Jeffrey Gross

                1114 Avenue of the Americas
                New York, New York 10036
                (212) 479-6000

                Attorneys for Plaintiff, Olga Rostropovich

To:    William S. Beslow, Esq.
       620 Fifth Avenue
       New York, NY 10020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
MICALDEN INVESTMENTS, S.A

                         Plaintiff,

          -against-                                    Index No.118422/03

OLAF GUERRAND-HERMES,                        **Affidavit in Opposition**

                         Defendant
------------------------------------------------------------X


KINGDOM OF MOROCCO   )
                     ) ss
DISTRICT OF TANGIERS )

Eva Blazek, being duly sworn, states:

1.   I am the principal and sole shareholder of Micalden Investments, S.A.

("Micalden"), a Panamanian corporation through which I hold and administer certain

personal, business and financial assets, including the proceeds of my divorce

settlement. I make this affidavit in opposition to the motion of non-party Olga

Rostropovich ("Olga") to vacate the judgment held by Micalden against Olaf

Guerrand-Hermes ("Olaf") in this action (the "Micalden Judgment"). I am personally

familiar with the facts herein set forth.

2.   By way of personal background, I received my B. A. in economics from

Harvard in 1991. I then worked for Morgan Stanley and Credit Suisse First Boston

before staring my own fund, Prague Capital Partners, in 1995. Together with my ex-

husband, I acquired two companies in Central Europe manufacturing natural-gas

appliances, Feg, R.T in Hungary, and Karma, A.S. in the Czech Republic. When I got

divorced, the settlement I received from my ex-husband was basically a buyout of my

interest in the marital assets I worked to create. It is important for this Court to
understand that I worked very hard for all of the money involved in this lawsuit.

3. The motion should be denied because the Micalden Judgment was entered
in good faith to secure Micalden's right to recover approximately $1.4 million
advanced by me through Micalden to or on behalf of Olaf., as set forth in detail
below.

4. In her moving papers, Olga impugns the integrity of the Micalden
Judgment by pointing to the "suspicious" nature of the timing, by which she means
that the Micalden Judgment was entered in October, 2003, shortly after this Court had
rendered a post-trial decision (the "Decision") in the divorce action between Olga and
Olaf (the "Divorce Action"), and shortly before a money judgment in favor of Olga
against Olaf for arrears based on the Decision was entered (the "Second Olga
Judgment"). In fact, the timing and motivation were perfectly straightforward. Having
advanced nearly $1.4 million to Olaf or for his benefit in 2003, I was naturally
anxious to protect my right to have those monies repaid from Olaf's shares of the
proceeds of the apartment at 1 West 67th Street (the "Apartment"). The funds
advanced had mostly related to the Apartment and were all advanced with the
understanding that they would be repaid from the proceeds of the sale. No one
therefore saw anything wrong with taking the steps necessary to protect that right to
repayment.

5. In fact, there is an element of coincidence to the timing, in that the process
of reducing these obligations to judgment actually began before the Decision was
rendered. As Olga's counsel herself notes in her moving affirmation, Olaf's affidavit

2

in connection with the confession of judgment was executed on October 2, 2003, before the issuance of the Decision, which was dated October 3 and entered October 8 (Renee Schwartz Affirmation ¶17). Thus the entry of the Micalden Judgment was not a response to the Decision.

6. However, there is no question that everyone knew in late 2003 that this Court would eventually decide the Divorce Action and that Olga, who at that point already had one arrears judgment against Olaf, would eventually obtain a second. Because I had advanced the funds in question several months earlier in good faith, there was no reason to wait and permit the entry of further liens or judgments against the Apartment by Olga or by anyone else. I therefore took the steps necessary to protect my rights. As it happens, the Decision was issued in the midst of that process. The net result, however, is, as Olga concedes, that the Micalden Judgment is prior in time to the Second Olga Judgment. Indeed, that is why Olga has brought this motion.

7. Olga also attacks the Micalden Judgment as the product of collusion. Obviously, Olaf cooperated in the entry of the Micalden Judgment. That makes it, however, no more or less collusive than any confession of judgment ever given by any debtor to any lender, a process which is by definition non-adversarial. Since I advanced these monies at Olaf's request, there is no reason why he should not have acknowledged the validity of the debt and taken the steps necessary to secure its repayment.

8. Olga further attacks the Micalden Judgment by arguing that Olaf testified at trial that he had no assets and it is therefore inconceivable that anyone would loan him money. However, that ignores the equity in the Apartment, a separate asset

3

acquired prior to the marriage. Olaf testified at trial that he regarded his father Patrick as the beneficial owner of the Apartment, but there was no question that title was in Olaf's name. There was also little doubt after the trial of the Divorce Action that this Court was inclined to view the Apartment as owned by Olaf, not Patrick. It was therefore assumed by all the parties involved (i.e. Patrick, Olaf and myself) that advances (especially those relating to the Apartment, as most of these were) could be secured by Olaf's equity in the Apartment. The funds were therefore advanced with every expectation of relatively prompt repayment from the proceeds of a known asset.

9.    The real question before the Court on this motion ought to be whether these funds were actually advanced and whether, as a result, Olaf was justly indebted to Micalden at the time the Micalden Judgment was entered. If the Micalden Judgment was based on a just and valid obligation, then there would not seem to be any valid basis for setting it aside. The fact that Olaf might have other valid obligations, including his obligation to Olga, would not seem to be such a reason. In the balance of this affidavit, therefore, I will address the circumstances in which these advances were made.

10. Most of the funds advanced had to do, in one form or another, with the Apartment. A list of the amount and date of each advance, with some brief indication of the purpose of the advance, is contained in Olaf's October 2 affidavit in support of the confession of judgment, a copy of which is annexed as Exhibit F to the Schwartz Affirmation. A more legible copy of that affidavit is annexed as Exhibit A to this affidavit.

4

11. All of the funds were advanced by wire transfer. Copies of the wire transfer confirmations from the wiring bank as to each listed advance are collectively annexed as Exhibit B.

12. Olaf executed a demand promissory note with respect to these advances, attached to which was a schedule of the funds advanced. A copy of that document is annexed as Exhibit C.

13. As to the source of the funds used by Micalden in making these advances, I annex as Exhibit D copies of two incoming wire transfer confirmations to Micalden on February 19 and February 24, 2003 in the aggregate amount of $1.65 million (minus the total of $10 in wire charges), showing that the funds emanated from Richen Investments Ltd., a company controlled by my ex-husband Fredrik Gradin. These were my own personal funds, held by me through the Panamanian corporation, Micalden, which I had caused to be set up for that purpose. These funds had no connection with any member of the Guetrand-Hermes family prior to the transactions underlying the Micalden Judgment. I shall now address those transactions in detail, beginning with the circumstances which formed the backdrop against which these transactions took place.

14. The trial of the Divorce Action took place over the winter of 2002-03. Olaf testified at length in that trial. Patrick came to New York in late February, 2003 to testify as well.

15. At that time, a disagreement developed between Patrick and Olaf in connection with the Apartment. The Apartment was then on the market with an asking price of $4 million, but was attracting little interest at that price due to the

5

generally poor real estate market in New York at that time and the condition in which Olga left the Apartment when she moved out in August 2002. Olaf, however, was resistant to lowering the price because he thought at the time that the Court would compel Olga to put the furniture back in the Apartment, which brokers had told him would markedly improve its sale value, and because he expected the market to improve shortly, as it since has.

16. The Apartment had originally been purchased and renovated with Patrick's money. Patrick had paid out $2 million in connection with the purchase of the Apartment and a further sum in connection with the renovations that were made..

17. For various planning reasons, all of which occurred long before my involvement in the situation, Patrick and Olaf put the Apartment in Olaf's name. Between themselves, however, they treated Patrick as in effect the beneficial or "real" owner of the Apartment. Their original understanding at some point had been that when the Apartment was sold, Patrick would recoup his investment. Any monies realized above that would be equally divided between them. (Their analysis assumed that the entire Apartment would be deemed separate property in the Divorce Action. They did not anticipate this Court's award to Olga of a portion of the appreciation in the value of the Apartment during the marriage.)

18. Thus, their thinking about the ownership of the Apartment was not entirely consistent. On the one hand, everyone recognized that Olaf was the titular owner. On the other hand, they regarded Patrick as being the beneficial owner, and, in any event, as being owed more than $2 million from the value of the Apartment. They did not really distinguish rigorously between these concepts and it seemed to make little

6

practical difference, since they assumed Olaf would get the entire Apartment as separate property in the divorce.

19. In the winter of 2003, the Apartment was encumbered by a mortgage of approximately $1.7 million. Since it was certainly not then worth more than $4 million, the net proceeds could not realistically much exceed $2 million. As Patrick and Olaf regarded the matter, in theory, Patrick could have demanded all of the proceeds in repayment of his investment. Informally, however, the understanding at that time was that Patrick and Olaf would divide the net proceeds above the mortgage equally. This would have meant that Patrick and Olaf would each get more than $1 million, net of the mortgage, if the Apartment sold for $4 million.

20. When Patrick was in New York in February, 2003, however, he was told that the asking price was too high and that the price should be lowered to attract a buyer. Olaf, however, was unwilling to accept a "fire sale" of the Apartment, because he believed that the timing did not favor a sale in that market and with the Apartment in that condition. He wanted to wait until the true value of the Apartment could be realized. Patrick was very upset by Olaf's resistance to selling in that market and was willing to sell even at a steep discount.

21. Additionally, at that time, Olaf had no income and no way to pay the mortgage and maintenance on the Apartment. Patrick, who was being told that he would never see back the $4 million he had already sunk into the Apartment, was adamantly refusing to put more money into the Apartment.

22. By virtue of our relationship, Olaf was aware that I was about to receive a $1.65 million payment from my ex-husband and he asked for my help in dealing with

7

the problem. He wanted to make a payment to Patrick on account of Patrick's interest in the proceeds of the Apartment sufficient to persuade Patrick to permit him to wait for the market to improve. After discussion with Patrick, Patrick agreed that in exchange for a payment of $1 million against the proceeds he would continue to allow Olaf to try to realize the true value of the Apartment. Olaf also needed to deal with the various outstanding problems such as the mortgage and ongoing maintenance obligations. He also needed money for living expenses.

23. Against this background I advanced, through Micalden, the following amounts, all as reflected in Exhibit B. On February 24, 2003, I advanced Olaf $16,290 (the uneven amount is because of the conversion from Euros) for living expenses. On the same date, I also paid $20,000 to Olaf's brother Mathias in repayment of one of two loans in that amount made by Mathias to Olaf in 2002. (The amounts I am using in this affidavit are the principal amounts; the actual charge may differ slightly because of the addition of bank fees.) Also on the same date, I paid $125,000 to Patrick, which was used to pay the amount then outstanding on the mortgage on the Apartment, plus the past-due maintenance and a special assessment on the Apartment. (This latter payment was made through Patrick because Olaf was sensitive about having large amounts from unknown sources going through his account during the trial.) Finally, on February 28, I transferred $5501.64 to pay some of Olaf's legal fees in Europe. That completes the February advances.

24. On March 14, 2003 I funded the agreement between Olaf and Patrick by wiring $1 million to an account of Patrick's. As I understood the arrangement, this was an on-account payment, which would reduce Patrick's entitlement to the

8

proceeds from the sale of the Apartment by $1 million. It was clear at the time and remains clear today that a) that this payment freed up equity in the proceeds of the Apartment for Olaf on a dollar-for-dollar basis, and b) that there was more than enough equity in the Apartment to repay the $1 million. Absent those realities, I could never have afforded to make this payment. I was repeatedly assured that I would be repaid as soon as the Apartment was sold.

25. Also in March, 2003, I advanced 20,000 Euros ($21,720) for Olaf and Olga's tuition obligation for the children and for living expenses.

26. In April, I advanced 5000 Euros ($5502.31) to Olaf for living expenses.

27. On May 14, I wired $20,000 to Mathias to repay Olaf's second loan obligation to him from 2002. On May 15, I wired $7500 to Olaf's divorce attorney. I also wired Olaf $5000 for living expenses on May 15 and another 5000 Euros ($6033.77) on May 19. On May 28, I loaned Olaf 10,000 Euros ($12,132.17) to pay charges due to the Des Artistes on the Apartment.

28. On June 12, 2003, I loaned Olaf another 5000 Euros ($6063.23) for living expenses. On June 16, I sent $33,500 to Olaf's New York attorneys Merle & Brown to make three monthly payments due on the Apartment mortgage.

29. On July 10, I again loaned Olaf 5000 Euros ($5847.48) for living expenses. On July 30, I wired $10,000 to the attorney representing Patrick in the federal lawsuit against Olga over the 19th Century Collection and the furnishings. This item should really have been Patrick's obligation, but because it arose out of Olga's seizure of the items, Patrick blamed it on Olaf and expected Olaf, as between them, to pay for that litigation.

9

30. On September 15, I advanced $4000 to Olaf for living expenses. On September 19, I sent $31,762.33 to Merle & Brown to pay the mortgage on the Apartment. Finally, on September 22, 2003, I wired $50,000 directly to the Hotel des Artistes to pay the outstanding charges on the Apartment.

31. In sum, therefore, most of the money I advanced related directly to the Apartment. The lion's share was of course the $1 million payment to Patrick on account of his right to receive recoupment from the proceeds of his investment in the Apartment. In addition, however, at least four other payments totaling more than $127,000 were directly for the mortgage or the maintenance on the Apartment. The balance was mostly direct loans to Olaf for various living expenses.

32. Both Olaf, in borrowing this money, and I, in lending it, regarded these advances as Olaf borrowing against his very substantial equity in the Apartment. It was therefore entirely natural and appropriate for us to use Olaf's equity in the Apartment to secure these obligations. That is exactly what the Micalden Judgment was intended to secure.

33. Olga also attacks the Micalden Judgment on the ground that statements made by Olaf in his affidavit on the confession of judgment (Exhibit A) contradict what Olaf said at trial. There is actually no contradiction, however, because for the most part these advances were made well after Olaf testified at trial.

34. The main attack in this regard is on the $1 million payment to Patrick. Olga claims that Olaf's statement that this item repaid an obligation to Patrick is false because Olaf did not testify at trial that Patrick made any such loan to him. But as detailed above, the obligation did not flow from any recent loan by Patrick to Olaf in

10

that amount, which is what Olaf was asked about at trial. Rather, it arose from the fact that Patrick put up the money to buy and renovate the Apartment, a fact no one disputes. Olaf testified at trial that he considered Patrick the owner of the Apartment, so naturally he would not have regarded Patrick's funding of the purchase as a loan to him. There is no question, however, that he recognized Patrick's rights pertaining to the proceeds of the Apartment

35. It is important to note that recognition by this Court of the legitimacy of Patrick's claim against the proceeds of the Apartment does not at all depend on the resolution of the issue as to who owned the Apartment. If, as Olaf and Patrick contended, Patrick owned the Apartment, then of course he was entitled to the proceeds. If, on the other hand, as this Court concluded, Olaf owned the Apartment, then Patrick, who concededly put up the purchase price, was at least entitled to be repaid when the Apartment was sold. The obligation created by his payment of more than $2 million regarding the Apartment, however characterized, cannot simply be wished away. Micalden's payment to Patrick, which relieved Olaf of his obligation to his father on at least a one-to-one basis, was therefore entitled to be secured by the proceeds of the Apartment.

36. It is even more critical to note, however, that the legitimacy of my loan to Olaf does not at all depend on whether the Court is persuaded by the above reasoning, because the point is that Olaf accepted it and borrowed $1 million from Micalden to pay to his father on that basis. I had no debt to Patrick, nor any earthly reason to cause Micalden to pay Patrick $1 million of my money. I caused Micalden to pay that money to Patrick purely at Olaf's behest, as a loan against the equity in the

11

Apartment. In other words, the essence of that payment was a payment from Olaf to Patrick. The propriety of that payment is not at issue here. I, through Micalden, simply loaned Olaf the money to make that payment against Olaf's interest in the Apartment. If Olaf had borrowed from a bank to make that payment against the security of the Apartment, the bank's right to recover against that security would not be in doubt. Micalden is entitled to be repaid that money, as well as the other advances made in 2003 by it to Olaf or on his behalf. This motion should therefore be denied.

37. At the very least, this matter should be set down for an evidentiary hearing, so that these matters may be fully set before the Court. I have been in Morocco and France during the short interval between the making of this motion and the service of this affidavit. There are documents I could not obtain on such short notice. Additionally, conflicts in testimony should not be resolved on paper. A hearing will in no way impede the sale of the Apartment, as this is a fight only about the proceeds, which can be escrowed if necessary, pending a full and fair resolution of these issues on the merits.

WHEREFORE, it is respectfully urged that this motion be denied or, in the alternative, set down for a hearing.

Eva Blazek

Sworn to before me this
20th day of January, 2005

Notary Public

12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MICALDEN INVESTMENTS SA,

                                    Plaintiff,

                                                              AFFIDAVIT FOR
                                                              JUDGMENT BY CONFESSION

        -against-

OLAF GUERRAND-HERMES,

                                    Defendant.

| STATE OF NEW YORK | ) | Kingdom of Morocco | ) |
|---|---|---|---|
| | ) ss.: | District of Casablanca | ) |
| | | City of Casablanca | ) SS |
| COUNTY OF NEW YORK | ) | Consulate Général of The | ) |
| | | United States of America | ) |

Olaf Guerrand-Hermes, being duly sworn, deposes and says:

1.      I am the defendant in the above entitled action.

2.      I reside at 1 West 67th Street, City of New York, County of New York, State of New York.

3.      I, the defendant in the above entitled action, confess judgment in this court in favor of the plaintiff, Micalden Investments SA, for One Million Three Hundred and Ninety Thousand Six Hundred and Seventy-Four Dollars and Thirty Cents ($1,390,674.30), plus interest and hereby authorize the plaintiff or its heirs, executors, administrators, or assigns to enter judgment for that sum against me.

4.      This confession of judgment is for a debt justly due to the plaintiff arising out of a personal loan that was made to the defendant by Micalden Investments SA, to pay the mortgage and maintenance fees for the defendant's apartment located at 1 West 67th Street, New York, New York. Proceeds from said personal loan was also used for his support and maintenance and the support and maintenance of defendant's two children Slava and Oleg. This personal loan was made in several separate transactions which are listed below:



(a)    $125,036.62 made on February 24, 2003, for mortgage payments and maintenance fees due on the defendant's apartment.

(b)    $20,036.62 made on February 24, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(c)    $16,326.62 made on February 24, 2003, for living expenses.

(d)    $5,508.99 made on March 3, 2003, for legal fees.

(e)    $1,000,036.68 made on March 17, 2003, for loan repayment/equity purchase given by Patrick Guerrand-Hermes to defendant.

(f)    $21,756.27 made on March 27, 2003, for Lycée Francais School tuition and living expenses.

(g)    $5,538.26 made on April 8, 2003, for living expenses.

(h)    $20,037.91 made on May 14, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(i)    $7,537.84 made on May 15, 2003, for legal fees.

(j)    $5,037.84 made on May 15, 2003, for living expenses.

(k)    $6,072.42 made on May 19, 2003, for living expenses.

(l)    $12,170.86 made on May 28, 2003, for assessment charges for defendant's apartment.

(m)    $6,101.53 made on June 12, 2003, for airline tickets for the defendant and his children to and from Morocco and living expenses.

(n)    $4,138.30 made on June 12, 2003, for life insurance policy.

(o)    $33,538.52 made on June 16, 2003, as mortgage payment for defendant's apartment

(p)    $5,884.33 made on July 10, 2003, for living expenses

(q)    $10,036.62 made on July 31, 2003, for legal fees.

(r)    $4,036.12 made on September 16, 2003, for living expenses.

(s)    $31,795.00 made on September 19, 2003, as mortgage payment for defendant's apartment.

(t)    $50,037.00 made on September 22, 2003, for common charges, assessments, and ancillary charges for defendant's apartment.

5.    This confession of judgment is not for the purpose of securing the plaintiff a    nst
a contingent liability.

Dated:

Olaf Guenard Hermes, Defendant

Sworn to before me this *2nd*
day of *October 200 3*

**Daniel J. ERNST**
Vice Consul of the United
States of America

Genève, le 24.02.03

MICALDEN INVESTMENT SA
BANQUE RESTANTE

MICALDEN INVESTMENT SA

COMPTE COURANT
USD  569820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :                        EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA                   M. OLAF GUERRAND-HERMES
F-75008 PARIS

REFERENCE :

| | | | | |
|---|---|---|---|---|
| MONTANT | | | EUR | 15.000,00 |
| AU COURS DE | 1,086 | | USD | 16.290,00 |
| FRAIS | | | USD | 36,62 |
| | | A VOTRE DEBIT | USD | 16.326,62 |
| | | | VALEUR | 26.02.03 |

Vos dévoués

Avis sans signature sauf modification manuelle          SE&O
11001526960007AG
                                                                   1011110

B

Genêve, le 24.03.03

MICALDEN INVESTMENT SA
BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :                        EN FAVEUR DE :

BANK AUDI (USA)                           M. MATHIAS GUERRAND-HERMES
NEW YORK, N.Y. 10022


REFERENCE :


| | | |
|---|---|---|
| MONTANT | USD | 20.000,00 |
| FRAIS | USD | 36,62 |
| A VOTRE DEBIT | USD | 20.036,62 |
| | VALEUR | · 26.02.03 |


Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
11001526990007AG                                              1010110

Genève, le 24.02.03

MICALDEN INVESTMENT SA
BANQUE RESTANTE

MICALDEN INVESTMENT SA

COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :                    EN FAVEUR DE :

BANK AUDI (USA)                       MR. PATRICK GUERRAND-HERMES
NEW YORK, N.Y. 10022

REFERENCE :

| | | |
|---|---|---|
| MONTANT | USD | 125.000,00 |
| FRAIS | USD | 36,62 |
| A VOTRE DEBIT | USD | 125.036,62 |
| | VALEUR | 26.02.03 |

Vos dévoués

Avis sans signature sauf modification manuelle          SEAO
11001526970007AG                                                1010110

Genève, le 28.02.03

MICALDEN INVESTMENT SA
BANQUE RESTANTE

MICALDEN INVESTMENT SA

COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :                    EN FAVEUR DE :

LGT BANK IN LIECHTENSTEIN             /0244483AA
FL-9490 VADUZ                         DOMAR FIDUCIARY AND MANAGEMENT
                                      ESTABLISHMENT

REFERENCE :

/RFB/DINGA 2003 FOUNDATION

| | | | |
|---|---|---|---|
| MONTANT | | CHF | 7.370,00 |
| AU COURS DE | 1,3396 | USD | 5.501,64 |
| FRAIS | | USD | 7,35 |
| | A VOTRE DEBIT | USD | 5.508,99 |
| | | VALEUR | 04.03.03 |

Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
03201533010007AG                                           1011110

Genève, le 14.03.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564920/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :              EN FAVEUR DE :

/0011617578                     /0005000356179910
WAFABANK                        0005000356179910
163 AV.HASSAN 2                 AT WAFABANK 213, BD MOHAMED V
CASABLANCA / MAROC              MARRAKECH GUELIZ/MAROC
                                PATRICK GUERRAND-HERMES

REFERENCE :



MONTANT                              USD    1.000.000,00

FRAIS                                USD         36,68
                                     ---------------------
                      A VOTRE DEBIT  USD    1.000.036,68
                                     =====================

                                     VALEUR     18.03.03




Vos dévoués

Avis sans signature sauf modification manuelle          SE&O
11001545600007AG                                              1010110

01/20/04  04:53 FAX 2128887306          477 MADISON AVENUE                                    ☑025
30/12 '03 15:58 FAX =41 22 704 11 00    BANQUE AUDI SA                                        ☑007

Genève, le 26.03.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :              EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA         M.OLAF GUERRAND-HERMES
F-75008 PARIS


REFERENCE :



MONTANT                                EUR     20.000,00

AU COURS DE    1,086                   USD     21.720,00

FRAIS                                  USD         36,27
                                       --------------------
                         A VOTRE DEBIT USD     21.756,27
                                       ====================

                                       VALEUR    28.03.03



Vos dévoués

Avis sans signature sauf modification manuelle         SE&O
11001556860007AG                                                  1011110

01/20/04  04:53 FAX 2128887306    _____   477 MADISON AVENUE                    ☑026
30/12 '03 18:59 FAX +41 22 704 11 00      BANQUE AUDI SA                        ☑008

Genève, le 08.04.03                      MICALDEN INVESTMENT SA
                                         BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :               EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA          /18252
F-75008 PARIS                    M. OLAF GUERRAND KERMES


REFERENCE :




MONTANT                          EUR      5.000,00

AU COURS DE    1,10046236        USD      5.502,31

FRAIS                            USD        35,95
                                         ---------------
                 A VOTRE DEBIT   USD      5.538,26
                                         ===============

                                 VALEUR   10.04.03




Vos dévoués

Avis sans signature sauf modification manuelle          SE&O
11001568870007AG                                              1011110

Genève, le 14.05.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :              EN FAVEUR DE :

INTERAUDI BANK                  MR.MATHIAS GUERRAND-HERMES
NEW YORK, N.Y. 10022


REFERENCE :


MONTANT                              USD      20.000,00

FRAIS                                USD          37,91
                                     ----------------------
                    A VOTRE DEBIT    USD      20.037,91
                                     ======================

                                     VALEUR      16.05.03


Vos dévoués

Avis sans signature sauf modification manuelle        SZ&O
11001601590007AG                                             1010110

MICALDEN INVESTMENT SA
BANQUE RESTANTE

Genève, le 15.05.03

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564920/001.000.940

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :                    EN FAVEUR DE :

/FW021000021                          /0381422849
CHASE MANHATTAN BANK                  WILLIAM S.BESLOW
11 WEST 51ST STREET
NEW-YORK, N.Y. USA


REFERENCE :



| | | | |
|---|---|---|---|
| MONTANT | | USD | 7.500,00 |
| FRAIS | | USD | 37,84 |
| | A VOTRE DEBIT | USD | 7.537,84 |
| | | VALEUR | 19.05.03 |



Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
11001602550007AG                                              1010110

01/20/04  04:54 FAX 2128887306 ___    477 MADISON AVENUE                    ☑029
30/12 '03 15:59 FAX ~41 22 704 11 00    BANQUE AUDI SA                      ☑011

MICALDEN INVESTMENT SA
BANQUE RESTANTE

Genève, le 15.05.03

MICALDEN INVESTMENT SA

COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :                    EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA               /18252
F-75008 PARIS                         M. OLAF GUERRAND HERMES

REFERENCE :

MONTANT                                    USD        5.000,00

FRAIS                                      USD           27,84
                                           ----------------------
                         A VOTRE DEBIT     USD        5.037,84
                                           ======================

                                           VALEUR     19.05.03

Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
11001602610007AG                                              1010110

Genève, le 19.05.03

                                        MICALDEN INVESTMENT SA
                                        BANQUE RESTANTE

MICALDEN INVESTMENT SA

COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :              EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA         M.OLAF GUERRAND-HERMES
F-75008 PARIS


REFERENCE :


| | | | |
|---|---|---|---|
| MONTANT | | EUR | 5.000,00 |
| AU COURS DE | 1,20675427 | USD | 6.033,77 |
| FRAIS | | USD | 38,65 |
| | A VOTRE DEBIT | USD | 6.072,42 |
| | | VALEUR | 21.05.03 |


Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
11001605420007AG                                             1011110

Genève, le 28.05.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :            EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA       M.OLAF GUERRAND-HERMES
F-75008 PARIS


REFERENCE :


| | | | | | |
|---|---|---|---|---|---|
| MONTANT | | | | EUR | 10.000,00 |
| AU COURS DE | 1,2132169 | | | USD | 12.132,17 |
| FRAIS | | | | USD | 38,69 |
| | | | A VOTRE DEBIT | USD | 12.170,86 |
| | | | | VALEUR | 03.06.03 |


Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
11001615770007AG                                              1011110

Genève, le 12.06.03                     MICALDEN INVESTMENT SA
                                        BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564920/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :              EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA         M.OLAF GUERRAND-HERMES
F-75008 PARIS


REFERENCE :



| MONTANT | | | EUR | 5.000,00 |
|---------|---|---|-----|----------|
| AU COURS DE | 1,21264579 | | USD | 6.063,23 |
| FRAIS | | | USD | 38,30 |
| | | A VOTRE DEBIT | USD | 6.101,53 |
| | | | VALEUR | 16.06.03 |



Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
11001627570007AG                                             1031110

Genève, le 16.06.03                          MICALDEN INVESTMENT SA
                                             BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUÉ LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :                    EN FAVEUR DE :

//FW321081669                         /1087309
FIRST REPUBLIC BANK                   MERLE AND BROWN, P.C.
SAN FRANCISCO/CA/U.S.A.


REFERENCE :

/RFB/OLAF GUERRAND-HERMES


MONTANT                                      USD       33.500,00

FRAIS                                        USD           38,52
                                             ------------------------
                       A VOTRE DEBIT         USD       33.538,52
                                             ========================

                                             VALEUR     18.06.03


Vos dévoués

Avis sans signature sauf modification manuelle          SE&O
11001630580007AG                                               1010110

Genève, le 10.07.03                    MICALDEN INVESTMENT SA
                                        BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :              EN FAVEUR DE :

BANQUE AUDI (FRANCE) SA         M. OLAF GUERRAND-HERMES
F-75008 PARIS


REFERENCE :


| | | | |
|---|---|---|---|
| MONTANT | | EUR | 5.000,00 |
| AU COURS DE | 1,16949601 | USD | 5.847,48 |
| FRAIS | | USD | 36,85 |
| | A VOTRE DEBIT | USD | 5.884,33 |
| | | VALEUR | 14.07.03 |


Vos dévoués

Avis sans signature sauf modification manuelle        SE&O
1100165849000D7AG                                            1011110

GenFve, le 30.07.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  56£820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :           EN FAVEUR DE :

//FW026013673                /7915425826
COMMERCE BANK NA             EDWARD RUBIN
2521 BROADWAY
NEW-YORK/USA


REFERENCE :

/RFB/HERMES


MONTANT                       USD      10.000,00

FRAIS                         USD          36,62
                              ----------------------
                 A VOTRE DEBIT USD      10.036,62
                              ======================

                              VALEUR    04.08.03




Vos dTvouTs

Avis sans signature sauf modification manuelle        SE&O
11001679130007AG                                            1010110

01/20/04  04:55 FAX 2128887306        477 MADISON AVENUE              ☒036
30/12 '03 18:01 FAX +41 22 704 11 00  BANQUE AUDI SA                  ☒019

Genève, le 15.09.03                   MICALDEN INVESTMENT SA
                                      BANQUE RESTANTE

MICALDEN INVESTMENT SA

COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :          EN FAVEUR DE :

/CH337919                   /019 450000 5000356179910 86
WAFA BANK                   M.PATRICK GUERRAND-HERMES
CASABLANCA/MOROCCO

REFERENCE :

MONTANT                          USD      4.000,00

FRAIS                            USD         36,12
                                 -------------------
               A VOTRE DEBIT     USD      4.036,12
                                 ===================

                                 VALEUR    17.09.03

Vos dTvouTs

Avis sans signature sauf modification manuelle        SB&O
11001718060007AG                                            1010110

GenFve, le 19.09.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :              EN FAVEUR DE :

//FW321081669                  /1087309
FIRST REPUBLIC BANK            MERLE AND BROWN P.C.
SAN FRANCISCO / USA


REFERENCE :


MONTANT                        USD      31.762,33

FRAIS                          USD          36,11
                              ---------------------
              A VOTRE DEBIT    USD      31.798,44
                              =====================

                               VALEUR    23.09.03


Vos dTvouTs

Avis sans signature sauf modification manuelle      SE&O
11001721890007AG                                         1010110

GenPve, le 32.09.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE DEBIT

NOUS AVONS EFFECTUE LE TRANSFERT SUIVANT :

COMPTE AUPRES DE :          EN FAVEUR DE :

//FW021000021               /304124273
J.P. MORGAN CHASE           HOTEL DES ARTISTES
NEW-YORK, U.S.A


REFERENCE :

/RFB/ M.OLAF GUERRAND-HERMES


MONTANT                              USD        50.000,00

FRAIS                                USD            36,91
                                     ----------------------
                    A VOTRE DEBIT    USD        50.036,91
                                     ======================

                                     VALEUR      24.09.03



Vos dTvouTs

Avis sans signature sauf modification manuelle          SE&O
11001723400007AG                                              1010110

01/20/04  04:55 FAX 2128887306        477 MADISON AVENUE                    ☒039
30 Déc 03 23:48      PGH                            (33)  3  44  57  73  87      p.2

## DEMAND REVOLVING PROMISSORY NOTE

Dated:  As of _02/20/63_

    FOR VALUE RECEIVED, the undersigned, Olaf Guerrand-Hermes, and individual residing at 1 West 67th Street, New York, New York (the "Payor"), HEREBY PROMISES TO PAY UPON DEMAND to the order of Micalden Investments SA, a company with registered offices at Swiss Tower, 16th Floor, 53 Road, URB Marbela, World Trade Center, Panama (the "Payee"), the aggregate principal amount of all advances made by the Payee to or for the benefit of the Payor in cash or otherwise and outstanding on the date of the demand by the Payee hereunder. If any advances are made by the Payee hereunder other than in cash, this Demand Promissory Note shall represent an advance of the fair value in cash of such advance on the date such advance is made, as determined by the Payee in its reasonable discretion. Each advance owing to the Payee by the Payor pursuant to this Demand Promissory Note, and all payments made on account of the principal thereof, shall be recorded by the Payee and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Demand Promissory Note. The grid attached hereto shall be conclusive and binding evidence of all advances made by the Payee hereunder, and of all payments made by the Payor on account of the principal thereof, absent manifest error.

    The Payor promises to pay interest on the unpaid principal amount of each advance made pursuant to this Demand Promissory Note from the date of such advance until such principal amount is paid in full, at the rate of interest equal to the Federal short-term rate in effect on such day under Section 1274(d) of the Internal Revenue Code of 1986, as amended, payable in arrears on each date on which any payment of principal is otherwise made by the Payor hereunder.

    The principal amount of this Demand Promissory Note may be prepaid by the Payor at his option from time to time, in whole or in part and without penalty or premium. Prepayments shall be applied first, to any accrued and unpaid interest at the time of such prepayment, and thereafter, to the principal amount outstanding under this Demand Promissory Note at such time.

    Both principal and interest are payable in lawful money of the United States of America to the Payee at the address of the Payee set forth above, in next day funds.

    This Demand Promissory Note shall be binding upon and inure to the benefit of the Payor and the Payee and their respective heirs, executors, successors and assigns, except that neither the Payor nor the Payee has the right to assign any of his or its rights herein or any interest herein without the prior written consent of the other party.

    This Demand Promissory Note is governed by, and construed in accordance with, the laws of the State of New York.

OLAF GUERRAND-HERMES

01/20/04  04:56 FAX 2128887306          477 MADISON AVENUE                    ☑040
30 Déc 03 23:48      PGH              (33)  3 44 57 73 87      p.3

## ADVANCES AND PAYMENTS OF PRINCIPAL

| Date | Amount of Advance | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|------|------|------|------|------|
| 24/02/03 | $16290 | | $16290 | |
| 24/02/03 | $125000 | | $141290 | |
| 24/02/03 | $20000 | | $161290 | |
| 03/03/03 | $5501.69 | | $166791.69 | |
| 17/03/03 | $1000000 | | $1166791.69 | |
| 27/03/03 | $21720 | | $1188511.69 | |
| 08/04/03 | $5502.31 | | $1194013.95 | |
| 14/05/03 | $20000 | | $1214013.95 | |
| 15/05/03 | $7500 | | $1221613.95 | |
| 15/05/03 | $5000 | | $1226613.95 | |
| 19/05/03 | $6033.77 | | $1232647.72 | |
| 28/05/03 | $12132.17 | | $1244679.89 | |
| 12/06/03 | $6063.23 | | $1250743.12 | |
| 12/06/03 | $4100 | | $1254843.12 | |
| 16/06/03 | $33500 | | $1288343.12 | |
| 10/07/03 | $5847.48 | | $1294190.60 | |
| 30/07/03 | $10000 | | $1304190.60 | |
| 15/09/03 | $4000 | | $1308190.60 | |
| 19/09/03 | $31762.33 | | $1339952.93 | |
| 22/09/03 | $50000 | | $1389952.93 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

01/20/04  04:56 FAX 2128887306          477 MADISON AVENUE                    ☑041
30/12 '03 16:02 FAX +41 22 704 11 00     BANQUE AUDI SA                        ☑022

Genève, le 19.02.03                 MICALDEN INVESTMENT SA
                                     BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE CREDIT

NOUS AVONS RECU LA BONIFICATION SUIVANTE :

D'ORDRE DE :

RICMEN INVESTMENTS LTD
LIMASSOL


REFERENCE :

USD 1'400'000.-- LESS CORRESP.
BANK CHARGES


A VOTRE CREDIT                        USD    1.399.995,00
                                      ========================

                                      VALEUR      16.02.03


Vos dévoués

Avis sans signature sauf modification manuelle     SE&O
12001522700007PG                                              1020010
                                                   ------------------



01/20/04  04:56 FAX 2128887306
30/12  03 16:02 FAX 441 22 704 11 00          477 MADISON AVENUE
                                              BANQUE AUDI SA
☑042
☑023

Genève, le 24.02.03                    MICALDEN INVESTMENT SA
                                       BANQUE RESTANTE

MICALDEN INVESTMENT SA


COMPTE COURANT
USD  564820/001.000.840

AVIS DE CREDIT

NOUS AVONS RECU LA BONIFICATION SUIVANTE :

D'ORDRE DE :

RICHEN INVESTMENTS LTD



REFERENCE :

REF:USD 250'000.-- LESS CORRESP.
BANK CHARGES


A VOTRE CREDIT                         USD      249.995,00
                                       ==============================

                                       VALEUR     21.02.03




Vos dévoués

Avis sans signature sauf modification manuelle          SE&O
12001526320007PG                                            1020010

Exhibit K

**DEMAND REVOLVING PROMISSORY NOTE**

Dated:  As of 02/20/63

FOR VALUE RECEIVED, the undersigned, Olaf Guerrand-Hermes, and individual residing at 1 West 67th Street, New York, New York (the "Payor"), HEREBY PROMISES TO PAY UPON DEMAND to the order of Micalden Investments SA, a company with registered offices at Swiss Tower, 16th Floor, 53 Road, URB Marbela, World Trade Center, Panama (the "Payee"), the aggregate principal amount of all advances made by the Payee to or for the benefit of the Payor in cash or otherwise and outstanding on the date of the demand by the Payee hereunder.  If any advances are made by the Payee hereunder other than in cash, this Demand Promissory Note shall represent an advance of the fair value in cash of such advance on the date such advance is made, as determined by the Payee in its reasonable discretion.  Each advance owing to the Payee by the Payor pursuant to this Demand Promissory Note, and all payments made on account of the principal thereof, shall be recorded by the Payee and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Demand Promissory Note.  The grid attached hereto shall be conclusive and binding evidence of all advances made by the Payee hereunder, and of all payments made by the Payor on account of the principal thereof, absent manifest error.

The Payor promises to pay interest on the unpaid principal amount of each advance made pursuant to this Demand Promissory Note from the date of such advance until such principal amount is paid in full, at the rate of interest equal to the Federal short-term rate in effect on such day under Section 1274(d) of the Internal Revenue Code of 1986, as amended, payable in arrears on each date on which any payment of principal is otherwise made by the Payor hereunder.

The principal amount of this Demand Promissory Note may be prepaid by the Payor at his option from time to time, in whole or in part and without penalty or premium.  Prepayments shall be applied first, to any accrued and unpaid interest at the time of such prepayment, and thereafter, to the principal amount outstanding under this Demand Promissory Note at such time.

Both principal and interest are payable in lawful money of the United States of America to the Payee at the address of the Payee set forth above, in next day funds.

This Demand Promissory Note shall be binding upon and inure to the benefit of the Payor and the Payee and their respective heirs, executors, successors and assigns, except that neither the Payor nor the Payee has the right to assign any of his or its rights herein or any interest herein without the prior written consent of the other party.

This Demand Promissory Note is governed by, and construed in accordance with, the laws of the State of New York.

OLAF GUERRAND-HERMES

| Date | Amount of Advance | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|---|---|---|---|---|
| | **ADVANCES AND PAYMENTS OF PRINCIPAL** | | | |
| 24/02/03 | $ 16290 | | $ 16290 | |
| 24/02/03 | $ 125000 | | $ 141290 | |
| 24/02/03 | $ 20000 | | $ 161290 | |
| 03/03/03 | $ 5501.69 | | $ 166791.69 | |
| 17/03/03 | $ 1000000 | | $ 1166791.69 | |
| 27/03/03 | $ 21720 | | $ 1188511.69 | |
| 08/04/03 | $ 5502.31 | | $ 1194013.95 | |
| 14/05/03 | $ 20000 | | $ 1214013.95 | |
| 15/05/03 | $ 7500 | | $ 1221513.95 | |
| 15/05/03 | $ 5000 | | $ 1226513.95 | |
| 19/05/03 | $ 6033.77 | | $ 1232547.72 | |
| 28/05/03 | $ 12132.17 | | $ 1244679.89 | |
| 12/06/03 | $ 6063.23 | | $ 1250743.12 | |
| 12/06/03 | $ 4100 | | $ 1254843.12 | |
| 16/06/03 | $ 33500 | | $ 1288343.12 | |
| 10/07/03 | $ 5847.48 | | $ 1294190.60 | |
| 30/07/03 | $ 10000 | | $ 1304190.60 | |
| 15/09/03 | $ 4000 | | $ 1308190.60 | |
| 19/09/03 | $ 31762.33 | | $ 1339952.93 | |
| 22/09/03 | $ 50000 | | $ 1389952.93 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit L

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : I.A.S. PART 17
------------------------------------------------------------X

MICALDEN INVESTMENTS, S.A.,

Plaintiff,

- against -                                    Index No. 118422/03

OLAF GUERRAND-HERMES,

Defendant.

------------------------------------------------------------X

EMILY JANE GOODMAN, J.S.C.:

Olga Rostropovich ("Rostropovich"), the former wife of Defendant Olaf

Guerrand-Hermes ("Hermes") and the plaintiff in a divorce action in which Hermes was

the defendant, brings this Order to Show Cause to vacate a Judgment by Confession

entered into between Hermes and Plaintiff herein, Micalden Investments, S.A.

("Micalden") in the amount of $1,390,664.35 (the "Consent Judgment").[1]  The Plaintiff

Micalden, is a corporation wholly owned by one Eva Blazek, the lover of Hermes and the

mother of his child; she is currently pregnant with their second child.  An affidavit of

service of this motion has been filed stating that service was made on Hermes at the

former marital home where he claimed residence (Ex F to Order to Show Cause), but only

---

[1] Rostropovich is not a party to this action.  However, as a creditor, she has
standing to vacate the Consent Judgment by motion, as opposed to commencing a plenary
action (see County Nat'l Bank v. Vogt, 28 AD2d 793 [3d Dept 1967], affd 21 NY2d 800
[1968]; Siegel, New York Practice §302, at 432 [2nd ed]).  She has also separately moved
in a related action to vacate a Judgment By Confession entered into between Hermes and
his father (see Patrick Guerrand-Hermes v. Olaf Guerrand Hermes, Index No. 118423/03).

1

Micalden has opposed this motion.

Background

Rostropovich and Hermes have been involved in a bitter and lengthy divorce action for the last three years, <u>Rostropovich v Hermes</u>, Index Number 350697/01 (the "Divorce Action"). A Judgment in the amount of $249,265.50 was entered in favor of Rostropovich against Hermes pendente lite on 7/24/02. A post trial decision was rendered on 10/3/03 (the "Trial Decision"). A further Judgment was entered in favor of Rostropovich against Hermes in the amount of $453,010.00 on 10/31/03 and a Judgment of Divorce was signed on 1/9/04. The Consent Judgment was made by affidavit of Hermes, dated 10/2/03, and was filed with the New York County Clerk on 10/22/03, after the Trial Decision was rendered. The Consent Judgment was also made after the Court signed an Order to Show Cause in the Divorce Action, dated 9/10/03, for sequestration of the family home at Hotel Des Artistes (the "Apartment") and for appointment of a receiver pursuant to DRL § 243, based on Hermes's continual failure to pay Rostropovich ongoing maintenance, child support and arrears as previously ordered (the "Sequestration OSC"). A UCC-1 Financing Statement, dated 10/8/03, was filed on 10/17/03 on behalf of Micalden, covering all of Hermes's right, title and interest in the Apartment and a

---

The Court granted Rostropovich's motion by Decision and Order dated 11/25/03, sequestered the Apartment and appointed a receiver. The receiver could not gain access to the Apartment for months, despite the fact that this Court ordered Hermes to provide a key (which he never provided).

2

...dio apartment in Hotel Des Artistes.

Discusssion

Rostropovich contends that the Consent Judgment should be vacated as a fraudulent conveyance under Debtor and Creditor Law §276 and under CPLR 5015(c), as part of a pattern of fraudulent conveyances within the Hermes family designed to hinder, delay and defraud Rostropovich and the children of the marriage of maintenance, child support and equitable distribution. Rostropovich observes that the Micalden loan was allegedly made in 2003, but Hermes testified in the Divorce Action that he received no loans in that year (Ex I to Order to Show Cause). Further, Rostropovich observes that Hermes did not list the Micalden loan in his statement of proposed disposition (Ex J to Order to Show Cause).

Micalden argues that Hermes's motivation in making the loan is irrelevant and that the only relevant inquiry is whether Micalden actually advanced the money to Hermes.[3] Micalden argues that New York law precludes any inquiry into whether Hermes preferred one creditor (Micalden) over another (his former wife), citing Ultramar Energy, Ltd. v Chase Manhattan Bank, 191 AD2d 86 [1st Dept 1993]). Micalden further argues that there is nothing suspicious about the Consent Judgment or its timing. Eva Blazek submits

---

[3] In support of the loan's existence, Micalden submits a Demand Revolving Promissory Note dated "As of 2/20/03" [emphasis added] and attaches a paper reflecting the loan advances, without any explanation as to when, and by whom, the attachment was prepared.

3

in an Affidavit that "the funds advanced had mostly related to the Apartment and were advanced with the understanding that they would repaid from the proceeds of the sale." Ms. Blazek states that the bulk of her loan to Hermes was made by a direct payment of $1,000,036.88 to Hermes's father, to satisfy a purported agreement between father and son. Without first hand knowledge of such an agreement, Ms. Blazek claims that based on the alleged agreement, upon the sale of the Apartment, the father was to recoup the amount he paid for a down payment and for renovations, and the balance was to be equally divided between father and son.[4] Attempting to justify why she lent money to Hermes to pay his father, Ms. Blazek circuitously claims that she, Hermes and his father anticipated that the Court would decide the Apartment was really owned by Hermes, not his father, and she therefore advanced the bulk of the loan on the expectation that it would be secured by an Apartment that Hermes claimed in the Divorce Action not to own.[5]

The Court rejects Micalden's contention that the only relevant inquiry is whether a loan was in fact made and that Hermes's motivation is irrelevant. In fact, to the contrary,

---

[4] In the Trial Decision, the Court clearly rejected Hermes's and his father's argument that it was his father who really owned the Apartment (despite the fact that all documents were in the son's name and were relied upon by banks, insurance companies, the IRS and other third parties). Yet, Ms. Blazek recycles the argument here. Notably, Micalden is represented by same law firm that has represented Hermes's father (Ex K to Order to Show Cause).

[5] Hermes alternatively argued in his post trial submissions that in the event that the Court decided that his father did not own the Apartment, he owned it as separate property.

4

the intent of Hermes, who has defaulted on the motion, is central to the inquiry.[6]

A conveyance under the Debtor and Creditor Law includes "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance" (see Debtor and Creditor Law §270). A confession of judgment is the 'creation of any lien or incumbrance' and is therefore a conveyance (see Spear v Spear, 101 Misc 2d 341, 345 [Sup Ct, Nassau County 1979]; Ostashko v Ostashko, 2002 US Dist. LEXIS 27015 at 51-52 [ED NY 2002]). A dependent wife who is separated from her husband is a creditor of her husband (see Debtor and Creditor Law §270 [a creditor is defined as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent"]; see also Ostashko, supra at 50-51). Even a dependent wife who has not entered in to a separation agreement or obtained an order of support may be a creditor of her husband within the meaning of §270 of the Debtor and Creditor Law (see Kasinski v Questel, 99 AD2d 396 [4th Dept 1984]).

In establishing a claim of fraudulent conveyance under §276 of the Debtor and Creditor Law, the movant must show by clear and convincing evidence that the debtor (1) acted with actual intent and (2) entered into the consent judgment to hinder, delay or

---

Contrary to Micalden's position, Ultramar Energy Ltd. v Chase Manhattan Bank, 191 AD2d 86, supra, does not dictate a different result. That case is clearly inapposite as it involves §273 of the Debtor and Creditor Law while this motion involves §276 of the Debtor and Creditor Law. It also involves an insolvent debtor, and this Court has previously rejected Hermes's argument that he had a negative net worth.

5

defraud the movant (see Ostashko, supra at 52-54). In addition to the debtor's intent, the movant must also show that the party to whom the judgment was confessed had knowledge of the debtor's intent, or, should have had such knowledge (see Ostashko, supra at 53-63).

Applying these principles here, the Consent Judgment must be set aside as a fraudulent conveyance under §276 of the Debtor and Creditor Law. A hearing is not necessary to summarily dispose of a motion to vacate a consent judgment under §276 of the Debtor and Creditor Law if the opposition fails to raise a triable issue of fact (see Quality Jewelry Co. v Genevit Creations, Inc., 248 AD2d 103 [1st Dept 1998]).² Thus, although the existence of actual intent to 'hinder, delay or defraud', within the meaning of Debtor and Creditor Law §276 is ordinarily a question of fact" (Dillon v Dean, 236 AD2d 360 [2d Dept 1996]) cases have granted summary judgment where debtors have failed to present evidence, in admissible form, sufficient to raise an issue of fact (see Jensen v Jensen, 256 AD2d 1162 [4ᵗʰ Dept 1998]). Here, Hermes has not appeared to contest the motion and Ms. Blazek does not raise an issue of fact about her lover's intent. Based on the circumstances surrounding the transaction, Rostropovich has shown, by clear and convincing evidence, that Hermes intentionally entered into the Consent

---

²Micalden has requested a hearing on the motion, to be scheduled after Ms. Blazek gives birth.

Judgment to hinder, delay or defraud her.[8]

Because direct proof of the debtor's state of mind is rarely available, the intent to hinder, delay or defraud is inferred from the circumstances surrounding the transaction (see Wall Street Assoc. v Brodsky, 257 AD2d 526, 529 [1st Dept 1999]; Marine Midland Bank v Murkoff, 120 AD2d 122, 128 [2d Dept 1986]). Thus, cases have considered a variety of factors in determining intent (see Miller v Miller, 276 AD2d 758 [2d Dept 2000] [fraudulent intent was inferable from the husband's transfer of property to his new wife a few months after his former wife's attorney sent him letters seeking to collect child support arrears]; Wall Street Assoc. v Brodsky, supra [fraudulent intent is inferable from facts including whether the transfer involves parties with a close relationship and whether the transfer was not made in the ordinary course of business]; Apple Bank for Savings v Contarutos, 204 AD2d 375 [2d Dept 1994] [debtor's transfer of real property to his daughter for only $10 with knowledge of claim against debtor supported finding of fraud under §276; the fact that the case involved "an intrafamily conveyance is further evidence giving rise to an inference of fraud"); AMEV Capital Corp. v Kirk, 180 AD2d 775 [2d Dept 1992] [deed from husband to wife was fraudulent under §276 when it was recorded eight years later shortly before bankruptcy of one of the husband's companies]; Farino v Farino, 113 Misc 2d 374 [Sup Ct, Nassau County 1982] [in setting aside a conveyance of

---

[8]Contrary to Ms. Blazek's argument, the fact she actually advanced the funds, does not mean that Hermes did not also have a fraudulent intent to hinder, delay or defraud his former wife (see Ostashko, supra at 59).

7

property as a fraudulent conveyance under §276, the court considered, among other factors, the relationship of the parties, the husband's failure to make timely alimony payments necessitating extensive post judgment matrimonial litigation, and the timing of the conveyance]).

In the case at hand, Hermes confessed judgment to someone with whom he had a close relationship, his lover and mother of his child. The timing of the action is extremely suspect because it was at a point in time where Hermes was aware of an inchoate debt to his then wife and the parties to this action hastily settled within one month. Moreover, Hermes's explanations (here articulated only through Ms. Blazek) as to the making of the loan are contradictory. Despite classifying Micalden's payment of $1,000,036.88 as a loan in his Affidavit For Judgment By Confession, in the Divorce Action, Hermes first denied receiving any loans in 2003, and then testified that he had no recollection of any loans in that year (Ex I to Order to Show Cause). Hermes also failed to declare the alleged loan in his statement of proposed disposition in the Divorce Action (Ex J to Order to Show Cause). Moreover, Hermes, who is a non practicing lawyer, has not paid maintenance, nor child support, necessitating extensive post judgment litigation and has made continuing efforts to subvert the Domestic Relations Law and orders of the Court. In addition, the UCC-1 Financing Statement which elevated Micalden to a secured creditor was not filed simultaneously with Ms. Blazek's advancing of $1,000,036.88 to Hermes's father (as would be done in the ordinary course of business) but was filed more

R

than eight months later, hastily, after Hermes was served with the Sequestration OSC.

These factors evidence that Hermes intentionally entered into the Consent Judgment to prevent Rostropovich from securing the maintenance, child support and arrears to which she was entitled and which he had been ordered to pay. Micalden's actual knowledge of Hermes's intent is established by Ms. Blazek's own admission regarding intimate knowledge of the divorce proceedings. Further, the fact that she only secured her purported loan (the bulk of which was made to pay her child's grandfather) by filing a UCC-1 Financing Statement shortly after this Court signed the Sequestration Order to Show Cause is sufficient circumstantial evidence to indicate that she was aware of, or should have been aware of, her boyfriend's intent to frustrate any recovery by his former wife.

It is hereby

ORDERED that the motion to vacate the Judgment of Confession is granted; and it is further

ORDERED that the Clerk of the Court is directed to vacate the Judgment upon service of a copy of this Decision and Order, with notice of entry.

This constitutes the Decision and Order of the Court.

Dated: March 17, 2004

ENTER:

J.S.C.

EMILY JANE GOODMAN

9

Exhibit M

At an IAS Part 17 of the Supreme
Court of the State of New York, County
of New York, at the Courthouse, 60
Centre Street, New York, New York on
April 2004

PRESENT:

  EMILY JANE GOODMAN,

          Justice.

———————————————————————X

OLGA ROSTROPOVICH,

       Plaintiff,      Index No. 350697/01

    -against-        **EX PARTE ORDER**

OLAF GUERRAND-HERMES,

       Defendant.

———————————————————————X

  Upon the affidavit of Receiver, Harvey Fishbein, the affidavit of Carol Lilienfeld,
attorney for Receiver, Harvey Fishbein, Esq., sworn to on April 7, 2004, and upon the
contract of sale, and the letters of approval of the contract by the attorneys for its
respective parties, it is

  ORDERED, that the Contract of sale dated March 30h to Atoosa and Mahmoud
Mamdani is hereby approved by the Court, and it is

  ORDERED, that Receiver is authorized to transfer the cooperative apartment
known as 601/603/6M at 1 West 67th Street, New York, New York, pursuant to this
contract.

Dated: April 8 ,2004

               _____
               EMILY JANE GOODMAN

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale – Cooperative Apartment

This Contract is made as of March 30    2004 between the "Seller" and the "Purchaser" identified below

**1 Certain Definitions and Information**

**1.1** The "Parties" are:

**1.1.1** "Seller": HARVEY FISHBEIN, as Receiver
Pursuant to Court Order: Supreme Ct./NY County
Index No. 350697/01

*Prior names used by Seller:* (RECORD OWNER:Olaf Guerrand-
Hermes)
*Address:* 1 West 67th Street, Apt. 601
New York, New York 10023

*S.S. No.:*

**1.1.2** "Purchaser": ATOOSA P. MAMDANI and
MAHMOUD A. MAMDANI, as
tenants by entirety
*Address:*    136 East 64th Street
New York, New York 10021

*S.S. No.:*  (MM) 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
            (AM) 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

**1.2** The "Attorneys" are *(name, address and telephone, fax):*

**1.2.1** "Seller's Attorney"

CAROL LILIENFELD
708 Third Avenue, Suite 1501
New York, New York 10017
(212) 683-3344

**1.2.2** "Purchaser's Attorney"

MICHAEL LIPPMAN, ESQ.
Lippman Krasnow & Kelton LLC
711 Third Avenue
New York, New York 10017

**3** The "Escrowee" is the [Seller's] [Purchaser's] Attorney.

CAROL LILIENFELD
708 Third Avenue, Suite 1501
New York, New York 10017
(212) 683-3344

**4** The Managing Agent is *(name, address and telephone, fax):*
Gerard J. Picaso, Inc.
1133 Broadway
New York, New York 10010
(212) 807-6969 F: (212) 691-3850

**5** The real estate "Broker(s) (see ¶12) is/are:
DOUGLAS ELLIMAN by DAVID LEWANDOWSKI (fiduciary
number: 253796

MICHEL MADIE of MICHEL MADIE REAL ESTATE   INC.
5 The name of the cooperative housing corporation
(the "Corporation") is:  Hotel des Artistes, Inc.

6 The "Unit" number is: 601, 603 & 6M and includes
all rooms depicted in attached diagram

**1.8** The Unit is located in "Premises" known as:
1 West 67th Street, New York, N.Y.

**1.9** The "Shares" are the 318, 330 & 76    shares of the
Corporation allocated to the Unit.

**1.10** The "Lease" is the Corporation's proprietary lease or occupan-
cy agreement for the Unit, given by the Corporation which expires
on September 30, 2052

**1.11** "Personalty" is the following personal property, to the extent
existing in the Unit on the date hereof: the refrigerators, freezers,
ranges, ovens, built-in microwave ovens, dishwashers, garbage dis-
posal units, cabinets and counters, lighting fixtures, chandeliers,
wall-to-wall carpeting, plumbing and heating fixtures, central air-
conditioning and/or window or sleeve units, washing machines, dry-
ers, screens and storm windows, window treatments, switch plates,
door hardware, mirrors; built-ins not excluded in ¶ 1.12 and
kitchen appliances, washer/dryer, built-in
mirror in living room.
(Two chandelier's being removed)

**1.12** Specifically excluded from this sale is all personal property not
included in ¶ 1.11 and Chandeliers, all paintings, works
of art and furnishings located in the Unit.

**1.13** The sale [does] [does not] include Seller's interest in
[Storage][Servant's Room][Parking Space] ("Included In 1.16")

**1.14** The "Closing" is the transfer of ownership of the Shares and Lease.

**1.15** The date scheduled for Closing is on or about May 11
("Scheduled Closing Date") at 10 A. M. (See ¶¶ 9 and 10)    200

**1.16** The "Purchase Price" is: $ 3,925,000.00
    **1.16.1** The "Contract Deposit" is: $390,000.00
    **1.16.2** The "Balance" of the Purchase Price due at Closing is:
$ 3,535,000.00 (See ¶ 2.2)

**1.17** The monthly "Maintenance" charge is
$ 6557.03    (See ¶ 4)

**1.18** The "Assessment", if any, payable to the Corporation, at the
date of this Contract is $    -0-    , payable as follows:

**1.19** [Seller] [Purchaser] shall pay the Corporation's flip tax, trans-
fer fee (apart from the transfer agent fee) and/or waiver of option fee
("Flip Tax"), if any.

**1.20** Financing Options *(Delete two of the following ¶¶ 1.20.1,
1.20.2 or 1.20.3)*

**1.20.1** Purchaser may apply for financing in connection with this
sale and Purchaser's obligation to purchase under this Contract is
contingent upon issuance of a Loan Commitment Letter by the Loan
Commitment Date (¶18.2).

**1.20.2** Purchaser may apply for financing in connection with this
sale but Purchaser's obligation to purchase under this Contract is
NOT contingent upon issuance of a Loan Commitment Letter.

**1.20.3** Purchaser shall not apply for financing in connection
with this sale.

**1.21** If ¶1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶18 are:
a loan of $    for a term of    years or
such lesser amount or shorter term as applied for or acceptable to

.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract deemed given to and received by Purchaser or Purchaser's At... as provided in ¶ 17.3.

.23 All "Proposed Occupants" of the Unit are:

1.23.1 persons and relationship to Purchaser:

Parents and children ...

1.23.2 pets:

.24 The Contract Deposit shall be held in [a non-] [an] IOLA escrow account. If the account is a non-IOLA account then interest ...all be paid to the Party entitled to the Contract Deposit. The Party ...eiving the interest shall pay any income taxes thereon. The ...crow account shall be a segregated bank account at

…pository:      Valley National Bank
…ddress:        275 Madison Avenue
                New York, New York 10017

.25 This Contract is [not] confirmed on attached rider(s).         (See ¶ 27)

**Agreement to Sell and Purchase; Purchase Price; Escrow:**

.1 Seller agrees to sell to, and Purchaser agrees to pur-
...ese from Seller, the Seller's Shares, Lease, Personalty and any
...cluded Interests and all other items included in this sale, for the
...rchase Price and upon the terms and conditions set forth in this
contract

2   The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract,
by Purchaser's good check to the order of Escrowee; and

2.2 the Balance at Closing, only by cashier's or official bank check
...certified check of Purchaser payable to the direct order of Seller,
...r check(s) shall be drawn on and payable by a branch of a
...mmercial or savings bank, savings and loan association or trust
...mpany located in the same City or County as the Unit. Seller may
...rect, on reasonable Notice (defined in ¶ 17) prior to Closing, that
...l or a portion of the Balance shall be made payable to persons other
...n Seller (see ¶ 17.7).

**Personalty**

1 Subject to any rights of the Corporation or any holder of a mort-
...ge to which the Lease is subordinate, this sale includes all of the
...ller's interest, if any, in the Personalty and the Included Interests.

2 No consideration is being paid for the Personalty or for the
...cluded Interests; nothing shall be sold to Purchaser if the Closing
...es not occur.

3 Prior to Closing, Seller shall remove from the Unit all the furni-
...re, furnishings and other property not included in this sale, and
...air any damage caused by such removal.

**Representations and Covenants**

. Subject to any matter affecting title to the Premises (as to which
...ller makes no representations or covenants), Seller represents and
...enants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the
...ares, Lease, Personalty and Included Interests, with the full right,
...wer and authority to sell and assign them. Seller shall make time-
...provision to satisfy existing security interest(s) in the Shares and
...ase and have the same delivered at Closing (See ¶ 10.1);

4.1.2 the Shares were duly issued, fully paid for and non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect
...d no notice of default under the Lease is now or will at Closing be
...effect;

4.1.4 the Maintenance and Assessments payable as of the date
...eof are as specified in ¶ 1.17 and 1.18; or by agent's letter

4.1.5 as of this date, Seller neither has actual knowledge nor has
...ceived any written notice of any increase in Maintenance or any
...sessment which has been adopted by the Board of Directors of
...Corporation and is not reflected in the amounts set forth in
1.17 and 1.18;

4.1.6 Seller has not made any material alterations or additions to
...Unit without any required consent of the Corporation or, to
...ler's actual knowledge, without compliance with all applicable

4.1.7 Seller has not entered into, shall not enter into, and has no
actual knowle... of any agreement (other than the Lease) affecting
title to the Un...; its true and/or occupancy after Closing, or which
would be binding on or adversely affect Purchaser after Closing (e.g.
a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past
10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against
Seller which have not been bonded against collection out of the Unit
("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests
shall be free and clear of liens (other than the Corporation's general
lien on the Shares for which no monies shall be owed), encum-
brances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid
by Seller to the end of the payment period immediately preceding the
date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material
which might give rise to the filing of a notice of mechanic's lien
against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of
the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that

4.2.1 Purchaser is acquiring the Shares and Lease for
residential occupancy of the Unit solely by the Proposed Occupants
identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been,
the subject of a bankruptcy proceeding;

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing
in connection with this purchase.

4.2.4 each individual comprising Purchaser is over the age of
18 and is purchasing for Purchaser's own account (beneficial and of
record);

4.2.5 Purchaser shall not make any representations to the
Corporation contrary to the foregoing and shall provide all docu-
ments in support thereof required by the Corporation in connection
with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing; any unpaid
tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants
contained in ¶ 4 shall be true and complete at Closing; and, except
for ¶ 4.1.6, shall survive Closing but any action based thereon must
be instituted within one year after Closing.

**5 Corporate Documents**
Purchaser has examined and is satisfied with, or (except as to any
matter represented in this Contract by Seller) accepts and assumes
the risk of not having examined, the Lease, the Corporation's
Certificate of Incorporation, By-laws, House Rules, minutes of
shareholders' and directors' meetings, most recent audited financial
statement and most recent statement of tax deductions available to
the Corporation's shareholders under Internal Revenue Code ("IRC")
§216 (or any successor statute).

**6 Required Approval and References**
6.1 This sale is subject to the unconditional consent of the
Corporation.
6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an
application with respect to this sale on the form required by the
Corporation, containing such data and together with such documents
as the Corporation requires, and pay the applicable fees and charges
that the Corporation imposes upon Purchaser. All of the foregoing
shall be submitted within 10 business days after the Delivery Date,
or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is
required by the Corporation, within 3 business days after the earlier
of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date
of receipt of the Loan Commitment Letter (defined in ¶ 1.8.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one
or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further
references, data and documents reasonably requested by the
Corporation.

This sale is also subject to the Corporation's
Waiver of the right of first refusal

promptly advise the other Party thereof. If the Corporation has not made a decision on or before the bedaled Closing Date, the Closing shall be adjourned for 30 b......... days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personalty; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law Section 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if, without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing Location**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s) and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller interest in th.... Personalty and Included Interests;

10.1..... y documents and payments to comply with ¶ 15.

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶ 2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation in relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax").

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller, Purchaser.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and any other periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified, or attorney's escrow check. This ¶ 11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶ 11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate

beneficiary of this Contract.

12.3 This ¶ 12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach or any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement.

14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be changed.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶ 4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act of omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchaser's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand, overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in § 17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

    17.3.1 on the day delivered by hand;

    17.3.2 on the business day following the date sent by overnight delivery;

    17.3.3 on the 5th business day following the date sent by certified or registered mail; or

    17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

**18 Financing Provisions**

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶¶ 1.20.1 or 1.20.2 applies.

    18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

    18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

    18.2.1 apply only to an Institutional Lender for a loan on

¶ . Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing true ... and complete information, and submit such application togeth ... ith such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all the requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 183, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶ 18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 183.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 183 shall constitute a waiver of the right to cancel under this ¶ 183.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 183, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reim-

burse Purchaser for any non-refundable financing and inspection expenses a ... ther sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change, Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

**19 Singular/Plural and Joint/Several**
The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**
No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**
Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

**22 Governing Law and Venue**
This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

**23 No Assignment by Purchaser; Death of Purchaser**
23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in Par. 12.

**24 Cooperation of Parties**
24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

**25 FIRPTA**
The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non-Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

**26 Additional Requirements**
26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending in rem action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement of ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party may cancel this Contract (pursuant to ¶ 16.3) by Notice.

**27 Escrow Terms**

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.2, and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the Contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys selected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorney's fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract.

**28 Margin Headings**
The margin headings do not constitute part of the text of this Contract.

**29 Miscellaneous**
This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

**30 Lead Paint**
If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and/or Lead-Based Paint Hazards is attached hereto and made a part hereof.

*In Witness Whereof,* the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:

SELLER:

PURCHASER:

_____
Escrow CAROL LILIENFELD

_____
HARVEY FISHBEIN, Receiver

_____
ATOOSA P. MAMDANI

_____
MAHMOUD A. MAMDANI

**Rider to, and Part of, Contract of Sale Between**
and

as Purchaser for Unit            at            as Seller

Suggested Purchaser's representations for use when applicable.

**31 Purchaser's Additional Representations and Covenants**
31.1 Supplementing ¶ 4.2 of the Contract, Purchaser also represents and covenants that:

31.1.1 Purchaser has, and will at Closing have, available unencumbered cash and cash equivalents (including publicly traded securities) in a sum at least equal to (and having a then current value of) the Balance; and

31.1.2 Purchaser has, and will at and immediately following the Closing have, a positive net worth.

31.2 the Maintenance and the monthly amount of the Assessment (if any) do not aggregate more than 25% of the current total gross monthly income of the individuals comprising the Purchaser;

31.3 (if ¶ 1.20.1 or ¶ 1.20.2 applies) the monthly debt service (interest and amortization of principal, if any) of the proposed financing together with the Maintenance and the monthly Assessment amount (if any), do not aggregate more than 35% of said current total gross monthly income.

32 Supplementing paragraph 4.1, Seller has no actual knowledge of a material default or condition which the Lessee is required to cure under the Lease and which remains uncured. If, prior to Closing, Seller acquires knowledge of a such default or condition which the Lessee would be required to cure, then Seller shall care same at or prior to Closing. This provision shall not survive closing.

The Parties have duly executed this Rider as of the same date as the Contract.

SELLER:                                   PURCHASER:

_____         _____

_____         _____

# RIDER ANNEXED TO CONTRACT OF SALE
## DATED AS OF MARCH 30, 2004
### FOR 1 WEST 67TH STREET, 601/603/6M

R1.    In the event of any inconsistency or conflict between the terms and provisions of this Rider and those contained in the agreement to which this Rider is annexed, the terms and provisions of this Rider shall govern and be binding.

R2.    This Contract is subject to approval by a Justice of the Supreme Court of New York County. If the approval cannot be obtained within    '60) days after full execution of the Contract, then either party may request return of the deposit and cancellation of Contract, and if the deposit is returned, the contract shall be null and void as though it never existed and neither side shall have a cause of action against the other for damages, specific performance or for any other matter.

R3.    Supplementing Paragraph 27 of the printed form of this Contract, if Seller is entitled to the Contract Deposit then interest earned if any, by the time of the Closing shall be paid to Seller and Purchaser shall not receive any credit against the Purchase Price hereunder for interest. Except as provided below, the party receiving such interest shall pay any income taxes thereon. Should the money be deposited into an attorney's IOLA account, then no party shall receive interest.

R4.    Supplementing the provisions of Paragraph 6 of the printed portion of this Contract, Purchaser agrees to use diligent efforts to fulfill all requirements or requests of the Co-operative Corporation in connection with obtaining approval of the directors or shareholders of the Corporation, as required by them. Without limiting the foregoing, Purchaser shall (I) diligently complete and submit the purchase application which accompanies this contract and shall complete and/or submit other related documents that may be required by the Board of directors, including but not limited to the submission of income tax returns or net worth statements, and (ii) promptly attend any personal interviews.

R5.    Supplementing and modifying Paragraph 14.1 of the printed portion of this Contract, Purchaser acknowledges having entered into this Contract without relying upon any promises, statements, estimates, representations, warranties, conditions or other inducements, expressly or implied, oral or written, not set forth in this Contract, and this particularly relates to information and/or representations that may have been made by any broker.

R6.    Supplementing and modifying Paragraph 11 of the printed portion of this Contract, a letter from the Corporation or its managing agent as to the status of Maintenance, Assessments, utility charges and any other customarily apportioned charges shall be sufficient for determining the apportionments. In this matter, although the managing agent has been billing apartment 600 along with the bills for the apartment being sold herein which is 601/603/6M, the Purchaser, after closing shall not be

required to make any payments for maintenance or assessments as to apartment 600.

R7.    The premises are not currently occupied. All furniture, artwork and personal possessions will be removed, and the apartment will be sold "as is" as of the date of this Contract. Two chandeliers shall be removed and not replaced. There is no representation that appurtenances, appliances, windows, toilets or sinks currently work and no repairs will be made.

R8.    Supplementing Paragraph 15 of the printed portion of this Contract, Purchaser shall cause a Lien search to be ordered promptly after the date hereof. Purchaser shall deliver a list of Liens, if any, which may violate Paragraph 4.1 of the printed portion of this Contract to Seller or Seller's Attorney promptly upon receipt of the lien search. Seller may adjourn the Closing for a period not to exceed thirty (30) days from the date set forth in Paragraph 1.15 hereof, if necessary, to remove any Liens which may violate Paragraph 4.1 of the printed portion of this Contract. However, any lien that can be satisfied by leaving an escrow deposit shall not be an impediment or delay to the closing. The lack or violation of any Certificate of Occupancy shall not be an impediment to closing nor shall it place any obligation on the part of the Seller.
        The parties understand that seller shall not be obligated to expend sums or ascertain information to satisfy a title company if purchaser chooses to obtain title insurance. Seller agrees to cooperate, but hereby reveals that as a court appointed Receiver to sell the property, he has no knowledge nor access to knowledge concerning the apartment other than what is of public record.

R9.    If any party obtains a judgment against any other party by reason of a breach of any of the terms or provisions of this Contract, reasonable attorney's fees and disbursements as fixed by the court shall be included in such judgment.
        It is understood that the Receiver has been directed by the Court to sell the property promptly and also there have been other bidders to purchase the property, and therefore if it is determined that Purchaser has defaulted, then the deposit shall be deemed liquidated damages.

R10.    The parties agree that if, for any reason whatsoever, Seller is unable to deliver to Purchaser "title" to the Proprietary Lease and the Shares and assign same according to the terms and provisions of this Contract and subject only to the matters set forth in this Contract, Seller shall not be required to bring any action or proceeding or otherwise incur any expenses (except to satisfy existing loans, if any) to render the "title" to the Lease and the Shares marketable, and if Purchaser shall refuse same, Purchaser may rescind this Contract in which event Seller shall forthwith return the Contract Deposit. However, Seller shall have the right, but not the obligation, on notice to Purchaser, to adjourn the Closing for a period not to exceed thirty (30) days in order to convey title to the Lease and the Shares under the terms of this Contract if Seller believes that Seller may be able to clear the problem within the specified time.

R11.    Purchaser acknowledges receipt from Seller of (I) "Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazard" executed by Seller

and a copy of the records and reports, if any, referenced therein, and (ii) a copy of the pamphlet entitled "Protect Your Family from Lead in Your Home". Purchaser hereby waives the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint hazards. In the event that the Corporation requires any lead paint remediation work to be performed in the Unit as a condition to the Closing, Purchaser shall be solely responsible for complying with the Corporation's requirements, and all such remediation work shall be performed at Purchaser's sole cost and expense.

R12.    Purchaser shall be solely responsible for payment of the New York State "Mansion Tax" (pursuant to Section 1402-a of the New York State Tax Law), by certified or official bank check payable to "Department of Taxation and Finance" to be delivered by Purchaser at the closing. Purchaser shall indemnify and hold Seller harmless from the imposition of the "Mansion Tax" or any other tax that is primarily the responsibility of Purchaser. The provisions of this paragraph shall survive the closing.

R13.    Purchaser will submit with Purchaser's application to the Board for approval a check for $250.00 payable to the Managing Agent, Gerard J. Picaso, Inc., for the processing fee; at the same time, a check to the Cooperative Board for $275.00 for the attorney's review fee shall be submitted by Purchaser with the approval package.

R14.    Receiver has no knowledge that the Certificate of Occupancy of the Building as a whole was changed to reflect the current structure of the apartment 601/603/6M. Therefore, Seller will not change the Certificate nor will this be an exception to closing. Seller's only obligation shall be to provide a letter from the Managing Agent or Board that the construction was done with the knowledge and consent of the Board.

R15.    The Purchaser shall be entitled to apply for a loan on the Cooperative Shares/Proprietary Lease in an amount not to exceed one half of the Purchase Price, and in the event said application, said Lender's processor or said Lender's attorneys delay the closing, then the Purchaser shall be required to close "all cash" as originally represented. The Contract is not contingent upon the loan. Since all parties understand that time is of the essence, Purchaser has agreed in good faith to promptly comply with all demands of their Lender and/or the Cooperative Board and Managing Agent.

PURCHASER:                                                              SELLER:

Mahmoud A. Mamdani                                          Harvey Fishbein

Atoosa P. Mamdani

## LEAD WARNING STATEMENT

Every purchaser of any interest in real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and also notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

Seller's Disclosure

    (a)  Presence of lead-based paint and/or lead-based paint hazards are present in the housing (explain:)

        [ ]  Known lead-based paint and/or lead-based paint hazards in the housing

        [XX]  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing

    (b)  Records and reports available to the seller (check one below)

        [ ]  Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below)

        [x]  Seller has no reports or records pertaining to lead-based paint hazards in the housing.

Purchaser's Acknowledgment

    ©)  Purchaser has received copies of all information listed above.

    (d)  Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*

    (e)  Purchaser has (check one below)

        [ ]  Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint

and/or lead-based paint hazards; or

[x]  Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Certificate of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge that the information provided by the signatory is true an accurate.

Seller: Harvey Fishbein, Receiver          Date                    3/30/07

Purchaser: Atoosa P. Mamdani          Date

Purchaser: Mahmoud A. Mamdani



*EXHIBIT C*

1 WEST 67TH STREET
COUNTY OF NEW YORK

## LIS PENDENS:

OLGA ROSTROPOVICH
VS.
OLAF GUERRAND HERMES
1 WEST 67TH STREET
NEW YORK, NY

FILED: 8/27/2002
INDEX NO. 350697/01

BLOCK 1120 LOT 23

* NATURE OF ACTION: ACTION FOR DIVORCE

OLGA ROSTROPOVICH
VS.
OLAF GUERRAND HERMES
1 WEST 67TH STREET
NEW YORK, NY

FILED: 10/31/2003
INDEX NO. 350697/01

BLOCK 1120 LOT 23

* NATURE OF ACTION: TO DETERMINE THE EQUITABLE DISTRIBUTION OF ASSETS.

USER:   NEW YORK   COUNTY CLERKS OFFICE   NEW YORK
TERM:  PE90        LIS PENDENS BOOK INQUIRY         DATE:  03/23/2007
             CONTROL NUMBER : 001770242 - 01          TIME:  10:25:12

         *** DOCKETING DATA ***        *** SOURCE DOCUMENT ***
DOCKETING DATE: 10/31/2003                   TYPE: LP    LIS PENDENS
         TIME:  03:57:00                   COUNTY: 31    NEW YORK
EFFECTIVE DATE: 10/31/2003                    COURT: S    SUPREME COURT
         TIME:  03:57:00   TOTAL BLOCKS & LOTS: 01        UPDATED: N
CLERK/SEQ #  :  AKING      024          INDEX #: 350697/01
                                      DOCUMENT #: 0070
                      *** PREMISES ***
            BLOCK #: 01120       LOT #:  00023
  ADDRESS    NUMBER: 1       STREET: WEST 67TH ST
            CITY  : NEW YORK NY         ZIP CODE:  00000
            *** 1ST NAMED DEFENDANT/CORPORATION ***
  NAME    FORMAT I   : HERMES-GURRAND,OLAF
            *** 1ST NAMED PLAINTIFF/CORPORATION ***
  NAME    FORMAT I   : ROSTROPOVICH,OLGA
   ADDRESS    NUMBER:        STREET:
            CITY  :
                                 ZIP CODE:  00000

ENTER CONTROL NUMBER FOR NEXT INQUIRY
PRESS: PF1- HELP, PF3- CANCEL PF8- 2ND PAGE, PF9-REPORT, ENTER- INQUIRE

FINANCING STATEMENT: (FILED IN THE NEW YORK COUNTY REGISTER'S OFFICE)

This FINANCING STATEMENT is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code

No. of Additional Sheets Presented

1 Debtor(s) (Last Name First) and Address(es)

Guerrand-Hermes, Olaf
1 West 67th Street
Apt. #600, #601, #603, #6M
New York, NY 10023

2 Secured Party(ies) Name(s) and Address(es)

Morgan Guaranty Trust Company
of New York
500 Stanton Christiana Road
Newark, DE 19713

3 Use Options — a transmitting utility
4 For Use Other Date for Use Other Office

09 MAY 15 PM 12:34

98PN24625

5 This Financing Statement covers the following types (or items) of property

Cooperative Proprietary Lease and stock filing on
Apt. #600, #601, #603, #6M at 1 West 67th Street, New
York, NY, i.e. 720 shares of Hotel des Artistes,
Inc. and lease of Apt to debtor together with all
fixtures used in connection there with by debtor.

☐ Products of the Collateral are also covered

6 Describe Real Estate Here

1 West 67th Street,
Apt. #600, 601, 603, 6M
New York, NY 10023
No. & Street          Town or City          County

☒ This statement is to be indexed in the Real Estate Records

until terminated

9 Name of a Record Owner

Hotel des Artistes, Inc.

8 Assignment of Secured Party and Address(es)

LOC. VER.
BY ADDRESS

10. This statement is filed without the debtor's signature to perfect a security interest in collateral (check appropriate box)
☐ under a security agreement signed by debtor authorizing secured party to file this statement, or
☐ which is proceeds of the original collateral described above as which a security interest was perfected, or
☐ acquired after a change of name, identity or corporate structure of the debtor, or
☐ already subject to a security interest in another jurisdiction
☐ when the collateral was brought into the state, or ☐ when the debtor's location was changed to this state.

Book 1120  pg 23

Olaf Guerrand-Hermes

Signature(s) of Debtor(s)

Morgan Guaranty Trust Company of New York

By   Thomas B. Monaghan   Vice President

(1) FILING OFFICER COPY NUMERICAL
STANDARD FORM - FORM UCC-1 - Approved by Secretary of State of New York



2003100801283001002E18EA

| **NYC DEPARTMENT OF FINANCE**<br>**OFFICE OF THE CITY REGISTER**<br><br>This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | |
|---|---|

### RECORDING AND ENDORSEMENT COVER PAGE

| | PAGE 1 OF 4 |
|---|---|
| Document ID: 2003100801283001 | Preparation Date: 10-08-2003 |
| Document Type: INITIAL UCC1 | COOPERATIVE |
| Document Page Count: 2 | |

| PRESENTER: | RETURN TO: |
|---|---|
| MERLE & BROWN P.C.<br>330 MADISON AVENUE, SUITE 2900<br>NEW YORK, NY 10017<br>212-471-2990<br>j.bradley@mbpclaw.com | MERLE & BROWN P.C.<br>330 MADISON AVENUE, SUITE 2900<br>NEW YORK, NY 10017<br>212-471-2990<br>j.bradley@mbpclaw.com |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | 603 | 1 WEST 67TH STREET |
| Property Type: SINGLE RESIDENTIAL COOP UNIT | | | | |

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1120 | 23  Partial Lot | 601 | 1 WEST 67TH STREET |
| Property Type: SINGLE RESIDENTIAL COOP UNIT | | | | |

⊠ Additional Properties on Continuation Page

### CROSS REFERENCE DATA

CRFN _____ or Document ID _____ or    Year _____ Reel _____ Page _____ or File Number _____

### PARTIES

| DEBTOR: | SECURED PARTY: |
|---|---|
| OLAF GUERRAND-HERMES<br>1 WEST 67TH STREET<br>NEW YORK, NY 10023 | MICALDEN INVESTMENTS SA<br>C/O MORGEN & MORGEN, SWISS TOWER, 16 FL, 53<br>ROAD E STREET, URB<br>MARBELA-WORLDTRADECTR |

### FEES AND TAXES

| Mortgage | | | | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Recording Fee: $ | 40.00 |
| Taxable Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | 0.00 |
| Exemption: | | | NYC Real Property Transfer Tax Filing Fee: | |
| **TAXES:** | | | $ | 0.00 |
| County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed    10-17-2003 10:37

City Register File No.(CRFN):

2003000426135

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2003100801283001002C1A6A

**RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION)**   **PAGE 2 OF 4**

Document ID: 2003100801283001
Document Type: INITIAL UCC1

Preparation Date: 10-08-2003

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 6M | 1 WEST 67TH STREET |
| | | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 600 | 1 WEST 67TH STREET |
| | | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |

## FINANCING STATEMENT: (FILED IN THE NEW YORK COUNTY REGISTER'S OFFICE)

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> Merle & Brown, P.C.
> 330 Madison Avenue
> New York, New York 10017

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| Guerrand-Hermes | Olaf | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1 West 67th Street | New York | NY | 10023 | U.S.A. |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| 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 | | | | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names    NONE

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)    NONE

| 3a. ORGANIZATION'S NAME |
|---|
| Micalden Investments SA |

| 3c. MAILING ADDRESS c/o Morgen & Morgen, Swiss Tower, 16th FL, 53 Road E Street, URB Marbela-World Trade Ctr | CITY Panama City | STATE | POSTAL CODE | COUNTRY Panama |

4. This FINANCING STATEMENT covers the following collateral:

All of the debtor's right, title, and interest in 756 Shares of Hotel des Artistes, Inc. represented by share certificates numbered 345, 346, 347 and 354 and assigns to the Secured Party all of the debtor's interest in the Proprietary Leases, dated July 10, 1990, for apartments 603, 601, 6M, and 600 located at 1 West 67th Street, New York, NY 10023, and the proceeds of any sale of the Shares, transfer of the apartments, or subsequent assignment of the leases.

5. ALTERNATIVE DESIGNATION [if applicable]: LESSEE/LESSOR   CONSIGNEE/CONSIGNOR   BAILEE/BAILOR   SELLER/BUYER   AG. LIEN   NON-UCC FILING

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2003101400495001001EBC92

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 4 |
|---|---|

Document ID: 2003101400495001
Document Type: INITIAL COOP UCC1
Document Page Count: 2

Preparation Date: 10-14-2003
COOPERATIVE

| PRESENTER: | RETURN TO: |
|---|---|
| MERLE & BROWN P.C. | MERLE & BROWN P.C. |
| 330 MADISON AVENUE | 330 MADISON AVENUE |
| SUITE 2900 | SUITE 2900 |
| NEW YORK, NY 10017 | NEW YORK, NY 10017 |
| 212-471-2990 | 212-471-2990 |
| j.bradley@mbpclaw.com | j.bradley@mbpclaw.com |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 603 | 1 WEST 67TH STREET |

Property Type: SINGLE RESIDENTIAL COOP UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 601 | 1 WEST 67TH STREET |

Property Type: SINGLE RESIDENTIAL COOP UNIT

☒ Additional Properties on Continuation Page

**CROSS REFERENCE DATA**

CRFN ____ ____ or Document ID ____ ____ or     Year ____ Reel ____ Page ____ or File Number ____ ____

**PARTIES**

| DEBTOR: | SECURED PARTY: |
|---|---|
| OLAF GUERRAND-HERMES | XAVIER GUERRAND-HERMES |
| 1 WEST 67TH STREET | 216 BD SAINT GERMAIN |
| NEW YORK, NY 10023 | PARIS |
| | FRANCE |

**FEES AND TAXES**

| Mortgage | | | | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Recording Fee: $ | 40.00 |
| Taxable Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | 0.00 |
| Exemption: | | | NYC Real Property Transfer Tax  Filing Fee: | |
| TAXES: | | | $ | 0.00 |
| County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |

RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK
Recorded/Filed      10-22-2003 09:44
City Register File No.(CRFN):
2003000431595

_City Register Official Signature_

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2003101400495001001CBE12

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 4 |
|---|---|

Document ID: 2003101400495001
Document Type: INITIAL COOP UCC1

Preparation Date: 10-14-2003

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 6M | 1 WEST 67TH STREET |
| | | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |
| Borough | Block | Lot | | Unit | Address |
| MANHATTAN | 1120 | 23 | Partial Lot | 600 | 1 WEST 67TH STREET |
| | | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |

## FINANCING STATEMENT: (FILED IN THE NEW YORK COUNTY REGISTER'S OFFICE)

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Merle & Brown, P.C.
330 Madison Avenue
New York, New York 10017

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| Guerrand-Hermes | Olaf | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1 West 67th Street | New York | NY | 10023 | U.S.A. |

| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| 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 | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| Guerrand-Hermes | Xavier | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 216 bd Saint Germain | Paris | | | France |

4. This FINANCING STATEMENT covers the following collateral:

All of the debtor's right, title, and interest in 756 Shares of Hotel des Artistes, Inc. represented by share certificates numbered 345, 346, 347 and 354 and assigns to the Secured Party all of the debtor's interest in the Proprietary Leases, dated July 10, 1990, for apartments 603, 601, 6M, and 600 located at 1 West 67th Street, New York, NY 10023, and the proceeds of any sale of the Shares, transfer of the apartments, or subsequent assignment of the leases.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

**NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2003101400621001002E4541

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 4 |
|---|---|---|
| Document ID: 2003101400621001 | Document Date: 10-14-2003 | Preparation Date: 10-14-2003 |
| Document Type: INITIAL COOP UCC1 | | COOPERATIVE |
| Document Page Count: 2 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| MERLE & BROWN, P.C. | MERLE & BROWN, P.C. |
| 330 MADISON AVENUE | 330 MADISON AVENUE |
| SUITE 2900 | SUITE 2900 |
| NEW YORK, NY 10017 | NEW YORK, NY 10017 |
| 212-471-2990 | 212-471-2990 |
| j.bradley@mbpclaw.com | j.bradley@mbpclaw.com |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot 603 | 1 WEST 67TH STREET |
| | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot 601 | 1 WEST 67TH STREET |
| | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | |

☒ Additional Properties on Continuation Page

**CROSS REFERENCE DATA**

| CRFN | or Document ID | or | Year | Reel | Page | or File Number |
|---|---|---|---|---|---|---|

**PARTIES**

| DEBTOR: | SECURED PARTY: |
|---|---|
| OLAF GUERRAND-HERMES | PATRICK GUERRAND-HERMES |
| 1 WEST 67TH STREET | 29 RUE DE SENLIS, DINEUIL ST. FIRMIN 60500 |
| NEW YORK, NY 10023 | CHANTILLY |
| | FRANCE |

**FEES AND TAXES**

| Mortgage | | | |
|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Recording Fee: $ 40.00 |
| Taxable Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ 0.00 |
| Exemption: | | | NYC Real Property Transfer Tax Filing Fee: |
| TAXES: | | | $ 0.00 |
| County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: |
| City (Additional): | $ | 0.00 | $ 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** |
| NYCTA: | $ | 0.00 | Recorded/Filed     10-22-2003 09:48 |
| TOTAL: | $ | 0.00 | City Register File No.(CRFN): |
| | | | 2003000431623 |

*City Register Official Signature*

*EXHIBIT D*

JUN. 8. 2004  4:11PM                                              NO. 4446   P. 27

 **First American**
**Title Insurance Company**
**of New York**

Carol Lilienfeld, Esq.
708 Third Avenue
Suite 1501
New York, N.Y., 10017

June 8, 2004

Re: Title # 3008-33746
Guerrand-Hermes
Your file # 5054HF

Dear Ms. Lilienfeld:

In order to omit the UCC filed by Interaudi Bank vs. Units 600,601,603, and 6M at 1 West 67th Street, New York, New York (Hotel des Artistes, Inc.), filed as CRFN #2003000426135 this company will require that $249,000 be held in escrow pending termination of the UCC. Despite the fact that the loan was made in December of 2003, the balance owing is an unknown. Furthermore, the period of time which will be required for the parties to resolve this matter is also an unknown. Based upon these factors, First American requires that an escrow of 50% above the face amount of the loan be held pending resolution of this matter. Any escrow agreement should also provide that the UCC must be terminated or released from the premises within six months from date of closing.

Very truly yours,

*Vincent Whooley*

Vincent Whooley



*Carol Lilienfeld, attorney for Receiver by court order, will hold in Escrow $249,000.°° concerning the above, which shall not be released until there is a court order AND a UCC-3 acceptable to First American*

633 Third Avenue New York, N.Y., 10017
TEL 212-850-0613 • FAX 212-331-1524
WWW.FIRSTAM.COM

*Carol Lilienfeld*

*EXHIBIT E*

# CAROL LILIENFELD
### ATTORNEY AT LAW
708 THIRD AVENUE
NEW YORK, NEW YORK 10017

(212) 683-3344

June 10, 2004

Harvey Fishbein, Esq.
Gould, Fishbein, Reimer & Gottfried, LLP
61 Broadway, Suite 1601          Re:    1 West 67th Street
New York, NY 10006                      File 5054HF

## DISBURSEMENTS ONLY

| | |
|---|---:|
| Duplication | $ 44.20 |
| Special mail | 15.16 |
| Federal Express | 28.00 |
| Court clerical services | 18.00 |
| Fax charges | 72.25 |
| Long distance calls | 7.50 |
| Messenger services | 156.70 |
| Transportation | 106.50 |
| Apartment sitters | 500.00 |

**TOTAL AMOUNT DUE:**              **$ 948.31**

06/11/2004 15:41 FAX 2122673024          GFRG LAW FIRM                          ☒001

# GOULD FISHBEIN REIMER & GOTTFRIED, LLP

ATTORNEYS AT LAW

FRANKLYN GOULD
HARVEY FISHBEIN
NORMAN L. REIMER
ROBERT N. GOTTFRIED
MARCIA GOFFIN
SUSAN J. WALSH
PAUL FELDMAN

61 BROADWAY, SUITE 1601
NEW YORK, NEW YORK 10006
TEL: (212) 267-1600
FAX: (212) 267-3024
WWW.GFRGLAWFIRM.COM
ADMIN@GFRGLAWFIRM.COM

## FAX TRANSMISSION

**DATE:** 6/11/04

**ATTN:** Carol Lilienfeld, Esq

**COMPANY:**

**FROM:** Harvey Fishbein

**RE:** 1 West 67 St, Apt 601

**FAX:** 212-286-8481

**NUMBER OF PAGES INCLUDING COVER SHEET:** 7

**MESSAGE:**

My Disbursements

① Bond (Blackie Group) — $500

② Change of (3) locks            266. 13

③ 2 Fed Ex (2 x 11.98 = 23.96    23.96

④ Change of upstairs lock        14.99
                              $805.08

Is the following document sufficient?

**IMPORTANT NOTICE**

This FAX has been sent from a law firm. It may contain privileged information only for the use of the person named above. If you are not an intended recipient, you are hereby notified that any dissemination or duplication of this FAX is prohibited and that there is and shall be no waiver of any privileged or confidence by your receipt of this transmission. If you have received this FAX in error, please notify us by collect telephone call and return it by first class mail.
Thank you.

Please call immediately if there are any troubles with the receipt of this FAX transmission: (212) 267-2600.

*EXHIBIT F*

JUN-22-2004  15:17          POLLACK. COOPERMAN                              P.02/02

# BRILL & MEISEL
### ATTORNEYS AT LAW

488 MADISON AVENUE · NEW YORK, N.Y. 10022
(212) 753-5599
FAX (212) 486-6587

Pollack Cooperman & Fisher
5378 Mernet Rd
Suite 200
Massapequa NY

6/10/04

FOR PROFESSIONAL SERVICES RENDERED

In connection with Closing of Sale of
Apartments 601, 603, 611 at Hotel des Artistes, Inc.

$ 750

JUN-22-2004  16:16          POLLACK, COOPERMAN                                    P.01/02

# Pollack, Cooperman & Fisher, P.C.

*Attorneys at Law*
*5372 Merrick Road - Suite 200*
*Massapequa, New York 11758*

*Telephone: (516) 228-0033*
*Telecopier: (516) 797-1227*

*Howard K. Pollack*
*Cindy B. Cooperman**
*Charles J. Fisher*
*Kathleen E. Nolan*
*Lindsey Rohan*
*admitted In NY & NJ*

$2_{12}$-286-8981

June 22, 2004

Carol Lillianfeld, Esq
708 Third Avenue
New York, NY 10017

> Re: Guerrand-Hermes
> Loan No. 10873069-9
> Units 601, 603, 611

Dear Ms. Lillianfeld:

Enclosed please find a copy of the invoice from Brill & Meisel in connection with the above referenced closing.

I must advise you that after serious consideration I feel this bill for legal services is outrageous and uncalled for and I will under no circumstances agree to make payment of this on behalf of my client. Should you decide to seek payment of this from the funds on deposit of the borrower however, I will have no objection.

If you have any questions, please don't hesitate to call.

Very truly yours,

Howard K. Pollack

*EXHIBIT G*

## Maintenance and Related Charges: 6/04

| Apt. No. | Number of Shares | Maintenance per Share | Monthly Maintenance |
|---|---|---|---|
| 600 | 32 | $ 9.05687 | $ 289.81 |
| 601 | 318 | 9.05687 | 2,880.02 |
| 603 | 330 | 9.05687 | 2,988.70 |
| 8M | 76 | 9.05687 | 688.31 |
| | 756 | | |

| Apt. No. | Number of Shares | Assessment per Share | Monthly Assessment |
|---|---|---|---|
| 600 | 32 | $ 8.19 | $ 262.08 |
| 601 | 318 | 8.19 | 2,604.42 |
| 603 | 330 | 8.19 | 2,702.70 |
| 8M | 76 | 8.19 | 622.44 |
| | 756 | | $ 6,191.64 |

## Maintenance and Related Charges - Total Through 6/30/04

| Apt. No. | Due Through 5/31/04 | Maintenance 6/04 | Assessment 6/04 | Total Due Through 6/30/04 |
|---|---|---|---|---|
| 600 | $ 4,543.85 | $ 289.81 | $ 262.08 | $ 5,249.76 [1] |
| 601 | 46,148.36 | 2,880.02 | 2,604.42 | 51,632.80 |
| 603 | 47,889.81 | 2,988.70 | 2,702.70 | 53,581.21 |
| 8M | 11,028.17 | 688.31 | 622.44 | 12,144.01 [2] |
| | | | | $ 122,607.77 |

1) Includes $64.00 charge for House Phones
2) Includes $225.90 STAR abatement credited to apartment 8M, as per Dept. of Finance schedule and $30.00 charge for storage units

*June 1, Assessment*

*June Maintenance*

Hotel des Artistes
**Account Balances - Apts. Nos. 600, 601, 603 & 6M**

**Sigrid J. Picaso, Inc.- Real Estate System Balances**

| | | |
|---|---|---|
| | 14.95 | Electric- Apt. 600 |
| | 11.74 | Electric- Apt. 601 |
| | 99.41 | Electric- Apt. 603 |
| | 584.00 | Legal Charge |
| | 1,962.12 | Late Fee- Apt. 600 |
| | 303.99 | Cafe- House Account- Apt. 600 |

Charges Attributable to Seller Billed Effective 6/1/04

$  109,711.19  Effective Total Due Through 5/31/04 for Apts. Nos. 600, 601, 603 & 6M

**Percentage Apportionment of Balances Due at 5/31/04 to Apts Nos. 600, 601, 603 & 6M**

| Apt. No. | Number of Shares | Percentage Apportionment of Shares | Percentage Apportionment of 5/31/04 Balance Due |
|---|---|---|---|
| 600 | 32 | 4.23280% $ | 4,643.36 |
| 601 | 316 | 42.06349% | 46,149.38 |
| 603 | 330 | 43.65079% | 47,889.61 |
| 6M | 78 | 10.32291% | 11,029.17 |
| | 756 | 100.00000% $ | 109,711.19 |

total Invoices thru
May 31, 2004

Exhibit N

At an IAS Part 17 of the
Supreme Court of the State of
New York, County of New York,
60 Centre Street, New York,
New York on November 18,
2004

PRESENT:

      EMILY JANE GOODMAN,

                        Justice.

---------------------------------------------------------------X

OLGA ROSTROPOVICH.,                    Index No. 350697/01

                 Plaintiff,

                                **ORDER**

      -against-

OLAF GUERRAND-HERMES,

                 Defendant.

---------------------------------------------------------------X

      Upon the Order to Show Cause dated July 1, 2004, the Affidavit in Support of

Harvey Fishbein, Court-appointed Receiver, sworn to on June 24, 2004, the

Affirmation of Carol Lilienfeld, Court-appointed Attorney for the Receiver, dated June

22, 2004, Carol Lilienfeld's affirmation of legal services dated June 18, 2004, the

closing statement, exhibit letters from the building managing agent and their attorneys,

and upon the Order approving the Contract of Sale, the escrow agreement and UCC

lien of InterAudi bank and the other exhibits annexed, and upon the Plaintiff's Notice

of Cross Motion dated July 9, 2004, the Affirmation of Renee Schwartz in Support

dated July 7, 2004, and the Affidavit of Olga Rostropovich, sworn to on July 7, 2004,

and exhibits, and upon the Cross-Motion of InterAudi Bank dated July 29, 2004, and

the Affidavit of Joseph Audi, sworn to on July 29, 2004, and the Affirmation in

Opposition (to Cross-Motion) by Renee Schwartz dated August 5, 2004, and the

Affidavit in Reply of Carol Lilienfeld dated August 5, 2004, and of Harvey Fishbein sworn to on July 22, 2004, and upon the Reply Affirmation of Donald Pearce, attorney for InterAudi Bank, dated August 10, 2004, and there having been oral argument,

NOW, on motion of Carol Lilienfeld, attorney for the Receiver, it is

ORDERED that the sale of Apartment 601/603/6M at 1 West 67th Street, New York, New York is hereby confirmed and the two Notices of Pendency previously filed by plaintiff in this action are hereby cancelled and discontinued, and Plaintiff must take all necessary steps to make sure the Notices of Pendency are removed of record, and it is further

ORDERED that the Receiver's escrow contract with First American Title for $249, 000.00 as to the Interaudi Bank UCC lien of $166,000.00 shall remain in effect, the money to be held by Carol Lilienfeld, attorney for Receiver, in her IOLA account pending a final determination in any action that may be brought to determine the exact amount owed on that lien or upon any final stipulation of settlement agreed upon in writing among the necessary persons as to the amount and validity of that claim, and it is further

ORDERED that the above UCC lien of Interaudi Bank, recorded against the leases and stock shares of the co-operative apartment 601/603/6M at 1 West 67th Street, New York, New York, Block 1120, Lot 23 and filed as CRFN 2003000426135 is hereby discontinued and cancelled, and it shall be removed of record by defendant's counsel by serving and filing necessary documents and paying any necessary fees, within thirty days of entry of this Order, but shall attach to the $249,000 in the IOLA

- 2 -

account of Carol Lilienfeld, with the same priority and effect as that lien attached to the apartment and personalty, and it is further

ORDERED that, subject to the Receiver filing the appropriate forms, i.e., UCS-872-Notice of Appointment and Certification of Compliance and UCS-875-Statement of Approval of Compensation, the Receiver's fees are confirmed as $150,000.00, which sum was agreed to by the parties by Stipulation, dated November 12, 2004, and which the Court finds appropriate compensation pursuant to CPLR 8004, which shall be paid from the closing funds in his possession, and this Order confirms the disbursements already paid from the account and reimbursed to the Receiver, and it is further

ORDERED that, subject to the Attorney for the Receiver Carol Lilienfeld filing the appropriate UCS forms, i.e., UCS 872-Notice of Appointment and Certification of Compliance and UCS-875-Statement of Approval of Compensation, and if necessary UCS-876-Report of Compensation Received by Law Firms For Appointments, the attorney's fees to Carol Lilienfeld as court appointed Attorney for Receiver are awarded on agreement as $21,000.00, and Receiver shall pay her these fees from the closing funds in his possession, and the attorney's disbursements paid are confirmed, and the additional sum of $400.00 is directed to be paid by Receiver to Carol Lilienfeld to reimburse Carol Lilienfeld, Esq. for the appraisal of the chandelier, and it is further

ORDERED that upon Receiver filing with the Court an Affidavit that all payments specified herein are paid, the Receiver's bond on file with the Court is released and cancelled of record, and it is further

- 3 -

ORDERED that from the closing funds, Receiver pay to Plaintiff the sum of $369,350.44, representing a portion of the equitable distribution already awarded to her, and it is further

ORDERED that the sum of $750.00 (a disbursement) be paid to Alan Brill, Esq., as the Managing Agent's attorney with respect to the time spent at the closing, and it is further

ORDERED that Receiver's payment to Anthony Borg as superintendent of the Hotel des Artistes building be paid $400.00, the post motion sum of $600.00 to clear the storage bin and tip the other staff is hereby confirmed, and it is

ORDERED that the remaining balance of the closing funds in Receiver's possession be paid to Plaintiff toward accrued support and maintenance (not reduced to judgment form).

ENTER

_____
J.S.C.
Hon. Emily Jane Goodman

**EMILY JANE GOODMAN**

- 4 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OLGA ROSTROPOVICH,                          :

                     Plaintiff,                 :        Index No. 350697-01

        -against-                           :        STIPULATION

                             :

OLAF GUERRAND-HERMES,                        :

              Defendant.                   :

         IT IS HEREBY STIPULATED AND AGREED TO between counsel for Plaintiff,

Olga Rostropovich, Defendant, Olaf Guerrand-Hermes, and the Receiver, Harvey Fishbein, that the

Receiver shall be entitled to receive a commission of $150,000 from the proceeds of sale for

Defendant's cooperative apartment at Hotel Des Artistes; and

        IT IS FURTHER STIPULATED AND AGREED TO that the Receiver's

commission of $150,000 shall not include legal fees sought by the Receiver's counsel as set forth in

the Receiver's motion; and

        IT IS FURTHER STIPULATED AND AGREED TO that this Stipulation may be

executed in multiple counterparts and that a facsimile copy of the execution of this Stipulation by

any party shall have the same effect as an original.

*It is further agreed that this issue of the chandelier is settled for $7,500.00 additional money to be paid to defendant by purchasers.*

Date: August 12, 2004

_____
William S. Beslow, Esq.
Attorney for Defendant,
Olaf Guerrand-Hermes

_____
Carol Lilienfeld, Esq.
Attorney for Harvey Fishbein, as Receiver

_____
Jeffrey Gross, Esq.
Attorney for Plaintiff,
Olga Rostropovich

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:    **EMILY JANE GOODMAN**                    PART  17

_____                       *Justice*

OLGA ROSTROPOVICH

|  |  |
|---|---|
| INDEX NO. | 350697/01 |
| MOTION DATE | |

- v -

OLAF GUERRAND-HERMES

| MOTION SEQ. NO. | 018 |
|---|---|
| MOTION CAL. NO. | |

_____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits _____ | |
| Replying Affidavits _____ | |

**Cross-Motion:** ☑ Yes   ☐ No       **INTERIM DECISION**

*Stipulation and the* ~~foll~~

Upon the foregoing papers, it is ordered that this Order to Show Cause to confirm the sale of a cooperative apartment, cancel a Notice of Pendency and determine the amounts due to the Receiver and Receiver's attorney, is granted in accordance with the terms of the Order signed simultaneously herewith. The cross-motion of Plaintiff for the same relief is granted in accordance with the Order and is held in abeyance with respect to the additional relief declaring that Bank Audi has no right to any of the proceeds from the cooperative, as a result of its security interest. Bank Audi's cross-motion for an order requiring payment of escrowed funds to Bank Audi is also held in abeyance. In connection with the cross-motions, the Court orders that $249,000 remain in the IOLA account of Carol Lilienfeld, in accordance with the terms of the Order, until resolution of Bank Audi's claim to such funds.

This constitutes the Decision and Order of the Court.

Dated:  **November 18, 2004**

_____                                J.S.C.
                                                        **EMILY JANE GOODMAN**

**Check one:** ☑ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

**Check if appropriate:**   ☐ DO NOT POST

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE ___ FOR THE FOLLOWING REASON(S):

Exhibit O

Buckley, P.J., Andrias, Catterson, Malone, JJ.

7384N      Micalden Investments S.A.,          Index 118422/03
                Plaintiff-Appellant,

                -against-

           Olaf Guerrand-Hermes,
                Defendant.
                - - - - -
           Olga Rostropovich,
                Nonparty Respondent.



Edward Rubin, New York, for appellant.

Kronish Lieb Weiner & Hellman LLP, New York (Renee Schwartz of
counsel), for respondent.

Order, Supreme Court, New York County (Emily Jane Goodman,

J.), entered April 2, 2004, which granted the motion of nonparty

respondent pursuant to Debtor and Creditor Law § 276 to vacate a

judgment by confession entered against defendant in favor of

plaintiff, Micalden Investments, reversed, on the law, without

costs, and the matter remanded for a hearing.

Plaintiff-appellant Micalden Investments S. A. (Micalden) is

a corporation wholly owned by Eva Blazek, wife of defendant Olaf

Guerrand-Hermes, and mother of his two children.  At the time

that defendant made the judgment by confession in 2003, Eva

Blazek was defendant's fiancee, and defendant was in the final

stages of a divorce from his first wife, nonparty respondent

Rostropovich, in this action.

8

The divorce action was decided on October 3, 2003, and Rostropovich obtained a judgment, entered October 31, 2003, consisting of an award for $449,904 in maintenance and child support arrears.[1]

In the meantime, on October 2, 2003, defendant executed an affidavit of confession of judgment in favor of Micalden purportedly to repay a loan of approximately $1.4 million. In December 2003, Rostropovich moved to vacate the judgment by confession on the ground that she was a creditor of her husband, and that the judgment was a fraudulent conveyance entered with "actual intent to hinder, delay or defraud" either present or future creditors. The court granted the motion. Now, for the reasons set forth below, this Court reverses and remands the matter for a hearing.

The record demonstrates that between February and September 2003, defendant arranged to borrow almost $1.4 million from Micalden. There is documentary evidence in the form of wire transfer confirmations that show these transactions. In March 2003, defendant arranged for Micalden to pay his father, Patrick Guerrand-Hermes (Patrick) $1 million to fund a certain agreement

---

[1] This Court modified the award finding that wife's efforts were not a factor in the appreciation of husband's New York City cooperative apartment (*Rostropovich v Guerrand-Hermes*, 18 AD3d 211 [2005]).

9

regarding defendant's apartment at the Hotel des Artistes.  The
record demonstrates that most of the other advances by Micalden
related to that apartment as well, including an initial payment
of $125,000 sent to Patrick in February 2003 to pay arrears in
maintenance and a special assessment on the apartment, a payment
of $12,132.17 to defendant in May 2003 to pay charges on the
apartment, a $33,500 transfer to Merle & Brown, P.C. (defendant's
New York lawyers) in June 2003 to make three monthly mortgage
payments on the apartment, a further $31,762.33 transfer to Merle
& Brown in September 2003, also to service the mortgage and a
$50,000 payment directly to the Hotel des Artistes in September
2003 to pay charges on the apartment.  The remainder of the funds
were allegedly advanced to pay defendant's other expenses between
February and May of 2003.

It has been hornbook law for more than a century that, "in
the absence of statutory restrictions an insolvent debtor has the
right to sell and transfer the whole or any portion of his
property to one or more of his creditors in payment of or to
secure the debts, when that is the honest purpose, although the
effect of the sale or the transfer is to place his property
beyond the reach of his other creditors and render their debts

10

uncollectible" (*Dodge v McKechnie*, 156 NY 514, 520 [1898], citing *Tompkins v Hunter*, 149 NY 117 [1896]; *see Ultramar Energy Ltd. v Chase Manhattan Bank*, 191 AD2d 86 [1993]). In the instant case, the question of defendant's "honest purpose" is clearly one of fact. More significantly, the standard of proof as to a showing of fraudulent intent under the statute is that of clear and convincing evidence (*see Symbax, Inc. v Bingaman*, 219 AD2d 552, 553 [1995], citing *Marine Midland Bank v Murkoff*, 120 AD2d 122, 126 [1986], *appeal dismissed* 69 NY2d 875 [1987]). Contrary to the suggestion of the dissent, that standard is simply not met by the motion court's "full familiar[ity] with the background of this action."

Because the dates of and the documentation in support of the various transfers made by Micalden at the very least create the issue of fact, the respondent failed to show defendant's fraudulent intent by the requisite clear and convincing evidence. Accordingly, we remand the case for a hearing under § 276 of the Debtor and Creditor Law.

All concur except Andrias, J. who dissents in a memorandum as follows:

11

ANDRIAS, J. (dissenting)

Because the court properly found sufficient circumstantial evidence to indicate that plaintiff's principal was aware or should have been aware of defendant's intent to frustrate any recovery by his former wife, I dissent and would affirm the order granting nonparty respondent's motion pursuant to Debtor and Creditor Law § 276 to vacate a judgment by confession entered against defendant, respondent's former husband, and in favor of plaintiff, a company controlled by the mother of defendant's child.

Nonparty respondent, defendant's former wife, moved to vacate an undated judgment by confession in favor of plaintiff and against defendant in the amount of $1,390,664.35, which was entered on October 22, 2003, two weeks after the court in defendant's divorce action ordered entry of judgment against him for $449,904 in maintenance and child support arrears, on the grounds that such judgment was entered with actual intent to "hinder, delay or defraud" either present or future creditors, in this case his former wife.

In her affidavit in opposition to respondent's motion, plaintiff's principal, Eva Blazek, the mother of defendant's son who was pregnant with a second child at the time, stated that the confession of judgment was based upon a demand revolving

12

promissory note signed by defendant on February 20, 2003 and
advances made to defendant from February 24, 2003 through
September 22, 2003 totaling $1,389,952.93, that the loans were
made to defendant in good faith, and that the confession of
judgment was not collusive.  Plaintiff also relied upon this
Court's decision in *Ultramar Energy Limited v Chase Manhattan
Bank* (191 AD2d 86, 90-91 [1993]) for the proposition that a
conveyance which satisfies an antecedent debt made while the
debtor is insolvent is neither fraudulent nor otherwise improper,
even if its effect is to prefer one creditor over another.
However, as found by the motion court, *Ultramar Energy* is clearly
inapposite since it involved Debtor and Creditor Law § 273, which
governs conveyance by an insolvent and provides that any
conveyance made without a fair consideration is fraudulent
without regard to the transferor's actual intent.  All *Ultramar*
held was that it is not fraudulent for an insolvent acting in
good faith to satisfy an antecedent debt even if its effect is to
prefer one creditor over another (191 AD2d at 90-91).  Debtor and
Creditor Law § 276, unlike § 273, addresses actual fraud, as
opposed to constructive fraud, and does not require proof of
unfair consideration or insolvency (*Wall St. Assocs. v Brodsky*,
257 AD2d 526, 529 [1999]).  The issue, thus, is not whether Ms.
Blazek acted in good faith, but whether defendant entered the

13

judgment by confession in favor of plaintiff corporation with
actual intent to "hinder, delay, or defraud" either present or
future creditors.

The motion court correctly rejected plaintiff's contentions
that defendant's motivation is irrelevant and that the only
relevant inquiry is whether a loan was in fact made.  The court,
which had presided over defendant's divorce action and was fully
familiar with the background of this action, properly found that
a hearing was not necessary to summarily dispose of respondent's
motion in light of defendant's failure to appear and Ms. Blazek's
failure to raise an issue of fact about defendant's intent.
Moreover, direct proof of a debtor's state of mind is rarely
available; intent to hinder, delay or defraud is inferred from
the circumstances surrounding the transaction (*Wall St. Assocs.,*
*supra* at 529).  Here, the court properly found such intent from
the following:  Ms. Blazek's close relationship to defendant; the
timing of the consent judgment; defendant's contradictory
explanations, as articulated by Ms. Blazek, of the making of the
loan (he denied in the divorce action that he had received any
loans in 2003, then subsequently stated that he had no
recollection of any loans in that year); Ms. Blazek's admission
regarding intimate knowledge of the bitter and lengthy divorce
proceedings; and the fact that plaintiff waited eight months

14

after the loan was made to file a UCC-1 financing statement,

which was done only after the court signed the sequestration

order to show cause.

        THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

            ENTERED:   JUNE 29, 2006


                    *Catherine O'Hagan Wolfe*
                    ————————————————————
                            CLERK


15

# Exhibit P



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2004050601684002005E370C

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 4 |
|---|---|---|
| Document ID: 2004050601684002 | Document Date: 05-06-2004 | Preparation Date: 05-11-2004 |
| Document Type: UCC3 TERMINATION | | COOPERATIVE |
| Document Page Count: 2 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| OLGA ROSTROPOVICH | RENEE SCHWARTZ |
| 64 EAST 77TH STREET | KRONISH LIEB WEINE & HELLMAN LLP |
| NEW YORK, NY 10021 | 1114 AVENUE OF THE AMERICAS |
| | NEW YORK, NY 10036 |
| | 212-479-6627 |

## PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 601 | 1 WEST 67TH STREET |
| | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | | |
| Borough | Block | Lot | | Unit | Address |
| MANHATTAN | 1120 | 23 | Partial Lot | 6M | 1 WEST 67TH STREET |
| | Property Type: SINGLE RESIDENTIAL COOP UNIT | | | | |
| x | Additional Properties on Continuation Page | | | | |

## CROSS REFERENCE DATA

CRFN: 2003000426135

## PARTIES

| DEBTOR: | SECURED PARTY: |
|---|---|
| OLAF GUERRAND-HERMES | MICALDEN INVESTMENTS SA |
| 1 WEST 67TH STREET | C/O MORGEN & MORGEN, SWISS TOWER, 16 FL., 53, |
| NEW YORK, NY 10023 | ROAD E STREET, URB |
| | MARBELA-WORLDTRADECTR |

## FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 40.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 0.00 |
| TAXES: | | | NYS Real Estate Transfer Tax: | |
| County (Basic): | $ | 0.00 | $ | 0.00 |
| City (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** |
| Spec (Additional): | $ | 0.00 | **OF THE CITY REGISTER OF THE** |
| TASF: | $ | 0.00 | **CITY OF NEW YORK** |
| MTA: | $ | 0.00 | Recorded/Filed 05-12-2004 10:46 |
| NYCTA: | $ | 0.00 | City Register File No.(CRFN): |
| TOTAL: | $ | 0.00 | 2004000296607 |

*Rochelle Patrick*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2004050601684002005C358C

| RECORDING AND ENDORSEMENT  COVER PAGE (CONTINUATION) | | PAGE 2 OF 4 |
|---|---|---|
| Document ID: 2004050601684002 | Document Date: 05-06-2004 | Preparation Date: 05-11-2004 |
| Document Type: UCC3 TERMINATION | | |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | Partial Lot | 600 | 1 WEST 67TH STREET |
| | Property Type: | SINGLE RESIDENTIAL  COOP  UNIT | | | |

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1120 | 23 | 6M | 1 WEST 67TH STREET |
| | Property Type: | SINGLE RESIDENTIAL  COOP  UNIT | | |

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
212-479-6627

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Renee Schwartz
Kronish Lieb Weiner & Hellman LLP
1114 Avenue of the Americas
New York, New York 10036

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE # — 2003100801283001 *20030042135*

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. [X] TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement

3. [ ] CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

4. [ ] ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects [ ] Debtor or [ ] Secured Party of record. Check only one of these two boxes.

6. CURRENT RECORD INFORMATION:

6b. INDIVIDUAL'S LAST NAME: Guenand-Hermes   FIRST NAME: Olaf   MIDDLE NAME:   SUFFIX:

7. CHANGED (NEW) OR ADDED INFORMATION:

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

All of the debtor's right, title, and interest in 756 Shares of Hotel des Artistes, Inc. represented by share certificates numbered 345, 346, 347 and 354 and assigns to the Secured Party all of the debtor's interest in the Proprietary Leasees dated July 10, 1990, for apartments 603, 601, 6N, and 600 located at 1 West 67th Street, New York, NY 10023, and the proceeds of any sale of the Shares, transfer of the apartments, or subsequent assignment of the leases.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT

Micalden Investments SA

10. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)