UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

MICALDEN INVESTMENTS S.A.

                Plaintiff

        v.

OLGA ROSTROPOVICH, COOLEY GODWARD
KRONISH LLP, RENEE SCHWARTZ, ATOOSA
P. MAMDANI and MAHMOUD A. MAMDANI

               Defendants

-----------------------------------------------------------x

07 Civ. 2395  (VM)

## AFFIRMATION OF EDWARD RUBIN IN SUPPORT OF PLAINTIFF'S MOTION TO SUPPLEMENT ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

1. I am the attorney for the plaintiff in this action.  I am familiar with the matters set forth herein.

2. Attached as Exhibit A is a letter dated September 11, 2007 from myself to Judge Marrero.

3. Attached as Exhibit B is an affidavit from Olaf Guerrand-Hermes.

4. Attached as Exhibit C is plaintiff's proposed Second Amended Complaint, dated September 11, 2007.

Dated: New York, New York
      September 11,  2007

                    /s/  Edward Rubin
                    _____
                    Edward Rubin

# EXHIBIT  A

# LAW OFFICE OF EDWARD RUBIN
**477 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**
**TEL: 212-888-7300  FAX: 212-888-7306**

September 11, 2007

<u>**BY ECF**</u>
Hon. Victor Marrero
United States District Judge
United States Courthouse
500 Pearl St., Room 660
New York, NY 10007

Re: Micalden Investments v. Rostropovich
07 Civ. 2395 (VM)

Dear Judge Marrero,

I am one of the attorneys for plaintiff in this action.

On September 7, in accordance with the Court's previous order, plaintiff filed its opposition to defendants' motion to dismiss. As previously mentioned, those motions raised a single issue; the alleged absence of a security agreement and the resultant presumed invalidity of the UCC1 on which plaintiff's case is based. The opposition filed included a security agreement prepared and executed by the debtor, Olaf Guerrand-Hermes (himself a lawyer by training) in or about May 2003. I had been endeavoring to obtain an affidavit from the city official in Larache, Morocco who notarized that signature but had been unable to do so by the agreed-upon September 7 deadline.

Although it was thought that a more elaborate security agreement had been prepared by an American lawyer and executed in early October 2003 as part of the suite of documents including the affidavit authorizing the judgment by confession which was the subject of the previous state-court litigation between plaintiff and defendant Rostropovich, that document could not be located by plaintiff's principal, despite a diligent search of their Morocco residence and the residence of Mr. Guerrand-Hermes's father in Chantilly, France, where some of their records have been maintained.

On Monday, September 10, however, I was informed that Mr. Guerrand-Hermes had discovered a copy of the October security agreement in the office of a lawyer in Paris. That document, a copy of which is annexed as Exhibit A to the affidavit of Mr. Guerrand-Hermes filed herewith, clearly shows that it was notarized at the

Hon. Victor Marrero, U.S.D.J.
September 11, 2007
Page 2


U.S. Consulate in Casablanca on October 2, 2003 by Vice Consul Daniel J. Ernst. It is accompanied by an assignment of Mr. Guerrand-Hermes's interest in the proprietary lease to the subject co-op apartment, identical in its date and form of execution and acknowledgment. The notarization and date of these documents are precisely the same as those already familiar to defendants Rostropovich, Cooley and Schwartz from the state-court litigation. The existence of this security agreement, the authenticity and date of which cannot seriously be questioned, would appear to be entirely dispositive of the pending motions.

In these circumstances, because the probative value of this document greatly outweighs any conceivable prejudice to defendants accruing between Friday and today, I ask that the Court treat this letter as a motion to supplement plaintiff's opposition to the motions so as to include the documents filed herewith. The filing also includes a second amended complaint, changed only to include a reference to the October 2003 security agreement. Indeed, as the existence of a security agreement which antedated the UCC1 filing now appears inarguable, it seems fair to inquire of defendants why these motions should not now be withdrawn.

I thank the Court for its consideration of this matter.

Respectfully yours,

        */Edward Rubin/*
Edward Rubin (ER-8843)

## AFFIDAVIT OF OLAF GUERRAND-HERMES

)
                     ss:

REPUBLIC OF FRANCE
)

Olaf Guerrand-Hermes, being duly sworn, deposes and says:

1. I reside in Larache, Morocco. I am personally familiar with the matters set forth herein.

2. After signing my prior affidavit on September 6, 2007, to which a Security Agreement which I had prepared in the spring of 2003 is attached as Exhibit B, I recalled that I may have also signed another security agreement prepared by an attorney several months later at the time I also signed certain other documents relating to my indebtedness to Micalden Investments. On September 10, 2007 I went to the office of my attorney in Paris, Devolve Rouche, to look for another security agreement. Attached as Exhibit A is the Security Agreement which I found on that date in Mr. Rouche's office in Paris.

3. As indicated at the end of the document, I signed this Security Agreement on October 2, 2003 in Casablanca, Morocco in the Consulate General of the United States. My signature was notarized by Daniel J. Ernst, Vice Consul of the United States, at the office of the Consulate General on that date.

4. This Security Agreement (Ex. A) was prepared by an attorney for Micalden. I was asked by Micalden to sign this second Security Agreement by this attorney at the time I was

asked to sign other documents relating to my indebtedness to Micalden, including an affidavit of confession of judgment. A copy of this affidavit of confession of judgment, which I also signed on October 2, 2003 in Casablanca in the office of the United States Consulate General, and which was also notarized by Mr. Ernst at that time, is attached as Exhibit B.

Olaf Guerrand-Hermes

Sworn to this _____
day of September, 2007

2

# EXHIBIT  A

# SECURITY AGREEMENT

## Apartment No.: 603, 601, 6M, and 600

## Street Address: 1 West 67th Street, New York, New York 10023

This is a Security Agreement (the "Agreement") dated the _____ day of _____, 2003 between Olaf Guerrand-Hermes, residing at 1 West 67th Street, New York, New York, 10023(collectively, the "Borrower") and Micalden Investments SA("Lender"),a corporation, organized and existing under the laws of Panama, having an office c/o Morgen & Morgen, Swiss Tower, 16th Floor, 53 Road E. Street, URB Marbela – World Trade Centre, Panama City, Panama.

1.   Definitions

I, MINE, ME, MY, MYSELF--refer to the Borrower. Note--refers to the instrument which the Borrower signed this day and which evidences the loan (the "Loan") in the amount of $1,390,674.30 made to the Borrower by Lender.

2.   Loan

I agree to repay the Loan as required by the terms of the Note.

3.   Ownership

I own a total of 756 shares (the "Shares") of capital stock of Hotel des Artistes, Inc. (the "Corporation") and am the tenant under the proprietary leases (the "Leases") for Apartments 603, 601, 6M, and 600 (the "Apartments") in the building located at 1 West 67th Street, New York, New York 10023. I represent to Lender that the Shares are all the cooperative shares allocated to the Apartments.

4.   Security

To secure my repayment to Lender of the Loan, I pledge to Lender all of my right, title and interest in the Shares and assign to Lender all of my right, title and interest in the Leases and in the proceeds of any sale of the Shares, transfer of the Apartments or subsequent assignment of the Leases. The Shares, Leases, sale proceeds, any replacement and additional Shares and any amendments to and extensions or replacements of the Leases are referred to as the "Security"; the interest of Lender in the Security is referred to as the "Security Interest."

5.   End of Security Interest

The Security Interest shall end and Lender shall release its interest in the Shares and the Leases when I have repaid the Loan in full and have made all other payments required under the Note and this Agreement.

6.    Additional Documents; Power of Attorney

Upon Lender's request, I agree to sign any financing statements and renewals in addition to any other documents that Lender may require to establish and/or protect its rights in the Security. I also authorize Lender to sign these documents in my name as my attorney-in-fact and then file and/or record them as is appropriate. This power of attorney is coupled with an interest and shall not lapse due to my incompetency or disability.

I have also provided the Lender with the following documents: (A) Assignment of the Proprietary Leases; (B) blank stock power; and (C) Confession of Judgment. These documents are to be used by the Lender for the sole purpose of enforcing the terms and conditions set forth in the Agreement.

7.    Written Statement of Amount Due

If Lender requests, in writing, a confirmation of the amount owed by me under the Note and this Agreement, within eight (8) days after such request I will give Lender a signed statement confirming the amount owed.

8.    Rights In The Security

No one other than the Corporation, myself and, by virtue of this Agreement, Lender has any interest in or claim against the Security.  I agree to defend my ownership of, and Lender's rights to, the Security as specified in this Agreement against any and all other claims, and I shall keep the Security free of any other liens not expressly approved by Lender, other than liens granted to First Republic Bank of San Francisco, California; Prague Associates (Cyprus) Limited; On Capital LLC; Eva Blazek; Xavier Guerrand-Hermes; and Patrick Guerrand-Hermes.

9.    Reimbursement

If Lender has to defend its rights under the Note or this Agreement, then any money which Lender has to pay (including reasonable attorney's fees) shall be added to the amount I owe Lender and paid by me promptly at Lender's request with interest at the then applicable rate set forth in the Note.

10.    Default

The happening of any of the following events means that I will be in default. Lender will then have the right to require that all amounts that I owe to Lender under the Note and this Agreement be paid in full to Lender with interest at the then applicable rate set forth in the Note up to the day Lender receives payment. I will be in default: (A) If any payment required by the Note is not made within fifteen (15) days after it is due or if any terms, conditions or provisions of the Note have been violated; or (B) If any payment required by the Leases is not made on time or if any terms, conditions or provisions of the Leases have been violated; or (C) If either I or the Corporation cancel the Leases; or (D) If I fail to pay or bond any judgment and/or any tax deficiency; or (E) If I sublet the Apartment or assign the Security without first paying all amounts that I owe under the Note and this Agreement or receiving Lender's written consent; or (F) If I do not comply with any term,

condition or provision of this Agreement; or (G) If any statement or representation made by me, under this Agreement is not true or correct. However, Lender will not exercise its option to require immediate payment in full under (E) if exercise is prohibited by federal law as of the date of this Agreement.

11.     Lender's Rights If I Am in Default

(A) In the event that I am in default and Lender elects to demand payment of the entire amount I owe under the Note and this Agreement, Lender will so notify me. If I fail to pay what I owe within fifteen (15) days of the notification, Lender may, in addition to all of its other legal rights, sell the Security at public or private sale, with or without advertisement of the time, place or terms of sale, except that if it is a private sale, it shall occur no less than five (5) days after written notice to me. In the event of any such sale, Lender may deduct from the proceeds of the sale all expenses of collection, sale and delivery of the Security, and any other expenses including, but not limited to, reasonable attorney's fees and disbursements, costs, broker's commissions, transfer fees and taxes. Lender may then apply the balance of the sales proceeds to any liability of mine under the Note or this Agreement, and Lender shall return any surplus to me. Lender shall determine the terms of any such sale in its sole discretion. A sale conducted according to the usual practice of banks selling similar security will be considered reasonably conducted. Lender may sell the Security for immediate cash payment or on credit. If the sale is on credit, Lender shall retain the Security until the sale price is paid in full. Lender will not be liable if the buyer fails to pay and Lender may then resell the Security. (B) Lender may elect to continue to hold the Shares and Leases if it determines that a better price can be obtained at a later date and, absent gross negligence, Lender will not be liable to me for any loss in value in the Security. If Lender has the right to sell the Security and has not begun to do so within ninety (90) days, I may demand that Lender proceed to sell the Security or I may make the sale myself, at my own expense. However, Lender will not be required to sell the Security if the net proceeds would not be enough to repay in full my debt under the Note and this Agreement. Similarly, Lender may not prevent me from making the sale if the net proceeds would be enough to repay my debt in full. (C) If Lender elects to retain the Security, it shall give me notice of its election. If I object to its election within thirty (30) days after its notice, Lender shall offer the Security for sale and must sell if the net proceeds would be large enough to pay all that I owe Lender under the Note and this Agreement. (D) Lender shall have the right, in connection with a sale, to complete a stock power and assignment of Leases in order to transfer the Shares and the Leases. I hereby give Lender the right, in connection with such sale, to request that the Corporation terminate the Leases and take all lawful steps necessary to obtain possession of the Apartment for and on behalf of Lender. I will promptly vacate my Apartment upon the sale of the Security. Lender may start legal proceedings to get possession of the Apartment if I refuse to so vacate. (E) Lender or anyone designated by Lender may purchase the Security as stated in above, free of my right to redeem the Security, which right of redemption I now waive. (F) Lender may seek the appointment of a receiver, without notice to me and without regard to the adequacy of the Security, to the extent permissible by law.

12.     Disposition of Sale Proceeds

If Lender sells the Security, the proceeds shall be applied as follows: (A) first, to the expenses of collection, selling and delivering the Security, including (but not limited to) attorney's fees,

brokerage commissions, transfer fees and taxes; (B) second, to the payment of any charges due under the Leases; (C) third, to the payment of my debt in full; and(D) finally, the surplus, if any, to me unless there are other valid claims to the surplus.

13.    Nonliability of Corporation

The Corporation will not be liable to me if it transfers my Shares and Leases as required by this Agreement or if it refuses to transfer my Shares and Leases to another person without Lender's consent.

14.    Lender's Payments on My Behalf

In the event that Lender makes any of the payments or performs any acts required under the Leases on my behalf, I agree to promptly repay Lender for such payments and for the cost of such acts including but not limited to, reasonable attorney's fees, with interest at the then applicable rate provided in the Note. I further agree that any such sums shall be added to the amount owed to Lender and secured by the Security. I agree that Lender shall have no obligation to make any payments or perform any acts required under the Leases on my behalf.

15.    No Sale of the Security

If I sell, transfer, modify or surrender the Security or sublet the Apartment without Lender's prior written consent, Lender may, at its option, require immediate payment in full of the entire amount due under the Note or this Agreement. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Agreement.

16.    Usury

No matter what else is set forth in this Agreement, the Note or any other instrument executed by me in connection with the Loan, if any payment by me or act by me would result in the payment of interest in excess of the maximum rate of interest legally permissible, then my obligation to make such payment or do such an act shall be deemed automatically reduced to such maximum rate, so that in no event will I be obligated to make any payment, perform any act or promise to do (or not to do) any act which would result in the payment of interest in excess of such maximum rate. Any such excess payments shall be applied as partial prepayments of my debt.

17.    Use of Premises

At Lender's option, all sums due under this Agreement and the Note will become immediately due and payable if: (A) the Apartments are used for any purposes that increase the risk of fire or other hazard; or (B) the Apartments are used for any unlawful purpose. I will maintain the Apartments in a good state of repair, free from waste, and I will promptly obey all federal, state and municipal requirements affecting the Apartments.

18.  Successors and Assigns

All of my rights and obligations under this Agreement, and all of Lender's rights and obligations under this Agreement, shall bind and benefit our respective distributees, legal representatives, successors, heirs and assigns. Lender retains any such rights it may otherwise have that are not set forth in this Agreement. This Paragraph shall not be read to give me the right to sublet the Apartments, assign the Leases or transfer the Shares. However, Lender may assign this Agreement and its rights to the Security without my consent.

19.    Legal Expenses

If any legal proceeding is commenced in which Lender is made a party which relates to this Agreement or the Note, or if any attorney, on Lender's behalf, seeks to assert or defend Lender's rights under this Loan or the lien created by this Loan, I will repay on Lender's demand all of its legal fees, costs, expenses, disbursements and allowances, to the extent applicable law permits. Any amounts payable to Lender under this Paragraph shall be payable with interest from the date Lender requires payment at the then applicable rate set forth in the Note.

20.    Use of Captions

Captions are used in this Agreement only as a matter of convenience and do not define or describe the intent of any provision.

21.    New York Law

This Agreement shall be governed by the laws of the State of New York and any applicable federal law. In the event of a conflict between any provision of this Agreement and any federal or New York State statute, law or regulation in effect as of the date of this Agreement, the statute, law or regulation shall control to the extent of such conflict and the provision contained in this Agreement shall be without effect. All other provisions of this Agreement will remain fully effective and enforceable.

22.    Modification of Agreement

This Agreement may not be modified without the mutual agreement in writing of Lender and myself.

23.    Notice

All written notices and demands are to be given to me by personal delivery or by first class mail to the address of the Apartment or at a different address if I give Lender a notice of my different address. All written notices to Lender regarding this Agreement must be given by first class mail to Lender at the address identified on page 1 of this Agreement or at a different address if I am given notice of that different address.

24.    My Rights Before Default

Until there is a default under this Agreement and Lender has demanded payment in full, I will have all rights, responsibilities and privileges of a shareholder and lessee not otherwise affected by this

Agreement. I have the sole responsibility for making all payments required by the Leases and for complying with all the terms and conditions of the Leases. Except as otherwise set forth in this Agreement, my responsibilities under the Leases shall continue after any default by me under the Note or this Agreement.

25.    Distribution of Capital

Lender will have the right to receive any distributions of capital from the Corporation and shall apply any such distributions to reduce the amount that I owe to Lender.

26.    Responsible Parties

If more than one person signs this Agreement, each will be fully responsible for complying with its terms.

27.    Delivery of Security

If I sell the Apartments before the Loan is paid in full, I may ask Lender to release its Security to me at the closing of the sale. At my request, Lender may, but will not be required to, arrange for one of its closing attorneys to deliver the Security and collect for Lender the amount which is necessary to pay off the Loan. Lender's closing attorney may charge me a reasonable fee for this service. I have signed this Agreement on the date set down at the beginning of this document.


_____
Olaf Guerrand-Hermes, Borrower


Kingdom of Morocco            )
District of Casablanca        )
City of Casablanca            )SS
Consulate Général of The      )
United States of America      )


Sworn to before me this _____
day of _OCTOBER_. 2003


_____
Daniel J. ERNST
Vice Consul of the United
States of America

## ASSIGNMENT OF PROPRIETARY LEASE

KNOW THAT, Olaf Guerrand-Hermes, Assignor in consideration of the sum of One Dollar ($1.00) paid by Micalden Investments SA, Assignee, and for other good and valuable consideration, does hereby assign unto Assignee certain leases (the "Leases") made by Hotel des Artistes, Inc. ("Lessor Corporation") with Assignor, dated July 1 ·, 1990 for Apartments 603, 601,6M, and 600 in Premises 1 West 67th Street, New York, New York 10023.

TO HAVE AND TO HOLD the same unto Assignee, his personal representatives and assigns, from and after _____ for all the rest of the term of the Leases, or any renewals or extensions thereof, and subject to the covenants, conditions and limitations therein contained.

IN WITNESS WHEREOF, Assignor has executed this Assignment on_____

Olaf Guerrand-Hermes

Kingdom of Morocco        )
District of Casablanca     )
City of Casablanca         )
Consulate Général of The   )ss
United States of America   )
                           )

Sworn to before me this 2ud day of OCTOBER 2003

Daniel J. ERNST
Vice Consul of the United
States of America

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MICALDEN INVESTMENTS SA,

           Plaintiff,

      -against-

OLAF GUERRAND-HERMES,

           Defendant.

**AFFIDAVIT FOR
JUDGMENT BY CONFESSION**

| | | |
|---|---|---|
| STATE OF NEW YORK ) | Kingdom of Morocco | ) |
| ) ss.: | District of Casablanca | ) |
| COUNTY OF NEW YORK ) | City of Casablanca | )ss |
| | Consulate Général of The | ) |
| | United States of America | ) |

Olaf Guerrand-Hermes, being duly sworn, deposes and says:

1.    I am the defendant in the above entitled action.

2.    I reside at 1 West 67th Street, City of New York, County of New York, State of New York.

3.    I, the defendant in the above entitled action, confess judgment in this court in favor of the plaintiff, Micalden Investments SA, for One Million Three Hundred and Ninety Thousand Six Hundred and Seventy-Four Dollars and Thirty Cents ($1,390,674.30), plus interest and hereby authorize the plaintiff or its heirs, executors, administrators, or assigns to enter judgment for that sum against me.

4.    This confession of judgment is for a debt justly due to the plaintiff arising out of a personal loan that was made to the defendant by Micalden Investments SA, to pay the mortgage and maintenance fees for the defendant's apartment located at 1 West 67th Street, New York, New York. Proceeds from said personal loan was also used for his support and maintenance and the support and maintenance of defendant's two children Slava and Oleg. This personal loan was made in several separate transactions which are listed below:

(a)    $125,036.62 made on February 24, 2003, for mortgage payments and maintenance fees due on the defendant's apartment.

(b)    $20,036.62 made on February 24, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(c)    $16,326.62 made on February 24, 2003, for living expenses.

(d)    $5,508.99 made on March 3, 2003, for legal fees.

(e)    $1,000,036.68 made on March 17, 2003, for loan repayment/equity purchase made by Patrick Guerrand-Hermes to defendant.

(f)    $21,756.27 made on March 27, 2003, for Lycée Francais School tuition and living expenses.

(g)    $5,538.26 made on April 8, 2003, for living expense.

(h)    $20,037.91 made on May 14, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(i)    $7,537.84 made on May 15, 2003, for legal fees.

(j)    $5,037.84 made on May 15, 2003, for living expenses.

(k)    $6,072.42 made on May 19, 2003, for living expenses.

(l)    $12,170.86 made on May 28, 2003, for assessment charges for defendant's apartment.

(m)    $6,101.53 made on June 12, 2003, for airline tickets for the defendant and his children to and from Morocco and living expenses.

(n)    $4,138.30 made on June 12, 2003, for life insurance policy.

(o)    $33,538.52 made on June 16, 2003, as mortgage payment for defendant's apartment.

(p)    $5,884.33 made on July 10, 2003, for living expenses.

(q)    $10,036.62 made on July 31, 2003, for legal fees.

(r)    $4,036.12 made on September 16, 2003, for living expenses.

(s)    $31,795.00 made on September 19, 2003, as mortgage payment for defendant's apartment.

(t)    $50,037.00 made on September 22, 2003, for common charges, assessments, and ancillary charges for defendant's apartment.

5.    This confession of judgment is not for the purpose of securing the plaintiff a\_nst a contingent liability.

Dated:

Olaf Gue\_\_\_\_ Hermes, Defendant

Sworn to before me this _2ed_
day of _october 200 3_

Daniel J. ERNST
Vice Consul of the United
States of America

# EXHIBIT B

## AFFIDAVIT OF OLAF GUERRAND-HERMES

_____    )
                      ss:  )
REPUBLIC OF FRANCE         )


Olaf Guerrand-Hermes, being duly sworn, deposes and says:

1.   I reside in Larache, Morocco.  I am personally familiar with the matters set forth herein.

2.   After signing my prior affidavit on September 6, 2007, to which a Security Agreement which I had prepared in the spring of 2003 is attached as Exhibit B. I recalled that I may have also signed another security agreement prepared by an attorney several months later at the time I also signed certain other documents relating to my indebtedness to Micalden Investments.  On September 10, 2007 I went to the office of my attorney in Paris, Devolve Rouche, to look for another security agreement.  Attached as Exhibit A is the Security Agreement which I found on that date in Mr. Rouche's office in Paris.

3.   As indicated at the end of the document, I signed this Security Agreement on October 2, 2003 in Casablanca, Morocco in the Consulate General of the United States.  My signature was notarized by Daniel J. Ernst, Vice Consul of the United States, at the office of the Consulate General on that date.

4.   This Security Agreement (Ex. A) was prepared by an attorney for Micalden.  I was asked by Micalden to sign this second Security Agreement by this attorney at the time I was

asked to sign other documents relating to my indebtedness to Micalden, including an affidavit of confession of judgment.  A copy of this affidavit of confession of judgment, which I also signed on October 2, 2003 in Casablanca in the office of the United States Consulate General, and which was also notarized by Mr. Ernst at that time, is attached as Exhibit B.

Olaf Guerrand-Hermes

Vu pour légalisation de la signature
de M. Olaf GUERRAND_HERMES
Apposée  ci_dessus
CHANTILLY, le 11 septembre 2007
Le Maire,
Conseiller Général Délégué,

Sworn to this _____
day of September, 2007

2

# EXHIBIT A

# SECURITY AGREEMENT

## Apartment No.: 603, 601, 6M, and 600

## Street Address: 1 West 67th Street, New York, New York 10023

This is a Security Agreement (the "Agreement") dated the _____ day of _____, 2003 between Olaf Guerrand-Hermes, residing at 1 West 67th Street, New York, New York, 10023(collectively, the "Borrower") and Micalden Investments SA("Lender"),a corporation, organized and existing under the laws of Panama, having an office c/o Morgen & Morgen, Swiss Tower, 16th Floor, 53 Road E. Street, URB Marbela – World Trade Centre, Panama City, Panama.

1.   <u>Definitions</u>

I, MINE, ME, MY, MYSELF--refer to the Borrower. Note--refers to the instrument which the Borrower signed this day and which evidences the loan (the "Loan") in the amount of $1,390,674.30 made to the Borrower by Lender.

2.   <u>Loan</u>

I agree to repay the Loan as required by the terms of the Note.

3.   <u>Ownership</u>

I own a total of 756 shares (the "Shares") of capital stock of Hotel des Artistes, Inc. (the "Corporation") and am the tenant under the proprietary leases (the "Leases") for Apartments 603, 601, 6M, and 600 (the "Apartments") in the building located at 1 West 67th Street, New York, New York 10023. I represent to Lender that the Shares are all the cooperative shares allocated to the Apartments.

4.   <u>Security</u>

To secure my repayment to Lender of the Loan, I pledge to Lender all of my right, title and interest in the Shares and assign to Lender all of my right, title and interest in the Leases and in the proceeds of any sale of the Shares, transfer of the Apartments or subsequent assignment of the Leases. The Shares, Leases, sale proceeds, any replacement and additional Shares and any amendments to and extensions or replacements of the Leases are referred to as the "Security"; the interest of Lender in the Security is referred to as the "Security Interest."

5.   <u>End of Security Interest</u>

The Security Interest shall end and Lender shall release its interest in the Shares and the Leases when I have repaid the Loan in full and have made all other payments required under the Note and this Agreement.

6.    Additional Documents; Power of Attorney

Upon Lender's request, I agree to sign any financing statements and renewals in addition to any other documents that Lender may require to establish and/or protect its rights in the Security. I also authorize Lender to sign these documents in my name as my attorney-in-fact and then file and/or record them as is appropriate. This power of attorney is coupled with an interest and shall not lapse due to my incompetency or disability.

I have also provided the Lender with the following documents: (A) Assignment of the Proprietary Leases; (B) blank stock power; and (C) Confession of Judgment. These documents are to be used by the Lender for the sole purpose of enforcing the terms and conditions set forth in the Agreement.

7.    Written Statement of Amount Due

If Lender requests, in writing, a confirmation of the amount owed by me under the Note and this Agreement, within eight (8) days after such request I will give Lender a signed statement confirming the amount owed.

8.    Rights In The Security

No one other than the Corporation, myself and, by virtue of this Agreement, Lender has any interest in or claim against the Security. I agree to defend my ownership of, and Lender's rights to, the Security as specified in this Agreement against any and all other claims, and I shall keep the Security free of any other liens not expressly approved by Lender, other than liens granted to First Republic Bank of San Francisco, California; Prague Associates (Cyprus) Limited; On Capital LLC; Eva Blazek; Xavier Guerrand-Hermes; and Patrick Guerrand-Hermes.

9.    Reimbursement

If Lender has to defend its rights under the Note or this Agreement, then any money which Lender has to pay (including reasonable attorney's fees) shall be added to the amount I owe Lender and paid by me promptly at Lender's request with interest at the then applicable rate set forth in the Note.

10.    Default

The happening of any of the following events means that I will be in default. Lender will then have the right to require that all amounts that I owe to Lender under the Note and this Agreement be paid in full to Lender with interest at the then applicable rate set forth in the Note up to the day Lender receives payment. I will be in default: (A) If any payment required by the Note is not made within fifteen (15) days after it is due or if any terms, conditions or provisions of the Note have been violated; or (B) If any payment required by the Leases is not made on time or if any terms, conditions or provisions of the Leases have been violated; or (C) If either I or the Corporation cancel the Leases; or (D) If I fail to pay or bond any judgment and/or any tax deficiency; or (E) If I sublet the Apartment or assign the Security without first paying all amounts that I owe under the Note and this Agreement or receiving Lender's written consent; or (F) If I do not comply with any term,

condition or provision of this Agreement; or (G) If any statement or representation made by me under this Agreement is not true or correct. However, Lender will not exercise its option to require immediate payment in full under (E) if exercise is prohibited by federal law as of the date of this Agreement.

11.    Lender's Rights If I Am in Default

(A) In the event that I am in default and Lender elects to demand payment of the entire amount I owe under the Note and this Agreement, Lender will so notify me. If I fail to pay what I owe within fifteen (15) days of the notification, Lender may, in addition to all of its other legal rights, sell the Security at public or private sale, with or without advertisement of the time, place or terms of sale, except that if it is a private sale, it shall occur no less than five (5) days after written notice to me. In the event of any such sale, Lender may deduct from the proceeds of the sale all expenses of collection, sale and delivery of the Security, and any other expenses including, but not limited to, reasonable attorney's fees and disbursements, costs, broker's commissions, transfer fees and taxes. Lender may then apply the balance of the sales proceeds to any liability of mine under the Note or this Agreement, and Lender shall return any surplus to me. Lender shall determine the terms of any such sale in its sole discretion. A sale conducted according to the usual practice of banks selling similar security will be considered reasonably conducted. Lender may sell the Security for immediate cash payment or on credit. If the sale is on credit, Lender shall retain the Security until the sale price is paid in full. Lender will not be liable if the buyer fails to pay and Lender may then resell the Security. (B) Lender may elect to continue to hold the Shares and Leases if it determines that a better price can be obtained at a later date and, absent gross negligence, Lender will not be liable to me for any loss in value in the Security. If Lender has the right to sell the Security and has not begun to do so within ninety (90) days, I may demand that Lender proceed to sell the Security or I may make the sale myself, at my own expense. However, Lender will not be required to sell the Security if the net proceeds would not be enough to repay in full my debt under the Note and this Agreement. Similarly, Lender may not prevent me from making the sale if the net proceeds would be enough to repay my debt in full. (C) If Lender elects to retain the Security, it shall give me notice of its election. If I object to its election within thirty (30) days after its notice, Lender shall offer the Security for sale and must sell if the net proceeds would be large enough to pay all that I owe Lender under the Note and this Agreement. (D) Lender shall have the right, in connection with a sale, to complete a stock power and assignment of Leases in order to transfer the Shares and the Leases. I hereby give Lender the right, in connection with such sale, to request that the Corporation terminate the Leases and take all lawful steps necessary to obtain possession of the Apartment for and on behalf of Lender. I will promptly vacate my Apartment upon the sale of the Security. Lender may start legal proceedings to get possession of the Apartment if I refuse to so vacate. (E) Lender or anyone designated by Lender may purchase the Security as stated in above, free of my right to redeem the Security, which right of redemption I now waive. (F) Lender may seek the appointment of a receiver, without notice to me and without regard to the adequacy of the Security, to the extent permissible by law.

12.    Disposition of Sale Proceeds

If Lender sells the Security, the proceeds shall be applied as follows: (A) first, to the expenses of collection, selling and delivering the Security, including (but not limited to) attorney's fees,

brokerage commissions, transfer fees and taxes; (B) second, to the payment of any charges due under the Leases; (C) third, to the payment of my debt in full; and(D) finally, the surplus, if any, to me unless there are other valid claims to the surplus.

13.   Nonliability of Corporation

The Corporation will not be liable to me if it transfers my Shares and Leases as required by this Agreement or if it refuses to transfer my Shares and Leases to another person without Lender's consent.

14.   Lender's Payments on My Behalf

In the event that Lender makes any of the payments or performs any acts required under the Leases on my behalf, I agree to promptly repay Lender for such payments and for the cost of such acts including but not limited to, reasonable attorney's fees, with interest at the then applicable rate provided in the Note. I further agree that any such sums shall be added to the amount owed to Lender and secured by the Security. I agree that Lender shall have no obligation to make any payments or perform any acts required under the Leases on my behalf.

15.   No Sale of the Security

If I sell, transfer, modify or surrender the Security or sublet the Apartment without Lender's prior written consent, Lender may, at its option, require immediate payment in full of the entire amount due under the Note or this Agreement. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Agreement.

16.   Usury

No matter what else is set forth in this Agreement, the Note or any other instrument executed by me in connection with the Loan, if any payment by me or act by me would result in the payment of interest in excess of the maximum rate of interest legally permissible, then my obligation to make such payment or do such an act shall be deemed automatically reduced to such maximum rate, so that in no event will I be obligated to make any payment, perform any act or promise to do (or not to do) any act which would result in the payment of interest in excess of such maximum rate. Any such excess payments shall be applied as partial prepayments of my debt.

17.   Use of Premises

At Lender's option, all sums due under this Agreement and the Note will become immediately due and payable if: (A) the Apartments are used for any purposes that increase the risk of fire or other hazard; or (B) the Apartments are used for any unlawful purpose. I will maintain the Apartments in a good state of repair, free from waste, and I will promptly obey all federal, state and municipal requirements affecting the Apartments.

18. Successors and Assigns

All of my rights and obligations under this Agreement, and all of Lender's rights and obligations under this Agreement, shall bind and benefit our respective distributees, legal representatives, successors, heirs and assigns. Lender retains any such rights it may otherwise have that are not set forth in this Agreement. This Paragraph shall not be read to give me the right to sublet the Apartments, assign the Leases or transfer the Shares. However, Lender may assign this Agreement and its rights to the Security without my consent.

19.    <u>Legal Expenses</u>

If any legal proceeding is commenced in which Lender is made a party which relates to this Agreement or the Note, or if any attorney, on Lender's behalf, seeks to assert or defend Lender's rights under this Loan or the lien created by this Loan, I will repay on Lender's demand all of its legal fees, costs, expenses, disbursements and allowances, to the extent applicable law permits. Any amounts payable to Lender under this Paragraph shall be payable with interest from the date Lender requires payment at the then applicable rate set forth in the Note.

20.    <u>Use of Captions</u>

Captions are used in this Agreement only as a matter of convenience and do not define or describe the intent of any provision.

21.    <u>New York Law</u>

This Agreement shall be governed by the laws of the State of New York and any applicable federal law. In the event of a conflict between any provision of this Agreement and any federal or New York State statute, law or regulation in effect as of the date of this Agreement, the statute, law or regulation shall control to the extent of such conflict and the provision contained in this Agreement shall be without effect. All other provisions of this Agreement will remain fully effective and enforceable.

22.    <u>Modification of Agreement</u>

This Agreement may not be modified without the mutual agreement in writing of Lender and myself.

23.    <u>Notice</u>

All written notices and demands are to be given to me by personal delivery or by first class mail to the address of the Apartment or at a different address if I give Lender a notice of my different address. All written notices to Lender regarding this Agreement must be given by first class mail to Lender at the address identified on page 1 of this Agreement or at a different address if I am given notice of that different address.

24.    <u>My Rights Before Default</u>

Until there is a default under this Agreement and Lender has demanded payment in full, I will have all rights, responsibilities and privileges of a shareholder and lessee not otherwise affected by this

Agreement. I have the sole responsibility for making all payments required by the Leases and for complying with all the terms and conditions of the Leases. Except as otherwise set forth in this Agreement, my responsibilities under the Leases shall continue after any default by me under the Note or this Agreement.

25.    Distribution of Capital

Lender will have the right to receive any distributions of capital from the Corporation and shall apply any such distributions to reduce the amount that I owe to Lender.

26.    Responsible Parties

If more than one person signs this Agreement, each will be fully responsible for complying with its terms.

27.    Delivery of Security

If I sell the Apartments before the Loan is paid in full, I may ask Lender to release its Security to me at the closing of the sale. At my request, Lender may, but will not be required to, arrange for one of its closing attorneys to deliver the Security and collect for Lender the amount which is necessary to pay off the Loan. Lender's closing attorney may charge me a reasonable fee for this service. I have signed this Agreement on the date set down at the beginning of this document.


Olaf Guerrand-Hermes, Borrower

Kingdom of Morocco          )
District of Casablanca       )
City of Casablanca           )SS
Consulate Général of The     )
United States of America     )

Sworn to before me this _____
day of _OCTOBER_, _2003_


Daniel J. ERNST
Vice Consul of the United
States of America

## ASSIGNMENT OF PROPRIETARY LEASE

KNOW THAT, Olaf Guerrand-Hermes, Assignor in consideration of the sum of One Dollar ($1.00) paid by Micalden Investments SA, Assignee, and for other good and valuable consideration, does hereby assign unto Assignee certain leases (the "Leases") made by Hotel des Artistes, Inc. ("Lessor Corporation") with Assignor, dated July 1 ·, 1990 for Apartments 603, 601,6M, and 600 in Premises 1 West 67th Street, New York, New York 10023.

TO HAVE AND TO HOLD the same unto Assignee, his personal representatives and assigns, from and after _____ for all the rest of the term of the Leases, or any renewals or extensions thereof, and subject to the covenants, conditions and limitations therein contained.

IN WITNESS WHEREOF, Assignor has executed this Assignment on_____

Olaf Guerrand-Hermes

Sworn to before me this _2ud_
day of _OCTOBER 2003_

Kingdom of Morocco       )
District of Casablanca    )
City of Casablanca        )ss
Consulate Général of The  )
United States of America  )

Daniel J. ERNST
Vice Consul of the United
States of America

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MICALDEN INVESTMENTS SA,

                            Plaintiff,

                                                          **AFFIDAVIT FOR
            -against-                                     JUDGMENT BY CONFESSION**


OLAF GUERRAND-HERMES,

                            Defendant.


| | | |
|---|---|---|
| STATE OF NEW YORK ) | Kingdom of Morocco ) | |
| ) ss.: | District of Casablanca ) | |
| COUNTY OF NEW YORK ) | City of Casablanca )ss | |
| | Consulate Général of The ) | |
| | United States of America ) | |

Olaf Guerrand-Hermes, being duly sworn, deposes and says:

1.      I am the defendant in the above entitled action.

2.      I reside at 1 West 67ᵗʰ Street, City of New York, County of New York, State of New York.

3.      I, the defendant in the above entitled action, confess judgment in this court in favor of the plaintiff, Micalden Investments SA, for One Million Three Hundred and Ninety Thousand Six Hundred and Seventy-Four Dollars and Thirty Cents ($1,390,674.30), plus interest and hereby authorize the plaintiff or its heirs, executors, administrators, or assigns to enter judgment for that sum against me.

4.      This confession of judgment is for a debt justly due to the plaintiff arising out of a personal loan that was made to the defendant by Micalden Investments SA, to pay the mortgage and maintenance fees for the defendant's apartment located at 1 West 67ᵗʰ Street, New York, New York. Proceeds from said personal loan was also used for his support and maintenance and the support and maintenance of defendant's two children Slava and Oleg. This personal loan was made in several separate transactions which are listed below:

(a)    $125,036.62 made on February 24, 2003, for mortgage payments and maintenance fees due on the defendant's apartment.

(b)    $20,036.62 made on February 24, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(c)    $16,326.62 made on February 24, 2003, for living expenses.

(d)    $5,508.99 made on March 3, 2003, for legal fees.

(e)    $1,000,036.68 made on March 17, 2003, for loan repayment/equity purchase given by Patrick Guerrand-Hermes to defendant.

(f)    $21,756.27 made on March 27, 2003, for Lycée Francais School tuition and living expenses.

(g)    $5,538.26 made on April 8, 2003, for living expense.

(h)    $20,037.91 made on May 14, 2003, as repayment for loan given by Mathis Guerrand-Hermes to defendant.

(i)    $7,537.84 made on May 15, 2003, for legal fees.

(j)    $5,037.84 made on May 15, 2003, for living expenses.

(k)    $6,072.42 made on May 19, 2003, for living expenses.

(l)    $12,170.86 made on May 28, 2003, for assessment charges for defendant's apartment.

(m)    $6,101.53 made on June 12, 2003, for airline tickets for the defendant and his children to and from Morocco and living expenses.

(n)    $4,138.30 made on June 12, 2003, for life insurance policy.

(o)    $33,538.52 made on June 16, 2003, as mortgage payment for defendant's apartment.

(p)    $5,884.33 made on July 10, 2003, for living expenses.

(q)    $10,036.62 made on July 31, 2003, for legal fees.

(r)    $4,036.12 made on September 16, 2003, for living expenses.

(s)    $31,795.00 made on September 19, 2003, as mortgage payment for defendant's apartment.

(t)    $50,037.00 made on September 22, 2003, for common charges, assessments, and ancillary charges for defendant's apartment.

5.    This confession of judgment is not for the purpose of securing the plaintiff against a contingent liability.

Dated:

Olaf Guenard Hermes, Defendant

Sworn to before me this 2nd
day of October 200_

Daniel J. ERNST
Vice Consul of the United
States of America

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MICALDEN INVESTMENTS S.A.,

                    **Plaintiff**              07 Civ.  2395  (VM)

     -against-

OLGA ROSTROPOVICH, COOLEY          **SECOND**
GODWARD KRONISH LLP, RENEE        **AMENDED**
SCHWARTZ, ATOOSA P.                 **COMPLAINT**
MAMDANI and MAHMOUD A. MAMDANI,

                    **Defendants.**
-----------------------------------------------------------x

       Plaintiff Micalden Investments S. A. ("Micalden") by its undersigned counsel, for its Second Amended Complaint, states as follows:

## JURISDICTION, VENUE AND PARTIES

       1.  This is an action to declare the validity of a UCC lien on the shares of a cooperative apartment sold in 2004 for $3.925 million and to direct the sale of those shares, or in the alternative for damages against one defendant for removing the lien by fraudulent means. This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(2) because the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs, and is between a foreign corporation and citizens of a State.

       2.  Venue is proper in this District pursuant to 28 U.S.C. §1391 because all defendants reside in this District, the property to which the action relates is located in this District and significant acts giving rise to the claims took place in this District.

3.  Plaintiff Micalden is a corporation organized and existing under the laws of Panama with a principal place of business in Panama City, Panama and is wholly owned by Eva-Marie Blazek ("Blazek").

4.  Upon information and belief, defendant Olga Rostropovich ("Olga") is a citizen of New York residing at 161 West 61st Street in the Southern District of New York.

5.  Upon information and belief, Cooley Godward Kronish LLP ("Cooley"), a law firm, is a limited liability partnership organized and existing under the laws of California with a principal place of business in Palo Alto, California and an office located at 1114 Avenue of the Americas in the Southern District of New York. In the fall of 2006 Cooley became successor by merger to Kronish Lieb Weiner & Hellman LLP ("Kronish"), a New York law firm which represented and continues to represent Olga.

6.  Upon information and belief, Renee Schwartz ("Schwartz") is an attorney residing and practicing in the State of New York, a current partner of Cooley and former partner of Kronish and the attorney who at all material times represented Olga with respect to Olga's matrimonial litigation and the other litigations which are the subject matter of this action.

7.  Upon information and belief, defendants Atoosa P. Mamdani and Mahmoud A. Mamdani (collectively the "Mamdanis") are citizens of New York residing at 1 West 67th Street in the Southern District of New York.

## BACKGROUND

### The Creation Of The Relevant Liens

8.  In 1991, Olga married Olaf Guerrand-Hermes ("Olaf"). In or about 1990, Olaf's father, Patrick Guerrand-Hermes ("Patrick") paid for the purchase and renovation of a cooperative apartment at the Hotel des Artistes, 1 West 67th Street (units 600, 601, 603 and 6M and collectively the "Apartment") in which Olaf and Olga resided. Ownership of the Apartment, consisting of a total of 756 shares (the Shares") of the cooperative corporation, Hotel des Artistes, Inc. (the "Cooperative Corporation") and a proprietary lease or leases (collectively the "Lease"), was recorded in Olaf's name, but the purchase price and renovation costs, totaling more than $3 million, were paid by Patrick.

9.  In 2001 Olga commenced a divorce action against Olaf in Supreme Court, New York County (*Rostropovich v. Guerrand-Hermes,* New York County Index No. 350697/01 (the "Divorce Action")). The Divorce Action was tried in 2003. A post-trial decision (the "Divorce Decision") was issued on October 8, 2003. Judgment in the Divorce Action was entered January 26, 2004 (the "Divorce Judgment") but a money judgment for support arrears owed by Olaf to Olga in the amount of approximately $450,000 (the "Arrears Judgment") was entered earlier, on or about October 31, 2003. Following cross-appeals, the Divorce Judgment was modified in one respect in Olaf's favor and otherwise affirmed (*Rostropovich v. Guerrand-Hermes,* 18 A.D.3d 211, 794 N.Y.S.2d 42 (1st Dept. 2004)).

10.  In 2003, at a time when Olaf and Olga had been estranged and living apart for some years, Olaf was engaged to Blazek, whom he married in 2004 after his divorce from Olga became final. Between February and May of 2003, Olaf borrowed approximately $1.4 million from Micalden (the "Micalden Loans") to pay various expenses, mostly related to the Apartment. The agreement was that the Micalden Loans would be secured by the Shares.

11.  In or about  February, 2003 Olaf executed a Demand Revolving Promissory Note (the "Note") in favor of Micalden evidencing his indebtedness to Micalden.    On or about October 2, 2003, Olaf executed, among other documents prepared by Micalden, a Security Agreement to secure his indebtedness to Micalden under the Note.

12.    On or about October 2, 2003 Olaf also executed an affidavit of confession of judgment in favor of Micalden and authorized the filing of a judgment by confession and a UCC1 financing statement (the "UCC1") recording Micalden's security interest in the Shares and the Lease (the "Micalden Lien"). The UCC1 was filed on or about October 10, 2003 with the Office of the City Register of the City of New York (the "City Register") and the judgment by confession (the "Consent Judgment") was entered with the Clerk of the Supreme Court on or about October 22, 2003 under New York County Index No. 118422/03 (the "Consent Action"). The UCC1 identified the collateral as

> "…all of the debtor's interest in the Proprietary Leases
> dated July 10, 1990, for apartments 603, 601, 6M and
> 600 located at 1 West 67[th] Street, New York, NY 10023,
> and the proceeds of any sale of the Shares, transfer of
> the apartments or subsequent assignment of the Leases.

4

## The Appointment Of The Receiver And The Consent Judgment Litigation

13.  On or about December 5, 2003, the court in the Divorce Action (Supreme Court, New York County, Emily Jane Goodman, J.S.C. (the "Matrimonial Court")) entered an order appointing Harvey Fishbein, Esq. as receiver (the "Receiver") of the Apartment[1] with, among other powers, the authority to sell the Apartment (the "Receivership Order"). The Receivership Order also granted Olga's motion for "sequestration", meaning that all net proceeds of the sale of the Apartment, including the portion attributable to Olaf's equity interest, would be "sequestered" to secure Olaf's future alimony and child-support obligations to Olga.

14.  After qualifying, the Receiver obtained an order from the Matrimonial Court authorizing the retainer of Carol Lilienfeld, Esq. as his counsel and began efforts to sell the Apartment.

15.  During the period when the Receiver was trying to sell the Apartment, Olga, in an effort to maximize the net proceeds payable to her and/or available to be sequestered under the terms of the Receivership Order, began trying to remove those liens on the Apartment which had priority ahead of the Arrears Judgment and the Receivership Order, including among others the Consent Judgment.

---

[1] Of the four units which originally comprised the Apartment, Unit 600 was excluded from the receivership and subsequent sale by the Receiver of the Apartment to the Mamdani defendants because that unit was occupied not by the couple but by Olaf's brother Mathias Guerrand-Hermes ("Mathias") to whom it was transferred of record for no consideration simultaneously with the sale of the remainder of the Apartment to the Mamdanis. Subsequent references to the Apartment therefore refer only to Units 601, 603 and 6M and references to the Shares refer to the 724 shares appurtenant to those three units.

16.  On December 19, 2003, Olga, as a non-party affected by the judgment with statutory standing under applicable New York law, moved by order to show cause in the Consent Action to vacate the Consent Judgment on the ground that the entry of the Consent Judgment was designed to prevent Olga from collecting obligations due her and was therefore fraudulent as to her. Micalden contended in opposition that Micalden was a legitimate creditor of Olaf by virtue of the Micalden Loans, and that therefore the Consent Judgment, even if its effect was to prefer one legitimate creditor (Micalden) to another (Olga), was perfectly valid.

17. By decision and order dated March 17, 2004, the Matrimonial Court agreed with Olga and, without any evidentiary hearing, ordered the Consent Judgment vacated on the ground that even assuming the validity of the Micalden Loans, the court was satisfied that the real purpose of the Consent Judgment was to prevent Olga from collecting what she was and would be owed and it was therefore fraudulent as to her (the "Vacatur Order").

18.  Micalden appealed the Vacatur Order to the Appellate Division, First Department (the "Appeal"). By decision dated June 29, 2006 (the "Appellate Decision") the Appellate Division reversed the Vacatur Order and remanded the case for a hearing on the ground that the Consent Judgment could only be vacated if Olga proved, by clear and convincing evidence, that the Consent Judgment was specifically intended to defraud her, and that Olga had failed to prove that below (*Micalden Investments S.A. v. Guerrand-Hermes*,

30 A.D.3d 341, 819 N.Y.S.2d 228 (1st Dept. 2006)). Since the entry of the Appellate Decision, Olga has taken no steps to obtain such a hearing.

19.  At no time between December 2003 and June 2004 did Olga apply to any court for vacatur of the UCC1. The Vacatur Order, which contained a direction to the Clerk of the Court to vacate the Consent Judgment, did not mention the UCC1 and contained no direction of any kind to the City Register.

**The Filing Of The Unauthorized UCC3 And The Sale Of The Apartment**

20.  On or about March 30, 2004, the Receiver entered into a contract (the "Contract") to sell the Apartment to the Mamdanis for $3.925 million.

21.  On or about May 12, 2004, Olga, through her counsel Schwartz and Kronish, caused a UCC3 Termination Statement (the "UCC3") to be filed with the City Register purporting to terminate the Micalden Lien. The UCC3 identified the "Presenter" as Olga Rostropovich and the party to whom the acknowledgment of filing was to be sent as Renee Schwartz at Kronish. Under the heading "Name of Secured Party of Record Authorizing This Amendment" was written "Micalden Investments SA".

22.  The statement in the UCC3 that its filing had been authorized by Micalden was false. In truth, Micalden had never authorized the filing of the UCC3. At no time prior to the filing of the UCC3 did Olga or her counsel contact Micalden or its counsel with respect to the UCC3 or give notice to Micalden or its counsel of Olga's intent to file the UCC3 or of any legal challenge to the UCC1 or any attempt by Olga to have the UCC1 vacated.

23. Pursuant to the relevant provisions of Uniform Commercial Code ("UCC") §9-509, only Micalden was authorized to file a UCC3 terminating the Micalden Lien.

24. Micalden and its counsel were unaware of the UCC3 at the time it was filed and learned of it only when Olga moved to dismiss the Appeal as moot and then argued mootness in her appellate brief, both times in reliance on the false UCC3. Olga's mootness argument was impliedly rejected by the Appellate Division in that the Appeal was decided on the merits by the Appellate Decision, which does not mention the mootness argument.

25. The sale of the Apartment to the Mamdanis (the "Sale") closed on or about June 10, 2004 (the "Closing").

26. Upon information and belief, at the time of the Closing, the only liens on the Shares prior in time and right to the Micalden Lien were the first mortgage (the "Mortgage") and an earlier arrears judgment in Olga's favor (the "Interim Arrears Judgment") (collectively the "Prior Liens"). Upon information and belief, the amount of the Prior Liens did not exceed $2.4 million.

27. If the Micalden Lien had been paid in the order it was entitled to in the distribution of the proceeds of the Sale (the "Proceeds"), there would have been enough money to pay the Micalden Loans in their entirety, with applicable interest.

28. Upon information and belief, the portion of the Proceeds that should have been paid to Micalden was in fact paid to or for the benefit of Olga, either

pursuant to liens junior to the Micalden Lien, in payout of her equity interest or pursuant to the sequestration provision of the Receivership Order.

## COUNT I
### Declaratory Judgment

29. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28 of this complaint.

30. A justiciable controversy exists between plaintiff and defendants regarding the surviving validity of the UCC1 and the Micalden Lien after the filing of the UCC3 on May 12, 2004, in that plaintiff contends that the UCC1 and the Micalden Lien survived that filing and remain valid today, which defendants dispute.

31. Pursuant to UCC §9-510, a filed record is effective only if filed by a party authorized to file such a record pursuant to UCC §9-509.

32. UCC §9-509(d) provides in turn as follows:

(d) Person entitled to file certain amendments. A person may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement only if:

(1) the secured party of record authorizes the filing; or

(2) the amendment is a termination statement for a financing statement as to which the secured party of record has failed to file or send a termination statement as required by Section 9-513(a) or (c), the debtor authorizes the filing, and the termination statement indicates that the debtor authorized it to be filed.

33. The UCC3 here relied upon subsection (1) above in that it purported to have been authorized by the secured party, not by the debtor, but in fact it was never authorized by Micalden.

34. By reason of the foregoing, the UCC3 was ineffective as a matter of law to terminate or discharge the UCC1 and/or the Micalden Lien and Micalden is therefore entitled to a judgment declaring that the UCC1 and the Micalden Lien are valid and subsisting liens on the Apartment, the Shares and the Lease.

**COUNT II**
**Foreclosure and Sale**

35. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 34 of this complaint.

36. Pursuant to UCC §§9-604 and 9-601(a)(1) plaintiff is entitled to foreclose the Micalden Lien and the Consent Judgment and to have the Shares, the Lease and any appurtenant interests sold at auction to satisfy the debt created by the Micalden Loans and evidenced by the Consent Judgment.

37. By reason of the foregoing, plaintiff is entitled to a judgment of foreclosure providing for the appointment of a referee to compute the principal and interest due under the Micalden Loans as embodied in the Consent Judgment (the "Current Debt") and directing the referee to sell the Shares, Lease and any appurtenant interest to satisfy said debt, and to remit to Micalden the net proceeds of such sale up to the full amount of the Current Debt as of the date of sale.

## COUNT III
## Unjust Enrichment

38.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 37 of this complaint.

39.  By causing the filing of the unauthorized UCC3 and by then receiving money from the Proceeds of the Sale that should rightfully have gone to Micalden, Olga has been unjustly enriched.

40.  By reason of the foregoing, Micalden is entitled to a money judgment against Olga in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing.

## COUNT IV
## Impairment of Collateral

41.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 40 of this complaint.

42.  The filing of the unauthorized UCC3 by Olga, Schwartz and Kronish impaired Micalden's collateral by making it appear that the Micalden Lien had been discharged and caused the Proceeds of the Sale to be distributed in derogation of Micalden's lawful priority.

43.  By reason of the foregoing, Olga, Schwartz and Cooley are jointly and severally liable to Micalden in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing.

44.  Because the filing of the unauthorized UCC3 was a fraudulent act, plaintiff is also entitled to punitive damages in the amount of $12.5 million.

<u>**COUNT V**</u>
<u>**Fraud**</u>

45.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 44 of this complaint

46.   By filing the false UCC3, Olga, Schwartz and Kronish falsely represented to the City Register and to the public that they represented, or had authority to act on behalf of, Micalden in filing the UCC3 (the "False Representation")   Olga, Schwarz and Kronish knew the False Representation to be false when made.

47.   Olga, Schwartz and Kronish made the False Representation for the purpose of inducing the clerk of the City Register to accept their filing of the unauthorized UCC3, as well for the purpose of fraudulently deceiving prospective purchasers of the Apartment into believing that the Apartment could be purchased free of the lien of the UCC1.

48.   The clerk of the City Register relied on the False Representation in accepting the fraudulent UCC3 for filing and the Mamdanis, their counsel, their title company, the Receiver and the Receiver's counsel all relied on the apparent authenticity of the UCC3 and were deceived into believing that the Apartment was unencumbered by the UCC1 at the time of the Closing.

49.   Olga, Schwartz and Kronish intentionally concealed their filing of the fraudulent UCC3 from Micalden, which continued to believe that its interest was protected by the UCC1.   Micalden relied on the continuing viability of the UCC1 by failing to take legal action to protect its interest which it otherwise would have taken had it known of the fraudulent UCC3 filing.

50.  By virtue of the fraud perpetrated by Olga, Schwartz and Kronish, the Closing took place without any payment being made to satisfy the Micalden Loans.

51.  But for the fraud of Olga, Schwartz and Kronish, the Closing would not have occurred without payment of the Micalden Loans.

52.  By virtue of the foregoing, Olga, Schwartz and Kronish are jointly and severally liable to Micalden in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing.

53.  Because the fling of the unauthorized UCC3 was a flagrantly dishonest act aimed not only at Micalden but also at the public, plaintiff is further entitled to punitive damages in the amount of $12.5 million.

WHEREFORE plaintiff demands that this Court enter judgment in its favor as follows:

A) On Count I, declaring that the UCC1 and the Micalden Lien are valid and subsisting liens on the Apartment, the Shares and the Lease;

B) On Count II, directing the appointment of a referee to compute the principal and interest due under the Micalden Loans as embodied in the Consent Judgment (the "Current Debt") and directing the referee to sell the Shares, Lease and any appurtenant interest to satisfy said debt, and to remit to Micalden the net proceeds of such sale up to the full amount of the Current Debt as of the date of sale;

C) On Count III, granting plaintiff a money judgment against Olga in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing;

D) On Count IV, granting plaintiff a money judgment against Olga, Schwartz and Cooley jointly and severally in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing and punitive damages in the amount of $12.5 million;

E) On Count V, granting plaintiff a money judgment against Olga, Schwartz and Cooley jointly and severally in an amount to be determined at trial, consisting of a principal amount in excess of $1.391 million, plus interest accrued and accruing and punitive damages in the amount of $12.5 million; and

F) Granting plaintiff such other relief as the Court may deem just and proper.

Dated: New York, New York
      September 11, 2007

/s/   Edward Rubin

_____
EDWARD RUBIN (ER-8843)
477 Madison Avenue
New York, New York 10022
(212) 888-7300

MICHAEL SCHNEIDER (MS-4555)
477 Madison Avenue
New York, New York 10022
(212) 888-2100

*Attorneys for Plaintiff*